```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                  )
     United States of America,      )   File No. 14-364
 4                                  )            (RHK/FLN)
               Plaintiff,           )
 5                                  )
     vs.                            )   Minneapolis, Minnesota
 6                                  )   February 18, 2015
     (1) Veltrez Black,             )   9:30 a.m.
 7   (2) Tywin Bender,              )
     (3) Nitelen Jackson,           )
 8   (4) Dontevius Catchings,       )
     (5) Cinque Owens,              )
 9   (7) Darryl Parker,             )
     (8) Marquis Woods,             )
10   (9) Marques Armstrong,         )
     (10) Deontay Jones,            )
11   (11) Lakesha Coleman,          )

12           Defendants.
     ------------------------------------------------------------
13
                         BEFORE THE HONORABLE
14                        FRANKLIN L. NOEL
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15                       (MOTION HEARING)

16   APPEARANCES
       For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
17                               Jeffrey S. Paulsen, AUSA
                                 600 U.S. Courthouse
18                               300 South Fourth Street
                                 Minneapolis, MN 55415
19
       For Defendant Black:      DORSEY & WHITNEY LLP
20                               R.J. Zayed, ESQ.
                                 David Couillard, ESQ.
21                               Kristin K. Zinsmaster, ESQ.
                                 50 South Sixth Street
22                               Suite 1500
                                 Minneapolis, MN 55402
23
       For Defendant Bender:     PAUL ENGH LAW OFFICE
24                               Paul C. Engh, ESQ.
                                 220 South Sixth Street
25                               Suite 1225
                                 Minneapolis, MN 55402
```

```
 1      For Defendant Jackson:      WOLD MORRISON LAW
                                    Peter B. Wold, ESQ.
 2                                  Aaron Morrison, ESQ.
                                    247 Third Avenue South
 3                                  Minneapolis, MN 55415

 4      For Defendant               LAW OFFICES OF THOMAS SHIAH
        Catchings:                  Thomas H. Shiah, ESQ.
 5                                  247 Third Avenue South
                                    Minneapolis, MN 55415
 6
        For Defendant Owens:        F. CLAYTON TYLER
 7                                  F. Clayton Tyler, ESQ.
                                    331 Second Avenue South
 8                                  Suite 230
                                    Minneapolis, MN 55401
 9
        For Defendant Parker:       GOETZ & ECKLAND PA
10                                  Frederick J. Goetz, ESQ.
                                    43 Main Street SE
11                                  Suite 505
                                    Minneapolis, MN 55414
12
        For Defendant Woods:        ROBERT D. RICHMAN LAW
13                                  Robert D. Richman, ESQ.
                                    P.O. Box 16643
14                                  St. Louis Park, MN 55416

15      For Defendant               GASKINS, BENNETT, BIRRELL,
        Armstrong:                  SCHUPP, LLP
16                                  Andrew S. Birrell, ESQ.
                                    333 So. 7th Street
17                                  Suite 2900
                                    Minneapolis, MN 55402
18
        For Defendant Jones:        MITCHELL BRUDER & JOHNSON
19                                  Glenn P. Bruder, ESQ.
                                    7505 Metro Boulevard
20                                  Suite 325
                                    Edina, MN 55439
21
        For Defendant Coleman:      Thomas C. Plunkett, ESQ.
22                                  101 E. Fifth Street
                                    Suite 1500
23                                  St. Paul, MN 55101

24

25
```

1           Court Reporter:              STACI A. HEICHERT,
2                                        RDR, CRR, CBC, CCP
                                         1005 U.S. Courthouse
3                                        300 South Fourth Street
                                         Minneapolis, Minnesota 55415
4

5           Proceedings recorded by mechanical stenography;
6     transcript produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3                    THE COURT:  Okay.  This is the United States

4          versus Veltrez Black, et al.

5                    Let's get everybody's appearance on the record,

6          for the government.

7                    MR. PAULSEN:  Jeff Paulsen on behalf of the United

8          States.  With me at the counsel table is Special Agent

9          Kathryn Singer of ATF.

10                   THE COURT:  Okay.  For Mr. Black.

11                   MR. ZAYED:  Good morning, Your Honor.  R.J. Zayed,

12         Kristin Zinsmaster and David Couillard on behalf of

13         Mr. Black.

14                   THE COURT:  Okay.  For Mr. Jackson.

15                   MR. WOLD:  Good morning, Your Honor.  Peter Wold

16         with Aaron Morrison on behalf of Mr. Jackson.

17                   THE COURT:  Okay.  Mr. Catchings.

18                   MR. SHIAH:  Good morning, Your Honor.  Tom Shiah

19         on behalf of Mr. Catchings who is seated over there in the

20         box.

21                   THE COURT:  Mr. Owens.

22                   MR. TYLER:  Good morning, Your Honor.  F. Clayton

23         Tyler on behalf of Mr. Owens who is present in the

24         courtroom.

25                   THE COURT:  And for Mr. Parker.

1          MR. GOETZ:  Frederick Goetz, Your Honor.

2    Mr. Parker is also present.

3          THE COURT:  Mr. Woods.

4          MR. RICHMAN:  Robert Richman for Mr. Woods.  He is

5    also present.  He's right here in the upper corner.

6          THE COURT:  Okay.  For Mr. Armstrong.

7          MR. BIRRELL:  Andy Birrell, Your Honor.  Good

8    morning.  Mr. Armstrong is here in shackles in the jury box.

9          THE COURT:  Mr. Jones.

10          MR. BRUDER:  Good morning, Your Honor.  My name is

11   Glenn Bruder.  Last name spelled B-R-U-D-E-R.  I'm appearing

12   on behalf of Mr. Jones who is seated at counsel table to my

13   right.

14          THE COURT:  Okay.  And Ms. Coleman.

15          MR. PLUNKETT:  Good morning, Your Honor.  Thomas

16   Plunkett on behalf of Ms. Coleman who is seated on my left.

17          THE COURT:  Okay.  Okay.  So the first matter is

18   we met in chambers earlier to discuss the logistics of the

19   defendants in custody in the courtroom.  The marshals had

20   requested that if we're going to have all seven defendants

21   who are in custody in the courtroom at the same time that

22   they be subject to restraints.  I considered that and

23   granted the marshals' request, and I believe somebody or all

24   of you wanted to make a record regarding that.  Mr. Shiah.

25          MR. SHIAH:  Thank you, Your Honor.  I was present

1    when we had the discussion in chambers.  I told you

2    depending on what your decision was I wanted to make a

3    record.  I understand some of the logistics, but I don't

4    understand all of the concerns, and on behalf of my client,

5    Mr. Catchings, I'm objecting to the fact he's shackled,

6    absent some showing that he's a risk or a threat to the

7    proceedings in this courtroom.

8                    THE COURT:  Okay.  Mr. Zayed.

9                    MR. ZAYED:  Good morning, Your Honor.  R.J. Zayed

10   on behalf of Veltrez Black.  I join in Mr. Shiah's motion.

11                   I also move to sever this motions hearing.  The

12   logistics have made it impossible for me to meaningfully

13   represent Mr. Black with me seated in the first row in the

14   courtroom and Mr. Black being put in the jury box at a great

15   distance from us, so during the testimony I'm not going to

16   be able to confer with him with respect to what the events

17   are.  The government's going to call at least five witnesses

18   directly related to Mr. Black on his various motions to

19   suppress, and I believe my inability to communicate with him

20   is a denial of his due process rights, so I move for

21   severance of the motions hearing.

22                   THE COURT:  Okay.  Well, hold on a second, before

23   we get -- I guess I'm not sure why you're sitting where you

24   are as opposed to the whole -- it appears to me a bench in

25   front here.

 1            MR. ZAYED:  That's because the marshals indicated

 2    not to sit in that first pew.

 3            THE COURT:  Oh.  Who is in charge of the marshals?

 4            THE MARSHALL:  They can sit in that row.  That's

 5    fine, Judge.

 6            THE COURT:  Have a seat.

 7            MR. ZAYED:  Thank you.

 8            THE COURT:  Anybody else want to make a record

 9    regarding logistics?

10            MR. BIRRELL:  Yes, Your Honor.

11            THE COURT:  Mr. Birrell.

12            MR. BIRRELL:  Good morning, Your Honor.  On behalf

13    of Mr. Armstrong, I join Mr. Zayed's motion.  Thank you.

14            THE COURT:  Mr. Tyler.

15            MR. TYLER:  On behalf of Mr. Owens, I join in

16    Mr. Shiah's motion also, Your Honor.

17            THE COURT:  Mr. --

18            MR. GOETZ:  Frederick Goetz for Mr. Parker, Your

19    Honor.  We join in Mr. Shiah's motion.  I would just note

20    there's been no history of any kind of disruptive behavior

21    on the part of my client, Mr. Parker.

22            THE COURT:  Okay.

23            MR. WOLD:  And on behalf of Mr. Jackson, we join

24    too, Your Honor.

25            MR. RICHMAN:  I also object on behalf of Mr. Woods

1    to the shackles.  Thank you, Your Honor.

2              THE COURT:  Okay.  Does the government have a

3    position, Mr. Paulsen?

4              MR. PAULSEN:  Your Honor, as we've spoken in

5    chambers, the alternative was to bring the defendants up in

6    groups of three at a time without shackles, and the

7    consensus was that wouldn't be appropriate because this is a

8    conspiracy case and all of the defense attorneys, I think

9    almost all of them, said they wanted a joint hearing so

10   their clients could hear all of the evidence, and I agree

11   with that.

12             Having said that, though, I understand the

13   marshal's security concerns.  We have a very crowded

14   courtroom today.  The detention orders in this case that are

15   on file, I won't go into the details, but they support the

16   need for restraints.  There's no jury present, so there's no

17   prejudice.  And for those reasons, the Court's procedure is

18   appropriate.

19             THE COURT:  Okay.  Everybody's objection is noted.

20   I have made the decision I have made.  The defendants are

21   where they are.

22             If there's an issue -- I guess I would say this,

23   if there's an issue regarding communication with clients,

24   who made that argument, Mr. Zayed?

25             MR. ZAYED:  Yes, Your Honor.

1          THE COURT:  Bring it to my attention as we're

2     doing it.  I don't -- I'm not -- I don't think there should

3     be any restrictions on your communications, so if you need

4     to chat with your client during the course of testimony, I

5     don't see that there's any problem in your doing that.

6          MR. ZAYED:  I appreciate that, Your Honor.  And if

7     I may, Your Honor, may I provide him with a blank notepad

8     and a pen such that he can write down notes?

9          THE COURT:  Absolutely.

10          MR. ZAYED:  Thank you.

11          THE COURT:  All right.  With that, what I would

12     suggest, each -- each defendant has several motions pending

13     here.  I understand that a number of the motions do require

14     testimony.  Let's start with those motions that require

15     testimony and then we will at the end address the

16     non-dispositive motions that are not dependent on individual

17     testimony.  Mr. Paulsen.

18          MR. PAULSEN:  Your Honor, the first issue goes to

19     overt act 12 in the Indictment.  You're going to be hearing

20     about a search warrant conducted at an address on Girard

21     Avenue North on December 12th, 2013.  It's my

22     understanding -- and this goes to Mr. Black.  He was

23     arrested there and some items were seized from him.  I am

24     told by Mr. Zayed, and I'd like confirmation on the record,

25     that he's not challenging the search warrant per se.  I

1    believe he -- I don't think he is claiming he has standing

2    to challenge the search warrant.  So I think I will offer

3    the search warrant just as an exhibit for background

4    purposes and to prove that there was a search warrant, but

5    it's not being challenged is my understanding.

6              THE COURT:  Mr. Zayed.

7              MR. ZAYED:  That's correct, Your Honor.  We're not

8    challenging the search warrant.  However, we are challenging

9    the arrest for lack of probable cause.  We're also seeking

10   to suppress anything resulting from the arrest as a fruit of

11   the poisonous tree, any and all statements, any and all

12   evidence that was subsequent to that.

13             THE COURT:  I'm sorry.  Say that again.  So you

14   say there's no probable cause to the arrest?

15             MR. ZAYED:  That's correct.

16             THE COURT:  And was there some -- was there a

17   follow-up to that that I missed?

18             MR. ZAYED:  Yes, Your Honor, based on that arrest,

19   that led to statements that Mr. Black made later on in a

20   court proceeding in state court, and I believe that those

21   statements in the state proceeding are the fruits of the

22   poisonous tree and should be suppressed, so the issue before

23   the Court is the lack of probable cause to arrest Mr. Black

24   on December 12th.

25             THE COURT:  Were there other fruits of the arrest,

1     physical things, or is it just the statements that are the

2     subject of the suppression motion?

3                MR. PAULSEN:  He had some marijuana on his person

4     and some money.  I think it was 700 -- $673.

5                MR. ZAYED:  So we would be seeking to suppress

6     those as well.

7                THE COURT:  Okay.  Before we begin the testimony,

8     it just occurs to me that we should also, as part of the

9     record regarding the security issue, the record should

10    reflect that defense counsel, many of the defense counsel,

11    not all of them, have moved to the front of the courtroom.

12    I've made the statement I have regarding anybody need to

13    communicate with their client.

14                And the record should reflect that there are

15    several, I can't count them all, but there's a large group

16    of spectators in the courtroom in addition to the courtroom

17    court security officers as well as several United States

18    Marshals in the courtroom.

19                Okay.  Anything else, Mr. Zayed --

20                MR. ZAYED:  No, Your Honor.

21                THE COURT:  -- before we hear testimony?  Okay.

22    Thank you.

23                Mr. Paulsen, do you want to call your witness?

24                MR. PAULSEN:  The government calls Officer George

25    Peltz.

STACI A. HEICHERT, RDR, CRR, CBC, CCP
(612) 664-5105

Peltz - Direct

```
 1              THE COURT:  Do you want to come forward and get

 2     sworn in, please, sir.

 3          (The witness is sworn.)

 4              THE COURT:  Have a seat, state your name and spell

 5     your last name for the court reporter, please.

 6              THE WITNESS:  George John Peltz, P-E-L-T-Z.
```

**DIRECT EXAMINATION**

```
 8     BY MR. PAULSEN:

 9     Q.  By whom are you employed?

10     A.  Excuse me?

11     Q.  Who do you work for?

12     A.  City of Minneapolis.

13     Q.  And you're a police officer?

14     A.  Yes, I am.

15     Q.  For how long?

16     A.  Twenty years with Minneapolis.

17     Q.  I want to take you back to December 12th of 2013.  Did

18     you execute a search warrant that day at 3111 Girard Avenue

19     North in Minneapolis?

20     A.  Yes, I did.

21              MR. PAULSEN:  And, Your Honor, at this time I

22     offer Government Exhibit 22 which is a copy of that search

23     warrant, again, with the understanding that the warrant is

24     not being challenged, this is just for background purposes.

25              THE COURT:  Okay.  Any objections?
```

Feliz - Direct

1          MS. ZINSMASTER:  No, Your Honor.

2          THE COURT:  Hearing no objection, Exhibit 22 will

3     be received.

4          (Government Exhibit No. 22 is received.)

5     BY MR. PAULSEN:

6     Q.  We're going to be talking about the arrest inside this

7     address of a Mr. Veltrez Black and some property taken from

8     him.  In support of that arrest, can you tell us some of the

9     circumstances that led up to this search warrant?

10    A.  Through informant information, I was advised that

11    specific parties were gathering at that address and that

12    weapons and ammunition were being stored there and that a

13    group would be present on that night.

14    Q.  Okay.  And was Mr. Black said to be one of the people

15    that would be present?

16    A.  Yes.

17    Q.  And were these people alleged to be members of any

18    organization?

19    A.  Yes.

20    Q.  Which group?

21    A.  1-9 Dipset.

22    Q.  The 1-9 gang?

23    A.  Yes.

24    Q.  Okay.  And were you familiar with that gang back then?

25    A.  Yes.

Feliz - Direct

1    Q.  In fact, just prior to the execution of this search

2    warrant, had something happened at that same house about a

3    week earlier?

4    A.  Yeah.  A little over a week prior to that, some officers

5    were dispatched to a robbery and they chased a suspect into

6    that address and a firearm was recovered.

7    Q.  In that -- inside that same house?

8    A.  Yes.

9    Q.  And who was that suspect in the robbery that got chased

10   into this house?

11   A.  One of the defendants here today.

12   Q.  Named?

13   A.  Armstrong.

14   Q.  Marques Armstrong?

15   A.  Yes.

16   Q.  So that was a week before this search warrant, right?

17   A.  Correct.

18   Q.  Was there also an incident that had happened about five

19   weeks prior to the execution of this search warrant?

20   A.  Yes.

21   Q.  What was that?

22   A.  A homicide in downtown Minneapolis.

23   Q.  Who was the murder victim?

24   A.  Last name I believe was Jack -- I'd have to look on that

25   one.  I didn't have that.

1    Q.  Did he go by a nickname?

2    A.  Yes.

3    Q.  Which was?

4    A.  Knew him as Ty Crack.

5    Q.  Ty Crack.  Would it be Tyrone Washington?

6    A.  Yes, that would be him.

7    Q.  And what do you know about Tyrone Washington, was he a

8    member of this gang?

9    A.  At the time he had been reported as the leader of the

10   gang.

11   Q.  And he had been murdered at a nightclub downtown --

12   A.  Yes.

13   Q.  -- five weeks earlier?

14   A.  Yes.

15   Q.  Okay.  So was there any concern that these people might

16   be planning some sort of retaliation?

17   A.  Yes.

18   Q.  And you had information that they were in this house

19   with guns?

20   A.  Yes.

21   Q.  So you got the search warrant, you went into the house,

22   and before we get to Mr. Black, tell us what, in general,

23   you found during the search of this house at 3111 Girard

24   Avenue North?

25   A.  During the search, there were numerous occupants, male

Feliz - Direct

```
1    and female.  Officers that were conducting the search
2    informed me of areas where they were finding firearms which
3    were photographed and then recovered.
4    Q.  How many firearms were found in this house?
5    A.  Seven total.
6    Q.  And can you tell us, in general, where they were found
7    throughout the house?
8    A.  One was found in the I guess the west back bedroom.  Two
9    were found in a box under the basement stairs.  One firearm
10   was in the rafters in the basement.  And then three firearms
11   were recovered in a built-in like hutch or cabinet in the
12   dining room area.
13   Q.  So seven guns.  Was there any money seized during the
14   execution of this search warrant?
15   A.  There was money.  Actually, the majority, I believe, of
16   the money came from a vehicle that was outside in front of
17   the address at that time.
18   Q.  And your report indicates that how much total money was
19   recovered?
20   A.  I believe on the vehicle in the area of I think $8,000.
21   I'd have to check my report to verify that.
22   Q.  Okay.  I'm looking at about the sixth paragraph of your
23   report.  I see a reference to $9,418.
24   A.  Yes.  I believe that was from two parties.
25   Q.  Okay.  And some of that was from the vehicle and then
```

Feliz - Direct

1    some of it was from arrested person number five who I think

2    is Ray James?

3    A.  Yes.

4    Q.  All right.  And were there any controlled substances

5    found during this execution of this search warrant?

6    A.  Yes, marijuana was recovered.

7    Q.  So you had guns, drugs and money?

8    A.  Yes.

9    Q.  Now let's talk about Veltrez Black.  Was he one of the

10   persons that was in this house?

11   A.  Yes, he was.

12   Q.  And was he frisked incident to arrest?

13   A.  Yes.

14   Q.  And do you know what he had on him?

15   A.  I was informed that he had a quantity of marijuana that

16   was recovered from his person.

17   Q.  And did he have any money on him?  Second to the last

18   paragraph on page 1.

19   A.  Second to last.

20   Q.  Maybe your pages are different than mine.

21            MR. PAULSEN:  May I approach, Your Honor?

22            THE COURT:  Sure.

23   BY MR. PAULSEN:

24   Q.  Right here.

25   A.  That does not coincide.

1    Q.  You can use mine if the pages are different.

2    A.  Yeah, an amount of $673 was recovered from the jacket

3    that belonged to AP2 Black.

4    Q.  Now, is it standard procedure for these guns recovered

5    in situations like this to be checked under NIBIN?

6    A.  NIBIN?

7    Q.  NIBIN, N-I-B-I-N?

8    A.  Yes.

9    Q.  Okay.  And do you know whether these guns were checked

10   under NIBIN?

11   A.  Yes, they were.

12   Q.  And the purpose of NIBIN, that's I think it's a National

13   Integrated Ballistic Information Network?  Pardon?  Yeah,

14   something like that, the purpose is to see whether the guns

15   had been used in any prior shootings?

16   A.  Yes.

17           MR. PAULSEN:  Okay.  And there will be another

18   witness on that besides you, but that's all I have for this

19   witness at this time, Your Honor.

20           THE COURT:  Okay.  Mr. Zayed.

21           MR. ZAYED:  Your Honor, if we may have a moment to

22   confer with Mr. Black?

23       (Counsel conferred.)

24           MS. ZINSMASTER:  Your Honor, Kristin Zinsmaster of

25   Dorsey & Whitney.  I'm appearing on behalf of Mr. Zayed.

1           **CROSS-EXAMINATION**

2      BY MS. ZINSMASTER:

3      Q.  And Officer Peltz, I have a couple of questions for you,

4      once again returning to the evening of December 12th, 2013.

5      So first of all, let me just ask you what you have in front

6      of you.  Have you got your report?

7      A.  Yes.

8      Q.  And you're reading from your report?

9      A.  Yes.

10     Q.  Have you got anything else up there?

11     A.  A copy of the search warrant and the inventory.

12     Q.  Got it.  Thank you.  You talked about with Mr. Paulsen

13     an incident a week earlier where someone was chased into the

14     residence at 3111 Girard, is that right?

15     A.  Yes.

16     Q.  And Veltrez Black was not involved in that incident one

17     week prior to the execution of this search warrant, correct?

18     A.  I don't believe so, no.

19     Q.  And we heard Mr. Paulsen ask you about a homicide five

20     weeks earlier of a person by the name of Tyrone Washington?

21     A.  Correct.

22     Q.  And that person was not involved in -- or not present at

23     3111 Girard at any time that you know of, is that correct?

24     A.  I wouldn't know that.

25     Q.  Okay.  When you executed a search warrant on

```
 1    December 12th, 2013, and you found seven weapons, you didn't

 2    find any on Mr. Black's person?

 3    A.  I did not.

 4    Q.  And, in fact, you found them, you said, in a west back

 5    bedroom and in a basement, is that right?

 6    A.  Yes.  Yes.

 7    Q.  And Mr. Black wasn't in the back bedroom or the basement

 8    when the officers entered the home?

 9    A.  He was not.

10    Q.  Where was he?

11    A.  I believe he was in the dining room area.

12    Q.  Got it.  And we talked about some guns in the dining

13    room area.  Those guns were in a drawer, is that right?

14    A.  Yeah, they were in a built-in cabinet in I believe two

15    different drawers.

16    Q.  Sure.  Those drawers were shut?

17    A.  Yes.

18    Q.  I understand that you didn't conduct the frisk of

19    Mr. Black but that one of the officers executing the search

20    warrant with you did?

21    A.  Yes.

22    Q.  And that you know the results of that frisk?

23    A.  Yes.

24    Q.  And he had a small quantity of marijuana in his pocket,

25    is that right?
```

1    A.  Yes.

2    Q.  And some money in his pocket?

3    A.  I believe so, yes.

4    Q.  But you didn't arrest him on December 12th for

5    possession of the marijuana or for possession of the money,

6    is that right?

7    A.  No.

8    Q.  You testified that there was a jacket on the ground in

9    the dining room, correct?

10   A.  There was a jacket recovered, yes.

11   Q.  And what was in that jacket?

12   A.  I believe there was a quantity of marijuana in the

13   jacket.

14   Q.  And what did you do to determine that that jacket was

15   Mr. Black's, as you testified?

16   A.  I believe that was told to me by the officer that

17   searched him.

18   Q.  What did that officer do to determine that that jacket

19   was Mr. Black's?

20   A.  I think you'll have to talk to them.  I don't have that

21   information.

22   Q.  And you don't actually know whether that jacket belonged

23   to Mr. Black, am I right?

24   A.  I was told that at the scene.

25   Q.  Do you remember who told you that?

1    A.  It would be Officer Creighton.

2    Q.  C-R-E-I-G-H-T-O-N?

3    A.  Yes.

4    Q.  And which agency is Officer Creighton with?

5    A.  Minneapolis Police Department.

6    Q.  I want to talk a little bit about the basis for your

7    being at the house at 3111 in the first place.  You said an

8    informant gave you the information that suggested that

9    something was going on.

10   A.  Yes.

11   Q.  How -- how did you determine the reliability of that

12   informant's statement to you?

13   A.  I was able to verify specific information they provided,

14   and they had provided information in a continuing manner of

15   this case.

16   Q.  How many times?

17   A.  I don't have an exact count.

18   Q.  Is this a person that you work with a lot?

19   A.  Yes.

20   Q.  What did you do to verify this person's information?

21   A.  I did surveillance on the address, went through photo

22   identification of the parties that they had spoke to me

23   about and just continued information of possible retaliation

24   they talked about for the murder of their suspected leader.

25   Q.  And how many times did you conduct surveillance on this

1    property?

2    A.  Three to four times I would say.

3    Q.  Over a span of days or on the same day?

4    A.  Over a span of days.

5    Q.  What did you see?

6    A.  I did see persons arriving and leaving.  I believe I saw

7    Veltrez Black leaving the address and walking away from it

8    and I saw Hakeem Flax, a defendant not here today, as a

9    party that the CRI mentioned also arriving at that address.

10   Q.  Said you believe you saw my client, Mr. Black.  Can you

11   tell me anything more, anything else specific about when you

12   saw him leaving?  How many times you saw him there?

13   Anything?

14   A.  Just the one time I saw a male that looked like Veltrez

15   Black.

16   Q.  Did anything that you found in that house bear

17   Mr. Black's name, any letters, any papers, anything like

18   that?

19   A.  As far as resident, no.

20   Q.  And as far as him having any connection to that house

21   whatsoever, did you find anything other than his person?

22   A.  His presence, no.

23            MS. ZINSMASTER:  I think that's all I have, Your

24   Honor.  May I have a couple of seconds just to make sure

25   that that's it?

```
 1                    THE COURT:  Sure.

 2                    MS. ZINSMASTER:  Thank you.

 3             (The defendant conferred with his attorneys.)

 4                    MS. ZINSMASTER:  One more question, and I'll be

 5        very brief.

 6        BY MS. ZINSMASTER:

 7        Q.  Did you show your informant a photo line-up?

 8        A.  Yes.

 9        Q.  And whose photographs were in that line-up?

10        A.  The defendant's photograph.

11        Q.  There's a lot of them here.  Which defendant?

12        A.  Veltrez Black.

13        Q.  And what did that informant say about Mr. Black's photo?

14        A.  That that was the person that they knew as Chief" and

15        that he would be present at that address.

16        Q.  Was the person unsure about -- was your informant unsure

17        about anything related to that photo, or was he or she

18        positive that that was my client, Mr. Black?

19        A.  They were positive.

20                    MS. ZINSMASTER:  I have no further questions.

21        Thank you very much.

22                    THE COURT:  When you executed the search warrant,

23        how many people were in the house?

24                    THE WITNESS:  I believe there ended up being a

25        total of 11, possibly more with some children.
```

```
 1              THE COURT:  And was everyone in the house frisked?

 2              THE WITNESS:  Yes, I believe that's so.

 3              THE COURT:  Okay.  All right.  Anything else,

 4      Mr. Paulsen?

 5              MR. PAULSEN:  Yes.

 6              THE COURT:  I'm sorry, before we do that, any

 7      other defendant have any questions?  I didn't hear any

 8      testimony relating to anybody other than Mr. Black, but just

 9      to make sure I'm clear if anybody has any questions.

10              Seeing none, Mr. Paulsen.

11              MR. PAULSEN:  The record should reflect that

12      Officer Creighton who actually frisked Mr. Black was here

13      ready to testify but I was told that by defense counsel that

14      they didn't need him to testify so that's why I didn't call

15      him.

16                      REDIRECT EXAMINATION

17      BY MR. PAULSEN:

18      Q.  Let's talk about some of the other people that were

19      present.  Were there any other 1-9 gang members present?

20      A.  Yes, Ashimiyu Alowonle.

21      Q.  You're going to have to spell that, I think, for the

22      court reporter.  I've got it right here.  A-S-H-I-M-I-Y-U,

23      first name and last name, A-L-O-W-O-N-L-E.  Does that sound

24      right?

25      A.  Yes.
```

Feitz - Redirect

1    Q.  Okay.  And does that person have a nickname?

2    A.  "Cash."

3    Q.  And any other 1-9 gang members present?

4    A.  Besides the defendants, Deontae Jackson, known as Leaf,

5    an associate Lamont Charles McGee who had given a false name

6    due to a I believe he had a felony warrant at that time and

7    another person identified there was Omar Rush who was also a

8    believed associate or a member of 1-9.

9    Q.  Okay.  And you were asked -- well, and did you determine

10   that Mr. Black had a prior felony conviction, at least one?

11   A.  Yes.

12   Q.  And so what was he arrested for at the conclusion of

13   this search warrant?

14   A.  Probable cause weapons.

15   Q.  Felon in possession of a firearm?

16   A.  Yes.

17   Q.  Okay.  And were -- wasn't Cash also a convicted felon as

18   well as a 1-9 gang member?

19   A.  Yes.

20   Q.  And how about the other one, Deontae Jackson?

21   A.  I don't believe he was a convicted felon.

22   Q.  Okay.  And you, yourself, had seen Mr. Black coming out

23   of this house prior to executing the search warrant?

24   A.  Yes.

25   Q.  And that was how long before?

Feltz - Redirect

```
 1    A.  I believe within the week.
 2              MR. PAULSEN:  No further questions.
 3              THE COURT:  Thank you.  You're excused.  Next
 4    witness.
 5              MR. PAULSEN:  Next witness is Andrew Suerth,
 6    Detective Andrew Suerth.
 7              THE COURT:  Do you want to come forward and get
 8    sworn in, please, sir.
 9              THE WITNESS:  Yes, sir.
10         (The witness is sworn.)
11              THE COURT:  Have a seat.  State your name and
12    spell your last name for the court reporter, please.
13              THE WITNESS:  Sure.  Andrew Suerth, S-U-E-R-T-H.
14                      DIRECT EXAMINATION
15    BY MR. PAULSEN:
16    Q.  Detective Suerth, by whom are you employed?
17    A.  The City of Brooklyn Park.
18    Q.  And how long have you been with the Brooklyn Park Police
19    Department?
20    A.  I was hired in May of 2003.
21              MR. PAULSEN:  Your Honor, for the record, this is
22    related to Mr. Black.  It's going to be an incident on
23    April 22nd of 2014 which is Count 2 of the Indictment.
24    You're going to hear about an arrest, attempted arrest, a
25    chase and a recovery of an abandoned firearm.
```

1    BY MR. PAULSEN:

2    Q.  So Detective Suerth, on April 22nd of 2014, did

3    you -- were you participating, trying to participate in the

4    arrest of Veltrez Black?

5    A.  Yes.

6    Q.  And what was the basis for the arrest?

7    A.  An arrest warrant for a violation of conditional

8    release.

9             MR. PAULSEN:  May I approach, Your Honor?

10             THE COURT:  Sure.

11   BY MR. PAULSEN:

12   Q.  Showing you what's been marked as Government Exhibit 4,

13   is that the arrest warrant?

14   A.  No, this is not the right one.

15   Q.  That's not the right one, is it?  You're right.  I

16   pulled out the wrong exhibit.  Let me find the right one.

17   Here it is.  All right.  I was showing you the federal

18   arrest warrant that comes later.  How about this one,

19   Exhibit 4.

20   A.  Yeah, that's the arrest warrant that we were trying to

21   locate him for.

22             MR. PAULSEN:  Offer 4.

23             THE COURT:  Any objection?

24             MR. COUILLARD:  No objection.

25             THE COURT:  Exhibit 4 will be received.

Guelich - Direct

1          (Government Exhibit No. 4 is received.)

2     BY MR. PAULSEN:

3     Q.  So it says that apparently he had been out on pre-trial

4     release in another case?

5     A.  Correct.

6     Q.  And it says here that "the failure to abide by no

7     contact with known gang members, failure to remain

8     law-abiding, and it was based on probation notified that

9     defendant was in contact with known gang members on

10    March 17th of 2014.  Defendant cited and released for"

11    what's that, marijuana in motor vehicle?

12    A.  Yes.

13    Q.  "And DAR.  Police report reflects known gang member was

14    the other occupant in vehicle during traffic stop."  So that

15    warrant came out April 22, 2014?

16    A.  Yes.

17    Q.  And on that same day did you go to try to arrest

18    Mr. Black?

19    A.  Yes, I did.

20    Q.  And where did you go?

21    A.  I went to the Willows apartment complex in Brooklyn Park

22    which is 67th and -- Douglas and 67th area.

23          MR. PAULSEN:  And I just noticed what I did wrong,

24    Your Honor.  I -- Exhibit 1 should have been the, according

25    to the Exhibit list, should have been this warrant and I

Suetch - Direct

```
 1    accidentally picked up Exhibit 4 earlier.  So if I could
 2    just, so that we can conform to my exhibit list, if we could
 3    rename this exhibit that I just introduced as Exhibit 1
 4    which is the April 22, 2014, warrant, and then I'll be back
 5    on track.
 6                 THE COURT:  Hold on one second.  Let me orient
 7    myself.  So Exhibit 1, so what you've just -- what I just
 8    admitted as Exhibit 4 you wish to now call Exhibit 1, is
 9    that correct?
10                 MR. PAULSEN:  Yes, I had just picked up the wrong
11    one.  Exhibit 4 is a different arrest warrant for Mr. Black.
12    That comes later.  So just so we can keep this straight with
13    my exhibit list, if we call this April 22, 2014, warrant
14    Exhibit 1, then we'll be back on track.
15                 THE COURT:  And you've done that on the --
16                 MR. PAULSEN:  I actually have it right here.
17                 THE COURT:  Okay.  Any objection to that?
18                 MR. COUILLARD:  No objection.
19                 THE COURT:  Okay.  So Exhibit 1 now -- strike
20    that.  What was admitted as Exhibit 4 is now retitled
21    Exhibit 1 and it's a April 22nd arrest warrant for defendant
22    Black.
23         (Government Exhibit No. 1 is received.)
24                 THE COURT:  Okay.  Go ahead, Mr. Paulsen.
25                 MR. PAULSEN:  Sorry about that, Your Honor.
```

Suelch - Direct

```
1    BY MR. PAULSEN:

2    Q.  And where did you go to try to arrest him?

3    A.  The Willows apartment complex in Brooklyn Park on

4    Douglas and 67th.

5    Q.  And did you see him when you got there?

6    A.  Yeah, we set up surveillance in the area, and we had a

7    couple of other officers, and I ended up seeing him near a

8    vehicle that was known to be associated with him, with

9    Black.

10   Q.  So what did you do with respect -- did you see him get

11   into a vehicle?

12   A.  Yeah.  I saw Mr. Black come out of a building, get into

13   his vehicle, which was a Buick Century, get back out, meet

14   with a female, and then it appeared as though he was

15   flagging down a vehicle that he was -- that I couldn't see

16   at the time, but it looked like he was flagging somebody

17   down to the west of him in the parking lot.

18   Q.  So did he eventually get into this other car?

19   A.  Yeah, he walked to the west, disappeared from my view

20   and then this car appeared and came between the buildings

21   and I saw that he appeared to be in the front passenger

22   seat, Mr. Black was.

23   Q.  And what kind of car was that?

24   A.  That was a silver Pontiac passenger car.

25   Q.  Now, were you in a marked squad or unmarked squad?
```

Guelich - Direct

1    A.  I was in an unmarked vehicle.

2    Q.  So did you call for a marked squad to try to stop this

3    Grand Prix and get Mr. Black on the arrest warrant?

4    A.  Yeah, I called for Detective Hjelm, which is spelled

5    H-J-E-L-M, and Detective Johnson who were in a squad.

6    Q.  And are you familiar with what happened when they tried

7    to stop this Grand Prix?

8    A.  Yes.

9    Q.  What happened?

10   A.  They attempted to stop the Grand Prix on 65th Avenue in

11   front of another portion of the Willows apartment complex.

12   The car pulled in, initially stopped and then fled from the

13   scene of the original stop.

14   Q.  And the -- did -- do you know who turned out to be the

15   driver?

16   A.  Yeah, Omar Rush.

17   Q.  Do you know whether he's another 1-9 gang member?  If

18   you don't know, it's fine.

19   A.  I don't know.

20   Q.  His name came up with the last witness.  Okay.  So

21   what -- did a chase ensue?

22   A.  Yes.

23   Q.  And tell us a little bit about the chase.  Any

24   collisions or anything like that?

25   A.  Yeah, the chase went straight north through the parking

Buelteh - Direct

1    lot of the Willows apartments and then up toward 694 and

2    then the suspect vehicle turned left to go westbound in the

3    parking lot and collided with another vehicle and then

4    continued to flee westbound.

5    Q.  This was a civilian vehicle?

6    A.  Yeah.

7    Q.  Okay.  And did the squads eventually catch up to the

8    vehicle and stop it?

9    A.  Yes, they did.

10   Q.  And was Mr. Black the passenger?

11   A.  Yes, he was.

12   Q.  And was he arrested?

13   A.  Yes.

14   Q.  Now, did officers retrace the course of the vehicle to

15   see if anything had been thrown from the vehicle?

16   A.  They did.

17   Q.  And did they find anything?

18   A.  They found a, near where the collision with the civilian

19   vehicle occurred, they found a handgun laying in a parking

20   lot.

21   Q.  And was it kind of right out in the open, not hidden or

22   anything?

23   A.  Correct.  It was up near the garages.

24   Q.  And do you remember if that gun was loaded or not?

25   A.  I don't recall.

Suelch - Direct

1    Q.  Okay.  When Mr. Black was arrested, did he have a cell

2    phone on him?

3    A.  Yes.

4    Q.  And did you subsequently obtain a state search warrant

5    to search that cell phone for its contents?

6    A.  Yes, I did.

7                MR. PAULSEN:  May I approach again?

8                THE COURT:  Sure.

9    BY MR. PAULSEN:

10   Q.  Is Exhibit 2 the search warrant for Black's cell phone?

11   A.  Yes.

12               MR. PAULSEN:  Offer 2.

13               MR. COUILLARD:  No objection.

14               THE COURT:  Okay.  Exhibit 2 will be received.

15        (Government Exhibit No. 2 is received.)

16        (Mr. Paulsen conferred with counsel.)

17               MR. PAULSEN:  Your Honor, I also had as Exhibit 3

18   a search warrant for Mr. Black's DNA, but I just conferred

19   with defense counsel, and they're not challenging that

20   search warrant so I won't bother to offer Exhibit 3.

21               One more question for counsel.

22         (Mr. Paulsen conferred with counsel.)

23   BY MR. PAULSEN:

24   Q.  And so just so the record is clear, Mr. Black was

25   arrested on that arrest warrant that day?

Guerin - Direct

1    A.  Well, after the chase concluded, we found out that the

2    arrest warrant had been recalled.

3    Q.  Oh, it had been recalled?

4    A.  Yes.

5    Q.  That same day or later?

6    A.  The same day, sometime after --

7    Q.  Did you --

8    A.  I'm sorry.

9    Q.  Did you know that at the time you were trying to arrest

10   Mr. Black?

11   A.  No.  I was under the assumption -- or, well, I had just

12   received a copy of the warrant from the probation officer

13   and so I thought it to be a valid warrant.

14   Q.  Okay.  And you found out afterwards that somehow it had

15   been recalled in the interim?

16   A.  Correct.

17   Q.  But by then did you have other reasons to arrest

18   Mr. Black?

19   A.  Yes.

20   Q.  And what other reasons?

21   A.  Probable cause for weapons based on the recovered

22   firearm.

23              MR. PAULSEN:  Nothing further.

24              THE COURT:  Mr. Zayed.

25              MR. COUILLARD:  May we have one moment?

Suerth - Cross by Couillard

```
1              (The defendant conferred with his attorneys.)

2              MR. COUILLARD:  Your Honor, David Couillard on

3      behalf of Mr. Black.

4                        CROSS-EXAMINATION

5      BY MR. COUILLARD:

6      Q.  Detective Suerth, can you tell me what you have up there

7      with you today, other than the exhibits that have been --

8      A.  What I have up here?

9      Q.  Yes.

10     A.  I have my reports and some other documents from the

11     case.

12     Q.  Okay.  Exhibit 1 that was referred to earlier which is

13     the order revoking conditional release.

14     A.  Yes.

15     Q.  It states that probation notified defendant was in

16     contact with a known gang member, correct?

17     A.  Correct.

18     Q.  What is the -- do you know the basis for --

19     A.  Yes, I do.

20     Q.  -- that?

21     A.  Yes, I do.

22     Q.  Can you explain the basis for that?

23     A.  It was a Minneapolis traffic stop where he

24     was -- Mr. Black was stopped in -- driving a car in

25     Minneapolis with a passenger Joshua Ross.
```

Guetin - Cross by Coulard

1    Q.  And who provided the information that he -- that the

2    person he was with was a known gang member?

3    A.  That was through our intell analysts with the sheriff's

4    office.

5    Q.  And what did you do to -- did you do anything to verify

6    that?

7    A.  I didn't independently, no.

8    Q.  Now, you testified that the arrest warrant was later on

9    was recalled?

10   A.  Correct.

11   Q.  When you executed the arrest warrant, did you -- what

12   did you do to verify that it was valid at the time?

13   A.  Well, I received the paper copy of the warrant -- well,

14   I guess electronically, electronic copy from the PO, the

15   probation officer, and Detective Hjelm told me that he had

16   looked in the Minnesota Court Information System and saw

17   that there was a notation that there was a warrant for the

18   case.

19   Q.  Did you do anything else to verify that it was --

20   A.  No.

21   Q.  -- valid?  You said Mr. Black was the passenger of the

22   vehicle, correct, the Pontiac?

23   A.  Correct.

24   Q.  And is it -- it's true that the Pontiac had dark tinted

25   windows?

Gueltn - Cross by Coulnard

```
 1   A.  No.  I don't recall it having dark tinted windows.
 2   Q.  Do you recall writing a -- your police report in this
 3   case?
 4   A.  I do.
 5   Q.  And do you have that in front of you?
 6   A.  I can grab it from my folder.
 7   Q.  Yes, please.
 8   A.  Okay.
 9   Q.  Can I direct you to the fifth paragraph of your report?
10   A.  Yes, sir.
11   Q.  And did you put anything in your report in that
12   paragraph regarding the tint of the windows?
13   A.  I -- I put in here that the windows were darkly tinted
14   on the Buick Century which is a different vehicle than the
15   pursuit vehicle.
16   Q.  Okay.  That was the vehicle that you had seen him enter
17   or exit earlier?
18   A.  Yes.
19   Q.  You did not witness Mr. Black possessing a gun on April
20   22nd?
21   A.  Correct.
22   Q.  You did not personally take part in the chase that you
23   described earlier?
24   A.  No, I did not.
25   Q.  And did you -- you did not take part in the arrest
```

Guelich - Cross by Coulllard

```
1   itself?  Or you did not perform the arrest?

2   A.  I did not perform the arrest, no.

3   Q.  You didn't witness Mr. Gun -- or Mr. Black throw a gun

4   out of that Pontiac that day, did you?

5   A.  That's correct, I did not.

6   Q.  I would like to turn to a different incident.  Do you

7   recall November 19th, 2014?

8   A.  I do.

9   Q.  And you were assigned to locate Mr. Black on that date?

10  A.  I was.

11  Q.  And that was to arrest him based on a federal search

12  warrant -- or a federal arrest warrant?

13  A.  Correct.

14  Q.  And you had learned that day from a confidential

15  informant that Mr. Black was recently known to drive a

16  purple Buick SUV, is that right?

17  A.  That's how it was described to me, yes, sir.

18  Q.  And you were looking for that SUV in order to locate

19  Mr. Black?

20  A.  Correct.

21  Q.  And at some point later that day you arrived at an

22  address 3300 Douglas Drive North in Crystal, is that right?

23  A.  Correct.

24  Q.  And you saw a maroon Buick SUV in the parking lot?

25  A.  Yes, sir.
```

Guerin - Cross by Courtland

1    Q.  And it matched that description that you had received

2    from an informant earlier?

3    A.  Reasonably, yes.

4    Q.  And at some time later you observed Mr. Black walking

5    towards that Buick?

6    A.  Yes, sir.

7    Q.  And was he alone?

8    A.  He was with two other people.

9    Q.  And did Mr. Black enter that Buick?

10   A.  I don't recall if he entered it or not.  I recall him

11   going toward it.

12   Q.  Do you recall where he was when -- so -- an arrest was

13   performed at that point?

14   A.  Yes, sir.

15   Q.  Do you recall where he was when he was arrested?

16   A.  He was on the passenger side of the Buick.

17   Q.  Do you recall about how far away from the Buick he was?

18   A.  Not -- no, I don't recall.

19   Q.  But he was not removed from the Buick?

20   A.  Correct.

21   Q.  And he was handcuffed?

22   A.  Yes, sir.

23   Q.  Who performed the handcuffing?

24   A.  I believe it was Deputy Inglett.

25   Q.  Okay.  Did Mr. -- or did Deputy Inglett perform a search

Guelich - Cross by Couillard

1   of Mr. Black at that point?

2   A.  Yes, he did.

3   Q.  Were any weapons found on Mr. Black's body?

4   A.  Not to my knowledge.

5   Q.  The two others that were with him, were they also placed

6   into custody?

7   A.  They were -- yeah, they were detained in handcuffs and

8   eventually arrested, yes.

9   Q.  Now, did you observe any weapons at that scene?

10  A.  Yes, I did.

11  Q.  Where did you observe a weapon?

12  A.  It was underneath the driver's seat more toward the

13  rear, the rear of the driver's seat, so maybe accessible

14  from the rear seat.

15  Q.  Was that weapon removed from the Buick?

16  A.  Yes, it was.

17  Q.  At that point was Black already in custody?

18  A.  Yes, he was.

19  Q.  Were the other two also in custody?

20  A.  Yes.

21  Q.  After that, the Buick was searched by law enforcement

22  officers?

23  A.  Yes.

24  Q.  And additional items were recovered from the Buick?

25  A.  Yes, sir.

Buettn - Cross by Coulfiazo

```
1    Q.  Was a GPS device recovered from the Buick?

2    A.  Can I refer to my report?

3    Q.  You may.

4    A.  Yes, a GPS was recovered.

5    Q.  And a letter bearing Mr. Black's name, was that also

6    recovered?

7    A.  Can I refer to my report again?

8    Q.  Yes, you may.

9    A.  Okay.  Yeah, it just says a mailing.  I don't recall

10   whose name was on the mailing.

11   Q.  Okay.  And did you -- was there a cell phone recovered

12   from inside the Buick?

13   A.  I don't recall if there was one in the Buick.  I know

14   Mr. Black had one on him.

15   Q.  Was the Buick impounded or inventoried?

16   A.  I don't believe it was impounded.

17   Q.  Was it left in the parking lot where you found it?

18   A.  I believe so.

19   Q.  I have one other question going back to the April 22nd

20   incident.  How did you know that Mr. Black was at or near

21   the Willows apartment complex?

22   A.  GPS tracker on his car, on the Buick Century.

23   Q.  Did you obtain a warrant to --

24   A.  Detective Hjelm did.

25   Q.  Do you know the basis for that?
```

Suerth - Cross by Couillard

1    A.  Controlled purchase of marijuana.

2    Q.  You testified that the vehicle, the squad that you

3    called in to assist on that date, was a marked squad?

4    A.  It was not a marked squad.

5    Q.  It was not a marked squad?

6    A.  No.

7    Q.  Okay.  Were there any marked squads during that

8    incident?

9    A.  No, it was just the squad they were driving was just a

10   plain Crown Victoria police car with lights and sirens but

11   no police markings.

12            MR. COUILLARD:  May I have a moment just to

13   confer?

14            THE COURT:  Sure.

15       (The defendant conferred with his attorneys.)

16   BY MR. COUILLARD:

17   Q.  Detective Suerth, could you describe for me again the

18   basis for the warrant for the GPS tracker?

19   A.  Detective Hjelm had conducted a controlled purchase from

20   Mr. Black using a confidential informant, and the controlled

21   purchase had occurred from the Buick Century vehicle that we

22   had the tracker on.

23   Q.  Do you know how long it had been on the vehicle?

24   A.  I don't remember the specific date.

25            MR. COUILLARD:  Just for the record, I'd like to

Guelich - Redirect

1     say that Mr. Black has not received a copy of that warrant

2     and we request it now and reserve our right to challenge the

3     admissibility of that as well.

4                  THE COURT:  Okay.

5                  MR. COUILLARD:  I have no further questions.

6                  THE COURT:  All right.  Anybody else have any

7     questions for this officer?

8                  Seeing none, Mr. Paulsen, any redirect?

9                  MR. PAULSEN:  Briefly.

10                  THE COURT:  I'm sorry, before you go, Mr. Paulsen,

11    I had a question.

12                  MR. PAULSEN:  Sure.

13                  THE COURT:  What is a DAR?

14                  THE WITNESS:  Oh, driving after revocation.

15                  THE COURT:  Okay.  And do you know why the

16    warrant, April 22nd, for the arrest of Mr. Black had been

17    withdrawn?

18                  THE WITNESS:  I don't.

19                  THE COURT:  Okay.

20                          **REDIRECT EXAMINATION**

21    BY MR. PAULSEN:

22    Q.  Let's see.  The -- were there just one controlled buy of

23    marijuana from Mr. Black prior to this April 22nd arrest or

24    more than one?

25    A.  There was more than one.  I had conducted one as well.

Guetch - Redirect

1    Q.  And did that occur while he was out on pre-trial release

2    on a different pending case?

3    A.  I believe it was on a case that the warrant was issued

4    for.

5    Q.  Okay.  And now I was going to do this with the next

6    witness, but since we got into the subject on cross, you did

7    participate in the arrest of Mr. Black on November 19th of

8    2014?

9    A.  I did.

10   Q.  And that was on the federal arrest warrant in this case,

11   is that right?

12   A.  Correct.

13   Q.  And that's the one I mistakenly showed you before and I

14   will now show you again, Government Exhibit 4.  Now, is that

15   the federal arrest warrant?

16   A.  Yes.

17            MR. PAULSEN:  Offer 4.

18            THE COURT:  Any objection?

19            MR. PAULSEN:  The real 4 this time.

20            THE COURT:  Any objection to the real 4?

21            MR. COUILLARD:  No objections.

22            THE COURT:  Okay.  Exhibit 4 will be received.

23         (Government Exhibit No. 4 is received.)

24   BY MR. PAULSEN:

25   Q.  And as you stated, this arrest took place as Mr. Black

Bueltn - Redirect

1    was coming out of the building somewhere?

2    A.  Yeah.

3    Q.  And where was that again?

4    A.  3300 Douglas Drive in Crystal.

5    Q.  And I think you said on cross he was about to get into

6    his vehicle?

7    A.  Yeah, a Buick SUV.

8    Q.  And that's when officers moved in to arrest him pursuant

9    to the arrest warrant?

10   A.  Correct.

11   Q.  And I was going to do this with the next witness, but if

12   you know, do you know what was taken from Mr. Black incident

13   to arrest?

14   A.  There was a cell phone and a small amount of marijuana.

15   Q.  Okay.  And Deputy Pete Dawson later got a search warrant

16   for the contents of that cell phone, are you aware of that?

17   A.  I --

18           MR. PAULSEN:  You may not be aware of it, but I

19   have the search warrant, it's been provided to defense

20   counsel, and I'd offer Exhibit 5 at this time.  It's

21   actually, to be clear, it's a search warrant for three

22   different devices that were seized from the parties that

23   day: a black T-Mobile phone, a black Samsung phone and a

24   gray Garmin GPS unit, so I'd offer 5.

25           THE COURT:  Any objection to Exhibit 5?

1          MR. COUILLARD:  No objection.

2          THE COURT:  Okay.  Exhibit 5 will be received.

3       (Government Exhibit No. 5 is received.)

4  BY MR. PAULSEN:

5  Q.  And as far as the -- did you mention on cross that there

6  was a gun found in the car?

7  A.  In the Buick, yes.

8  Q.  And who was with Mr. Black, do you recall?

9  A.  I don't.  I don't recall names.

10 Q.  Okay.  But do you know whether or not that person's been

11 charged with that gun?

12 A.  No.

13         THE COURT:  No you don't know or no the person has

14 not been charged?

15         THE WITNESS:  Sorry, Your Honor, no, I don't know

16 if the person has been charged.

17         MR. PAULSEN:  We can tie it up with another

18 witness if it's important.  He has been charged federally.

19 But just so the record is clear, Mr. Black has not been

20 charged at this point with that gun.

21         THE COURT:  Okay.

22         MR. PAULSEN:  Let me confer with defense counsel

23 again.

24      (Mr. Paulsen conferred with counsel.)

25         MR. PAULSEN:  All right.  On the April 22 issue, I

1     had Officer Johnson here who was one of the officers with

2     Hjelm that followed the car, but I'm told we don't need him,

3     so I'm going to excuse Officer Johnson, and then the next

4     witness will follow-up on this November 19th arrest of

5     Mr. Black.  So no further questions for this witness.

6                 THE COURT:  Okay.  Thank you.  You're excused.

7                 THE WITNESS:  Thanks, Your Honor.

8                 THE COURT:  Next witness.

9                 MR. PAULSEN:  It will be Deputy Timothy Inglett.

10                 MR. SHIAH:  Your Honor, could I just briefly talk

11     to my client while we're waiting?

12                 THE COURT:  Yes.  Do you want to come forward and

13     get sworn in, Mr. Inglett.

14                 THE WITNESS:  Good morning.  Pardon me?

15                 THE COURT:  Do you want to come over this way?

16          (The witness is sworn.)

17                 THE COURT:  Have a seat, state your name and spell

18     your last name for the court reporter, please.

19                 THE WITNESS:  Deputy Timothy Inglett,

20     I-N-G-L-E-T-T.

21                          **DIRECT EXAMINATION**

22     BY MR. PAULSEN:

23     Q.  Deputy Inglett, we've heard some testimony about the

24     arrest of Veltrez Black on November 19th of 2014 pursuant to

25     the federal arrest warrant in this case.  Were you there?

Inglett - Direct

1    A.  I was.

2    Q.  And were you the person that searched Mr. Black incident

3    to arrest?

4    A.  I was.

5    Q.  And what did you find on his person?

6    A.  A cellular telephone and a glass jar containing

7    suspected marijuana.

8    Q.  And those items were seized, I assume?

9    A.  Yes, sir.

10   Q.  Do you know about how much marijuana?

11   A.  I'd say half an ounce, 15 to 20 grams.

12   Q.  And we've heard about a firearm that was found in the

13   car that was not on Mr. Black's person?

14   A.  It was not.

15   Q.  Did another officer see someone else apparently putting

16   the gun in the car?

17   A.  I cannot comment on that.  I heard about it first in the

18   rear of the vehicle.

19              MR. PAULSEN:  All right.  I won't put you on the

20   spot then.  No further questions.

21              THE COURT:  I'm sorry.  Who do you work for?

22              THE WITNESS:  The Hennepin County Sheriff's

23   Office, sir.

24              THE COURT:  Okay.  Any questions, Mr. Zayed?

25              ///

1                            **CROSS-EXAMINATION**

2     BY MR. ZAYED:

3     Q.  Good morning, officer -- Detective Inglett.  I'm R.J.

4     Zayed on behalf of Veltrez Black.

5     A.  Good morning.

6     Q.  Now, the arrest occurred roughly almost at 2 o'clock in

7     the afternoon, right, on November 19th?

8     A.  Correct.

9     Q.  And it occurred at the 3000 block of Douglas Drive North

10    in Crystal?

11    A.  Yes, sir.

12    Q.  Now, at that time you were looking for a Buick

13    Rendezvous sports-utility vehicle, right?

14    A.  Yes, sir.

15    Q.  You had received information that that was the car that

16    Mr. Black was seen driving around, correct?

17    A.  Yes, sir.

18    Q.  And so on that date what you were trying to do is arrest

19    Mr. Black on the warrant issued as a result of the

20    Indictment of this case, correct?

21    A.  Yes, sir.

22    Q.  And you had a whole team with you looking for Mr. Black,

23    correct?

24    A.  Yes, sir.

25    Q.  Now, when you saw that Buick Rendezvous, you and the

1    other officers then canvassed the area, right, and you set

2    up a perimeter around that Buick Rendezvous, right?

3    A.  Yes, sir.

4    Q.  How many officers were there?

5    A.  I would estimate 15 to 20.  There were two others in my

6    vehicle.

7    Q.  Okay.  At approximately a little after 2 o'clock

8    Detective Suerth said he saw Mr. Black exit from the 3300

9    building along with two other males, correct?

10   A.  True.

11   Q.  At that point the indication was they were approaching

12   the Buick Rendezvous, correct?

13   A.  Yes, sir.

14   Q.  At which point you executed the search warrant, right?

15   A.  Correct.

16   Q.  At that time all of you were wearing your police

17   emblazoned coats, right?

18   A.  Yes, sir.

19   Q.  With ATF and various other insignia on it, right?

20   A.  The appropriate parties, yes, sir.

21   Q.  And you approach with your guns drawn, right?

22   A.  Yes, sir.

23   Q.  And you yelled at Mr. Black and the others to who you

24   were, police, you're under arrest, get down on the ground?

25   A.  We did.

Ingrett - Cross by Zayed

1    Q.  Right.  And they all did that, right?

2    A.  They did.

3    Q.  At the time you did that, Mr. Black was at least 15 to

4    20 feet away from the Buick Rendezvous, right?

5    A.  When I first observed him, that's correct.

6    Q.  Right.  And that's where he laid down on the ground,

7    right?

8    A.  It is.

9    Q.  And at that point where were the other two males?  Could

10   you tell us where they were in relation to Mr. Black?

11   A.  The -- myself and the two officers I was with did

12   approach from the driver's side of that Buick Rendezvous.

13   The second and third male were on the driver's side near the

14   front passenger -- or front driver's and rear driver's door.

15   Q.  Okay.  Were those doors open?

16   A.  They were at that point.

17   Q.  Okay.  And so these two other males, what are their

18   names?

19   A.  I believe one was Rondell Bumpus and one was if I can

20   refer to my report, Judge?

21             THE COURT:  Sure.

22             MR. ZAYED:  Please do.

23             THE WITNESS:  One of them was Ramondo Rondell

24   Bumpus, 1/23 of '90.

25             ///

1    BY MR. ZAYED:

2    Q.  And was the other one a Akram Hameed Muhammad?

3    A.  It was.  Thank you, sir.

4    Q.  Now, I just want to orient us.  Can you -- where was

5    Mr. Bumpus?

6    A.  I don't recall which driver's door or front driver's

7    door or rear driver's door both -- or Mr. Bumpus and

8    Mr. Mohammed --

9    Q.  Mohammed, okay.

10   A.  -- were at.  When I got out of the vehicle, I focussed

11   on Veltrez Black and went right for him at the rear of the

12   vehicle.

13   Q.  Okay.  In the meantime, the other two individuals, the

14   doors were open and they --

15   A.  They would have been off to my left, and I don't recall

16   if one was in front or back.

17   Q.  Okay.  But they were -- how close were they to the car?

18   Were they --

19   A.  I would say both parties were within three or four feet

20   of the vehicle.

21   Q.  And did it appear to you that they were getting into the

22   car?

23   A.  It did.

24   Q.  But they did not get into the car, correct?

25   A.  I did not see them get in, no.

1   Q.  And they were taken into custody, right?

2   A.  Yes, I was not part of that.  It was those two parties

3   were arrested by -- by other officers.

4   Q.  But when they were handcuffed, they were removed from

5   around the Buick Rendezvous?

6   A.  That's true.

7   Q.  And placed in squad cars?

8   A.  That's true.

9   Q.  All right.  And Mr. Black was 15 to 20 feet away, right?

10  A.  That's true.

11  Q.  So there was nobody left in the car, right?

12  A.  Correct.

13  Q.  And then we saw at the detention hearing a photograph of

14  a firearm that was sticking out from the driver's seat

15  looking at it from the rear seat, do you follow me?

16  A.  Correct.

17  Q.  Was that the position that gun was found?

18  A.  I can't comment to that.  I have seen that photograph,

19  but, again, I went right for Mr. Black, took him into

20  custody.  While that was happening, simultaneously officers

21  reported that they saw a gun in plain view inside the

22  vehicle.

23  Q.  Okay.  Which officer reported that they saw it in plain

24  view?

25  A.  I can't comment.  There were 15 to 20 officers on scene,

Ingrett - Cross by Zayed.

1    and it was a male voice that screamed "gun."

2    Q.  Okay.  That gun was taken by the police, correct?

3    A.  Yes, sir.

4    Q.  And then no other guns were found in that vehicle,

5    right?

6    A.  To my knowledge, no.

7    Q.  Okay.  And the vehicle was left where it was found,

8    right?

9    A.  Yes, sir.

10   Q.  It was not towed?

11   A.  Correct.

12   Q.  And there was no inventory search done on that car

13   pursuant to standard police inventory searches, right?

14   A.  I'm not certain if there was an inventory search

15   performed or not.

16   Q.  You wouldn't know that?

17   A.  Correct.

18   Q.  But the car was left there?

19   A.  Yes, sir.

20   Q.  And but before leaving the car, police officers removed

21   two items from there, right?

22   A.  I would assume, and I'm certain that they retrieved the

23   firearm.  I don't know what else they recovered from the

24   vehicle itself, sir.  I had nothing to do with the vehicle.

25   Q.  Didn't they remove a GPS tracker and a cell phone from

1    that?

2    A.  I'm not certain of that.

3              MR. ZAYED:  If I may have a moment, Your Honor?

4              THE COURT:  Sure.

5              MR. ZAYED:  That's all I have, Your Honor.

6              THE COURT:  Okay.  Anybody else have any questions

7    for this witness?

8              Okay.  Thank you.  You're excused.

9              THE WITNESS:  Thank you, Judge.

10             THE COURT:  Next witness.

11             MR. PAULSEN:  Next witness is Officer Matt Brost.

12             MR. WOLD:  Is that moving to Mr. Jackson?

13             MR. PAULSEN:  Yeah, Bender would be next but he's

14   been postponed to this afternoon so we're just going right

15   down the line on Mr. Jackson now.

16             MR. WOLD:  Your Honor, would there be --

17             THE COURT:  Do you want to come up

18   here -- Mr. Wold, did you want to move up your seat?

19             MR. WOLD:  Is there a reason I couldn't sit with

20   my client at the counsel table here, Your Honor, for

21   this -- for the portion related to him?

22             THE COURT:  That's probably just more complicated

23   than I'm willing to deal with, but you can certainly have a

24   seat on the front bench there and, as Mr. Zayed has been

25   doing, communicate your client before testifying.  Have a

1    seat.

2              All right.  I'm sorry, your next witness,

3    Mr. Paulsen, is?

4              MR. PAULSEN:  Officer Mott Brost, B-R-O-S-T.

5              THE COURT:  Do you want to come forward and get

6    sworn in, please, sir.

7         (The witness is sworn.)

8              THE COURT:  Have a seat, state your name and spell

9    your last name for the court reporter, please.

10              THE WITNESS:  Officer Matthew Brost, B like boy,

11    R-O-S like Sam, T like Tom.

12              THE COURT:  Mr. Paulsen.

13              MR. PAULSEN:  Just to let you know where we're

14    going, Your Honor, this witness relates to a April 5th,

15    2012, stop of a vehicle that Mr. Jackson was in.  This was

16    the basis for Count 3 of the Indictment because a gun was

17    found under the glove box.

18              I'm going to assert an objection here.  I'm

19    certainly willing to prove up the stop of the vehicle, and

20    that witness can do this, but then there was a search of the

21    vehicle, and it's not the defendant's vehicle, it was not

22    Mr. Jackson's vehicle, he as a passenger in the vehicle, and

23    under the *Barragan* case, B-A-R-R-A-G-A-N, which I put in my

24    brief, a passenger does not have standing to challenge the

25    search of someone else's vehicle.

Brost - Direct

1      And I just consulted with Mr. Wold, I think he

2   might disagree with me on that, but I want to note -- I want

3   the record to reflect that my position is there is no

4   standing by this defendant for the search of the vehicle.

5   Nevertheless, I'm willing to put in the testimony with that

6   understanding that my position is that he doesn't have any

7   standing.

8          THE COURT:  Okay.

9          MR. PAULSEN:  Okay.

10                    **DIRECT EXAMINATION**

11  BY MR. PAULSEN:

12  Q.  Officer Brost, by whom are you employed?

13  A.  City of Maple Grove.

14  Q.  And are you a police officer?

15  A.  Yes.

16  Q.  How long have you been with -- a police officer with

17  Maple Grove?

18  A.  This is my tenth year.

19  Q.  I want to take you back to April 5th of 2012.  Did you

20  participate in the arrest of defendant Nitelen Jackson that

21  day?

22  A.  Yes.

23  Q.  What were the circumstances that led up to this traffic

24  stop we're going to be hearing about?

25  A.  There was a call put in by the Original Pancake House in

Elfelt - Direct

1    Maple Grove of a no pay or theft of services, some

2    individuals had run out on the bill.  And information that

3    our dispatch had provided officers is that they were the

4    same individuals who had been involved in a suspicious

5    activity call at that same pancake house on the 31st of

6    March I believe was in my report.  Information that I had

7    received from a investigative community service officer at

8    our police department stated that one of those individuals

9    who was listed in the call was Nitelen Jackson.  Officers

10   responded.

11   Q.  Okay, let me stop you there.

12   A.  Oh, yep.

13   Q.  So on April 5th of 2012, you get a -- dispatch gets a

14   call from the pancake house that some people have run out on

15   the bill?

16   A.  Yes.

17   Q.  And they said the same thing had happened like a week

18   earlier with some of the same people?

19   A.  Yes.

20   Q.  Okay.  And -- and at that point was one of them

21   identified as Jackson or does that come later?

22   A.  That comes later.

23   Q.  Okay.  So did the people calling from the pancake house

24   have license numbers of the people that had run out on the

25   bill?

Elliot - Direct

1   A.  Yeah, they had vehicle descriptions and license plate

2   numbers.

3   Q.  So were you one of the officers that responded to look

4   for these vehicles?

5   A.  When I responded, the vehicles were already stopped.

6   Q.  Okay.  And how shortly -- and what was -- was one of the

7   vehicles -- well, let's focus on the one that Mr. Jackson

8   was in.  Which one was that?

9   A.  It was the Chevy.

10  Q.  And the license plate matched one of the plates that was

11  given by the victims?

12  A.  Yes.

13  Q.  So what happened when you arrived?

14  A.  When I arrived, officers had the Chevy stopped, and I

15  made contact with the front passenger of the vehicle and

16  verbally identified him as Nitelen Jackson.

17  Q.  So at that point you knew Nitelen Jackson was one of the

18  people in the car?

19  A.  Yes.

20  Q.  And did you have information, pre-existing information

21  about Mr. Jackson?

22  A.  Yes, I did.

23  Q.  What did you know about him from?

24  A.  From our intelligence meetings that we have in Hennepin

25  County that are biweekly meetings is that he was a known

Elbert - Direct

1    gang member of the Stick Up Boys and had a history of

2    narcotics and weapons offenses.

3    Q.  Okay.  So you -- where was he seated in the car?

4    A.  The front passenger seat.

5    Q.  And did you go up to the front passenger side of the

6    car?

7    A.  I did.

8    Q.  And what happened then?

9    A.  I knocked on the window and said "hey, Nite," and he

10   couldn't roll down the window so --

11   Q.  You called him "Nite"?

12   A.  Yep.

13   Q.  His nickname?

14   A.  Yep.

15   Q.  Okay.

16   A.  And he couldn't roll down the window so he opened the

17   door, and at that point I could smell the odor of marijuana

18   coming from inside the passenger compartment of the vehicle.

19   Q.  What happened next?

20   A.  I had him step out of the vehicle and I conducted a

21   Terry frisk of his person from his history of weapons, and I

22   saw a baggy protruding out of the left pocket of his jacket

23   and asked him if I could get it.  He said yes, I could.  I

24   pulled it out and I could see residue that looked and

25   smelled like marijuana.

Elliott - Direct

1    Q.  Okay.  Who else was in the car?

2    A.  Louis Osborne.

3    Q.  Did you know anything about Louis Osborne?

4    A.  I didn't at that time.

5    Q.  Okay.  And was Osborne the driver?

6    A.  Yes.

7    Q.  Did this car belong to Jackson?

8    A.  No.

9    Q.  Who did it belong to?

10   A.  I believe it was Osborne's sister.

11   Q.  Okay.  So you talked about getting Mr. Jackson out of

12   the passenger side.  Then what happened next?

13   A.  Officers, we detained both Jackson and Osborne in the

14   backs of squads and then I conducted a probable cause search

15   for narcotics of the passenger compartment of the vehicle.

16   Q.  And did you find any narcotics in the passenger

17   compartment?

18   A.  Residue, green leafy residue in the front passenger side

19   door handle.  There was a baggy tear-off in the vehicle with

20   residue that looked and smelled just like marijuana but no

21   other narcotics and/or paraphernalia was found.

22   Q.  And did you find any weapon in the vehicle?

23   A.  I did.

24   Q.  Tell us about that.

25   A.  So as I was searching, I noticed underneath the glove

1    compartment on the front passenger side of the vehicle that

2    some of the molding had been broken and was just kind of set

3    back up in the vehicle, and in my experience, I've known

4    that sometimes people can make compartments to house either

5    narcotics or weapons, so when I was going up under the glove

6    box, that part of the molding had fallen and it was a

7    hallowed out compartment and when I reached inside, I felt a

8    handgun.

9    Q.   Did you remove the handgun?

10   A.   I did.

11   Q.   Was it loaded?

12   A.   Yes.

13   Q.   And did it have -- what kind of magazine did it have?

14   A.   It had an extended magazine.

15   Q.   When you say "extended magazine," describe that.  What?

16   A.   So it's like the same type of weapon I would use as a

17   police officer.  My magazine carries 15 bullets and -- or 15

18   rounds and this magazine carried 30.

19   Q.   And where was that gun found in relation to where

20   Mr. Jackson had been sitting?

21   A.   Right in front of him, by his feet.

22   Q.   So was Mr. Jackson arrested at that point?

23   A.   Yes.

24   Q.   Were you aware he was a convicted felon?

25   A.   Yes.

Elfrit - Direct

1    Q.  And then was there a follow-up search warrant done on

2    that vehicle, do you know?

3    A.  I believe there was.

4              MR. PAULSEN:  May I approach, Your Honor?

5              THE COURT:  Sure.

6    BY MR. PAULSEN:

7    Q.  Showing you what's been marked as Government Exhibit 8,

8    does that appear to be the search warrant for that vehicle?

9    A.  Yes.

10             MR. PAULSEN:  Offer 8, with the same understanding

11   that I don't believe he's got standing to challenge the

12   search of someone else's vehicle.

13             THE COURT:  Okay.  Any objection to Exhibit 8,

14   Mr. Wold?

15             MR. WOLD:  No objection.

16             THE COURT:  Okay.  Exhibit 8 will be received.

17        (Government Exhibit No. 8 is received.)

18   BY MR. PAULSEN:

19   Q.  And then did a fellow officer also subsequently obtain a

20   search warrant for Mr. Jackson's DNA sample?

21   A.  I believe that was done, yes.

22   Q.  Showing you Exhibit 9, does that appear to be the search

23   warrant?

24             MR. PAULSEN:  Well, let me check.  Are you

25   challenging this?

Brost - Cross by Wold

```
 1                    MR. WOLD:  Pardon me?

 2                    MR. PAULSEN:  Are you challenging this?

 3                    MR. WOLD:  No.

 4                    MR. PAULSEN:  I don't need it, Your Honor.  It is

 5      not being challenged.

 6                    THE COURT:  Exhibit 9 is not being offered?

 7                    MR. PAULSEN:  They're not challenging the search

 8      for the DNA sample, so I don't need Exhibit 9, Your Honor.

 9                    THE COURT:  Okay.

10                    MR. PAULSEN:  And with that, I have no further

11      questions.  Oh, wait a second.  No.

12                    THE COURT:  Mr. Wold.
```

**CROSS-EXAMINATION**

```
14      BY MR. WOLD:

15      Q.  Good morning, Officer Brost.

16      A.  Good morning.

17      Q.  I'm Peter Wold.  How are you?

18      A.  Good.  How are you?

19      Q.  Good.  You were among several officers at that scene

20      that day, do you recall?

21      A.  Yes.

22      Q.  And I think Officer Durrett, is that right?

23      A.  Yes.

24      Q.  And an Officer Hokey?

25      A.  Yes.
```

```
 1    Q.  And Sergeant Garland?

 2    A.  Yes.

 3    Q.  Sergeant Garland actually had made the stop of that

 4    Chevy by the time you had arrived, is that fair?

 5    A.  That's correct.

 6    Q.  Okay.  And it was his stop?

 7    A.  Yes.

 8    Q.  He had made the stop?

 9    A.  Yes.

10    Q.  And was he the senior officer there at that scene, sir?

11    A.  He was the sergeant, yes.

12    Q.  Okay.  And at that point do you know that

13    Sergeant Garland had asked -- after that stop had asked

14    Mr. Osborne for consent to search the vehicle, were you

15    aware of that?

16    A.  I was not.

17    Q.  Okay.  Well, you became aware that Mr. Osborne

18    denied -- or didn't give consent to search?

19    A.  I didn't have that in my report.

20    Q.  Have you reviewed the report?

21    A.  My report, yes.

22    Q.  Okay.  Just your report?

23    A.  Just my report.

24    Q.  Okay.  Did you discuss your decision to search the

25    vehicle with Sergeant Garland before you began that search,
```

Direct - Cross by Nold

```
 1    sir?

 2    A.  I discussed it with Officer Durrett.

 3    Q.  Okay.  And what was that discussion, sir?

 4    A.  I said that I smelled marijuana, the odor of marijuana

 5    coming from the vehicle, and he confirmed that.

 6    Q.  Okay.  And you looked in the vehicle and saw remnants of

 7    marijuana in plain view, is that correct?

 8    A.  That's correct.  When the door was opened.

 9    Q.  You also asked Mr. Jackson after you -- after he

10    identified himself to you, correct?  He identified himself

11    to you?

12    A.  Yes.

13    Q.  You had knocked on the window, the window wouldn't open,

14    is that fair?

15    A.  That's correct.

16    Q.  And he opened the door in response to your request?

17    A.  Yes.

18    Q.  You identified him, he verbally identified himself, that

19    was -- that happened, right?

20    A.  Yes.

21    Q.  And you asked him out of the vehicle?

22    A.  Yes.

23    Q.  He complied with your request?

24    A.  Yes.

25    Q.  Was he cooperative with you during your entire encounter
```

1    with him?

2    A.  He was cooperative.

3    Q.  You noticed what you thought to be marijuana or a baggy

4    that could contain marijuana coming out of his pocket, is

5    that right?

6    A.  Yes.

7    Q.  And you asked if you could have that?

8    A.  Yes.

9    Q.  And he voluntarily provided that to you, correct?

10   A.  Yes, he allowed me to take it.

11   Q.  Your Terry frisk was for your protection and the

12   protection of others to search for weapons, is that true?

13   A.  Yes.

14   Q.  And no weapons were on Mr. Jackson, were they?

15   A.  No.

16   Q.  You -- what point did you take Mr. Jackson into custody,

17   sir?

18   A.  I detained him -- after we had found the

19   handgun -- after I had found the handgun underneath the

20   glove compartment, but he was detained prior out of

21   handcuffs in the back seat of a squad car while we conducted

22   our search.

23   Q.  Okay.  And you conducted that search without a search

24   warrant at that point?

25   A.  Right.

1    Q.  And later, based on whatever factors, a search warrant

2    was received for the vehicle, is that correct?

3    A.  Yes.

4    Q.  But that was after you had found the gun that was hidden

5    in this molding someplace, is that correct?

6    A.  Yes.

7    Q.  Okay.  And that gun wasn't in plain view to you as you

8    stood outside the vehicle or looked in the vehicle during

9    your search, correct?

10   A.  No, it wasn't.

11   Q.  And you did do a visual search of the vehicle before you

12   undertook the search of the glove box and other crevices in

13   the vehicle, is that fair?

14   A.  Yes.

15   Q.  Okay.  And you talked about things you saw, including

16   remnants of potential packaging for marijuana, is that

17   correct?

18   A.  Yeah, there was a plastic tear-off of a corner of a

19   baggy, a tear-off.

20   Q.  Okay.  You -- you had had the opportunity to speak with

21   Mr. Jackson by that point, sir?

22   A.  Right.  Upon initial contact with the vehicle, yes.

23   Q.  Okay.  And you escorted him to your vehicle, is that

24   correct?

25   A.  I escorted him to one of the officers' vehicles, yes.

```
 1     Q.  Okay.  That wasn't yourself?

 2     A.  It wasn't mine.

 3     Q.  Okay.  You put him in the back of the squad, you

 4     assisted him in doing that?

 5     A.  I believe so, yes.

 6     Q.  Okay.  You saw him, you -- you had a -- you recognized

 7     him.  Do you recognize him today?

 8     A.  Yes.

 9     Q.  Okay.  So do you -- as you sit here today, Officer

10     Brost, do you have a fairly good recollection of that day?

11     A.  Yes.

12     Q.  Okay.  And can you tell us, sir, what -- or do you

13     remember what Mr. Jackson was wearing?

14     A.  I -- I don't.  A jacket and pants.  I don't -- I --

15     Q.  Okay.

16     A.  I don't remember --

17     Q.  Okay.

18     A.  -- the exact color or description.

19     Q.  So if he wasn't wearing pants, you'd remember that?

20     A.  That's right, yeah.

21     Q.  Was he wearing a hat, do you know?  Do you recall?

22     A.  I can't recall.

23     Q.  Do you know if he's wearing gloves when you saw him?

24     A.  I can't recall.

25     Q.  Did you notice anything in the vehicle besides the
```

Brost - Cross by Wold

```
 1    remnants of marijuana packaging loose in the vehicle at all,
 2    that you recall?
 3    A.  I can't recall.
 4    Q.  Was the vehicle impounded after the arrest?
 5    A.  Yes.
 6    Q.  And where was it taken?
 7    A.  It was taken to Citywide Towing.
 8    Q.  And do you know what happened to it from there?
 9    A.  I don't.
10             MR. WOLD:  If I can have a minute, Your Honor.
11             THE COURT:  Sure.
12          (The defendant conferred with his attorney.)
13             MR. WOLD:  I have no other questions.
14             THE COURT:  Anybody else have any questions for
15    this witness?
16             MR. PAULSEN:  I do.
17             THE COURT:  Hearing none other than redirect from
18    Mr. Paulsen.
19                      **REDIRECT EXAMINATION**
20    BY MR. PAULSEN:
21    Q.  Just briefly.  Before you got Mr. Jackson out of the
22    car, did you have any discussion with him about the alleged
23    incident at the pancake house?
24    A.  I'd have to refer to my report.
25             MR. PAULSEN:  May I approach, Your Honor?
```

Elicit - Redirect

1    THE COURT:  Sure.

2    BY MR. PAULSEN:

3    Q.  Does that refresh your recollection?

4    A.  Yes.  Yep.

5    Q.  Can you tell us now, having refreshed your recollection,

6    what the conversation was with Mr. Jackson about the pancake

7    house?

8    A.  Yeah, he admitted to eating at the pancake house and

9    thought that someone else had paid the bill.

10    Q.  But he did agree that the bill was actually unpaid?

11    A.  Yeah, he said that he would go back and pay for the bill

12    if need be.

13    Q.  And about how much did he think it was?

14    A.  $60.

15    Q.  Okay.  And that was all before you took him out of the

16    car and frisked him or anything?

17    A.  That's correct.

18    Q.  When you say that you knew he had a history of weapons

19    violations, do you recall today the exact details of that?

20    A.  We just -- in my unit, I worked in our street crimes

21    unit, and I attended biweekly meetings that were put on by

22    Hennepin County, and information and intelligence in those

23    meetings was that he had a history of weapons and was

24    affiliated with the SUB gang.

25    MR. PAULSEN:  Nothing further.

1           THE COURT:  I have a question.  So you indicated

2     when you approached the vehicle, you referred to defendant

3     by his first name, is that correct?

4           THE WITNESS:  That's correct.

5           THE COURT:  And did you know him before?  Have you

6     had other encounters with him?

7           THE WITNESS:  I have not, other than seeing his

8     photographs.

9           THE COURT:  But you knew who he was from the

10    photographs and the brief things that you just described?

11          THE WITNESS:  That's correct.

12          THE COURT:  Okay.  All right.  Thank you.

13    Anything else?

14          MR. WOLD:  Not here.

15          THE COURT:  Okay.  Thank you.  You're excused.

16    All right.

17          It's 11 o'clock.  Let's take a brief ten-minute

18    recess.  We'll come back and we've got more witnesses.

19       (Recess taken.)

20          THE COURT:  All right.  Mr. Paulsen, next witness.

21          MR. PAULSEN:  Officer Jeffrey Hagen, H-A-G-E-N.

22    And just so you know where we're going, this relates to a

23    search on, let's see, January 2 of 2013, a duplex on Lyndale

24    Avenue North relating to Mr. Jackson.  It's overt act 9 in

25    the Indictment.

```
 1              THE COURT:  I'm sorry, did you say a search
 2    warrant or just a search?
 3              MR. PAULSEN:  It's a search.
 4              THE COURT:  Okay.
 5              MR. PAULSEN:  And once again, my position is that
 6    Mr. Jackson has established no standing on this search.
 7              THE COURT:  Okay.  But you've got testimony?
 8              MR. PAULSEN:  I'll put the witness on anyway.
 9              THE COURT:  Are you Mr. Hagen?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  Do you want to come forward and get
12    sworn in, please, sir.
13          (The witness is sworn.)
14              THE COURT:  Have a seat.  State your name and
15    spell your last name for the court reporter.
16              Before you begin, Mr. Paulsen, I think my staff
17    has just notified everybody we're going to go until
18    1 o'clock, we're going to break for lunch until 2:15.  How
19    are we doing timewise?
20              MR. PAULSEN:  Good.  Good.
21              THE COURT:  Okay.  So we'll be done --
22              MR. PAULSEN:  I think we'll be done.  I have a
23    3:45 with Judge Tunheim.
24              THE COURT:  Okay.  Okay.
25              MR. PAULSEN:  So --
```

1           THE COURT:  Let's just keep going.

2           MR. PAULSEN:  Okay.

3                    **DIRECT EXAMINATION**

4    BY MR. PAULSEN:

5    Q.  You are Officer Hagen?

6    A.  Correct.

7    Q.  Who do you work for?

8    A.  The City of Minneapolis.

9    Q.  How long have you been a Minneapolis police officer?

10   A.  Twenty-one years.  And I was an officer at the time of

11   the incident, sergeant today.

12   Q.  Sergeant, sorry.  Okay.  I want to direct your attention

13   to an incident on January 2nd of 2013.  Did you get a call

14   to go someplace that day?

15   A.  I did.

16   Q.  So this is right after New Year's Day in 2013.  What was

17   the call about?  Where did you go and what was the call

18   about?

19   A.  It was a duplex, 4017 and 4019 Lyndale Avenue North, and

20   it was in regards to a damage to property from shots fired.

21   Q.  And that's an up and down duplex?

22   A.  Correct.

23   Q.  Did you go to the lower first to talk to the callers?

24   A.  My partner did.

25   Q.  All right.  And what did you guys learn what -- about

Hagen - Direct

```
1    what they had said had happened?
2    A.  There was damage, two bullet holes in the ceiling of
3    their unit that came from the upstairs unit.
4    Q.  And could -- were the bullet holes actually visible in
5    the ceiling?
6    A.  They were.
7    Q.  And did anybody find any bullets in the floor?
8    A.  I did not.
9    Q.  Do you know if your partner did?
10   A.  I believe he did.
11   Q.  Okay.  And what did the people in the lower say had
12   happened?
13   A.  They had heard shots fired earlier in the night around
14   2:30 in the morning.  And they did not call the police at
15   that time.  Later on they notified their landlord and then
16   we were notified.
17   Q.  So to be clear, they weren't injured in the shooting?
18   A.  Correct.
19   Q.  Bullets just came through their ceiling and into their
20   floor?
21   A.  Correct.
22   Q.  And then was there some concern about people in the
23   upstairs?
24   A.  There was.
25   Q.  What was the concern?
```

Hagen - Direct

```
1    A.  Well, in talking to the landlord, he said he had not

2    seen the female tenant of that unit and that the previous

3    month's rent had been paid by a male on her behalf and he

4    had not been able to make contact with her.

5    Q.  So what did you decide to do with respect to the upper

6    level?

7    A.  Well, with -- with the fact that she hadn't been seen or

8    heard from, along with the fact that there is gunfire from

9    up there, we felt an urgency to go and check the welfare of

10   anyone upstairs.

11   Q.  And were you one of the people that went and did that?

12   A.  I was.

13   Q.  How did you get into the apartment?

14   A.  With a key provided by the landlord.

15   Q.  And was anybody inside the apartment?

16   A.  There was not.

17   Q.  I assumed you looked around for any -- any people or any

18   victims?

19   A.  We checked the whole inside.

20   Q.  And while you were doing that, did you find any signs of

21   guns or ammunition?

22   A.  We did.

23   Q.  Tell us about that.

24   A.  Okay.  There was a hole in the wall from the living room

25   to the kitchen which appeared to be a bullet hole.  There
```

1    was also a --

2    Q.  Now, that doesn't match the ones from the floor -- or

3    the ceiling down into the floor of the lower apartment, does

4    it?

5    A.  Right.

6    Q.  So that would be a different shooting?  That would be a

7    different bullet hole?

8    A.  Correct.  In addition to the other two.

9    Q.  Yeah.

10   A.  And there was a live round of rifle ammunition, so an

11   unfired round on the living room floor.  There was blood

12   splatter in the kitchen area that led to the stairs going

13   down to a storage unit downstairs.  And we continued further

14   looking, there was a -- there was a closet door near two

15   bedrooms and a bathroom towards the rear of the unit that

16   was open and in plain view there was a magazine to a handgun

17   there.

18   Q.  And did you find an actual gun?

19   A.  I did.  I continued to go back to one of the rear

20   bedrooms and looked under the mattress and there was a

21   handgun and a rifle.

22   Q.  What kind of handgun was it?

23   A.  It was later recovered to be a 40-caliber.  I did not

24   handle the guns at the time and inspect them very closely.

25   Our crime lab came out and they later collected them.

Hagen - Direct

```
1     Q.  And I don't know if you know or not, but did
2     Mr. Jackson's DNA turn up on that handgun?
3     A.  Yeah.  I was not part of that process but was informed
4     that it had, yes.
5     Q.  And did his fingerprint turn up on the magazine that was
6     with that gun?
7     A.  Yes.
8     Q.  But to be clear, Mr. Jackson wasn't there, nobody was
9     there?
10    A.  There was no one inside the upstairs unit.  And
11    according to the landlord, he was not on the lease.
12    Q.  Jackson was not on the lease?
13    A.  Correct.
14    Q.  Did you find any paperwork or anything like that with
15    his name in the upper apartment?
16    A.  I did not collect anything with his name on it.
17          MR. PAULSEN:  No further questions.
18          THE COURT:  Mr. Wold.
19                    CROSS-EXAMINATION
20    BY MR. WOLD:
21    Q.  Sergeant Hagan?
22    A.  Yes, sir.
23    Q.  Peter Wold I am.  You were called because of property
24    damage report by a landlord, correct?
25    A.  Correct.
```

Hagen - Cross by Wold

```
1    Q.  And you testified he hadn't seen the woman that was

2    actually on the lease there in a month, that's what he told

3    you?

4    A.  Correct.

5    Q.  But he was an absentee landlord, wasn't he, sir?

6    A.  I would have no idea about that, sir.

7    Q.  Well, he lived in Eden Prairie?

8    A.  I don't know that.

9    Q.  Do you have your report, sir, with you?

10   A.  I have my statement with me.

11   Q.  Okay.  Well, you wrote the report regarding this

12   incident, didn't you, sir?

13   A.  There were several officers involved, and I didn't

14   inquire with the landlord as to where he lived.

15   Q.  Okay.  Well, he didn't live downstairs in the apartment,

16   did he?

17   A.  No, he had tenants downstairs that had called him --

18   Q.  Okay.

19   A.  -- to that location.

20   Q.  Okay.  And he had tenants upstairs?

21   A.  Correct.

22   Q.  And he didn't live there?

23   A.  Correct.

24   Q.  Okay.  So at least in that respect, whether he lived in

25   Eden Prairie or not, he was an absentee landlord?
```

1    A.  He was not living on-site.

2    Q.  Okay.  So anyway, he said he hadn't seen the woman that

3    lived there in about a month?

4    A.  Correct.

5    Q.  And did he tell you that or is that information you got

6    from the -- your fellow officers?

7    A.  That was information passed on by one of the other

8    responding officers.

9    Q.  Okay.  And you had testified that when he was paid rent,

10   he was paid rent by a male individual?

11   A.  Correct.

12   Q.  Okay.  And did you learn who that male was, sir?

13   A.  I did not.

14   Q.  Okay.  Did you learn any description of the male?

15   A.  I did not.

16   Q.  Did you know if the male was black or white or some

17   other ethnic origin?

18   A.  I did not inquire about that.

19   Q.  Okay.  As far as you know, that male was Mr. Jackson?

20   A.  It could have been.

21   Q.  Okay.  You testified that you -- you went upstairs for a

22   welfare check, right?

23   A.  Correct.

24   Q.  And your reason for the welfare check was the concern

25   that there was at least some notice that shots had been

1    fired and two, the concern that this -- the woman that

2    leased that part of the duplex hadn't been seen for a month?

3    A.  Correct.

4    Q.  It was her welfare you were checking on?

5    A.  Or anybody else inside.

6    Q.  Okay.

7    A.  That may have been shot.

8    Q.  And you did a full sweep of the upstairs duplex and

9    found no -- no person in need of welfare?

10   A.  Correct.

11   Q.  Okay.  And certainly the look underneath the mattress

12   wasn't a welfare check at that point, sir, fair?

13   A.  People have been under beds.

14   Q.  Okay.

15   A.  In closets under dirty laundry, any --

16   Q.  You didn't look under the bed, you looked between the

17   mattress and the box spring, right, sir?

18   A.  As part of the check, yes.

19   Q.  Okay.  The -- how long were you in the apartment at that

20   point, sir?  The upstairs apartment?

21   A.  Upon entering that bedroom?

22   Q.  Yeah.  No, upon opening the door, the landlord opens the

23   door to the second floor apartment, how long were you in the

24   apartment ?

25   A.  Prior to?

```
1    Q.  Prior to leaving.

2    A.  Okay.  I can't put an exact time on it.  I don't know.

3    I can't answer that.

4    Q.  15 minutes, 2 hours?

5    A.  Longer than 15 minutes, less than 2 hours.

6    Q.  Less than a half-hour?

7    A.  I would say longer.

8    Q.  Okay.  And did you go through the mail?

9    A.  We -- I know that, you know, I was accompanied by a

10   couple of other officers, and someone had looked for

11   mailings to see who belonged there.

12   Q.  Okay.  Well, who belonged there?

13   A.  As far as I was aware, it was the, you know, it was

14   secondhand information that there was a gal on the lease

15   that was not there.

16   Q.  Okay.

17   A.  And that's what was from the landlord.

18   Q.  Okay.  That's what the landlord told you?

19   A.  Correct.

20   Q.  Okay.  Did you look for any mailings or written

21   materials or anything like that yourself, sir?

22   A.  No.

23   Q.  Tell us about the closet the magazine was found in.

24   A.  Okay.  It was a small closet near a bathroom and there

25   was a bedroom back in that area as well.
```

Hagen - Cross by Nord

1    Q.  Okay.  A small closet.  How wide, how deep, how tall?

2    A.  I didn't measure it, but it had linens in it.  It was

3    that type of closet.

4    Q.  Okay.  Full door, half door?  What -- was it two feet

5    tall, five feet tall?

6    A.  It was tall.  I don't know exactly how tall.

7    Q.  Okay.  Well, I'm -- let's say I'm five-eleven, I mean,

8    was it as tall as me, less, half my size?

9    A.  It was a standard linen-type closet.

10   Q.  There was a phone found there too, sir, right?

11   A.  I cannot testify to that.

12   Q.  Well, do you know there was a cell phone there?

13   A.  I believe there was, but it was not recovered by myself.

14   Q.  Okay.  Well, nor was the other items that were

15   fingerprinted or tested, is that right?

16   A.  They were recovered by the crime lab, correct.

17   Q.  Okay.  And were you aware that fingerprints of

18   Mr. Jackson's were found on the cell phone?

19   A.  The cell phone specifically I do not recall.

20   Q.  Okay.  Well, if you were attempting to discern who

21   occupied that residence, a cell phone could provide pretty

22   good information about that from time to time, is that fair?

23   A.  Anyone's phone could be there.

24   Q.  Okay.  Well, whose phone was it?

25   A.  I -- didn't really deal with the phone, sir.  I cannot

1    testify to that.

2                MR. WOLD:  I have no other questions.

3                THE COURT:  Anybody else have questions for this

4    officer?

5                Mr. Paulsen, any redirect?

6                MR. PAULSEN:  No, Your Honor.

7                THE COURT:  Did -- when you went upstairs to look

8    -- I believe you testified when you went downstairs, when

9    you first arrived, you looked at the ceiling and you saw the

10   bullet holes in the ceiling, is that correct?

11               THE WITNESS:  My partner was the first one there,

12   not my partner of my squad but there was another officer

13   that dealt mostly with the landlords and the tenants

14   downstairs and got some of this initial information and it

15   was passed on to us secondhand.  I was more involved in -- I

16   was -- I did enter the downstairs.

17               THE COURT:  Let me rephrase my question.  Is there

18   evidence in the case that there were bullet holes observed

19   by law enforcement in the downstairs apartment ceiling?

20               THE WITNESS:  Absolutely.

21               THE COURT:  Okay.  When you went upstairs, did you

22   see the corresponding bullet holes in the floor of the

23   upstairs?

24               THE WITNESS:  Yes.

25               THE COURT:  Okay.  All right.  Thank you.  You're

1    excused.  Next witness.

2          MR. WOLD:  Your Honor, if I can approach.  I

3    would -- you can be excused.  My -- I can make an offer of

4    proof or offer the limited testimony of Mr. Jackson to

5    establish his standing to challenge the search, Your Honor,

6    and if this would be the appropriate time, I would --

7          THE COURT:  Why don't you wait.  My thought is the

8    government will put in all the evidence it has, I'll call on

9    all of the defendants who wants to put in some evidence and

10   we'll address it at that time.

11         MR. WOLD:  Okay.

12         THE COURT:  Okay.

13         MR. PAULSEN:  Officer Rian Jensen.

14         THE COURT:  Do you want to come forward and get

15   sworn in, please, sir.

16       (The witness is sworn.)

17         THE COURT:  Have a seat, state your name, spell

18   your last name for the record for the court reporter,

19   please.

20         THE WITNESS:  My name is Rian Jensen, J-E-N-S-E-N.

21         MR. PAULSEN:  Your Honor, just so you know where

22   we're going, this relates to two defendants, Mr. Catchings

23   and Mr. Armstrong.  As to Catchings, it's Count 4 of the

24   Indictment, and as to Armstrong, it's overt act 14 of the

25   Indictment.

Jensen - Direct

**DIRECT EXAMINATION**

BY MR. PAULSEN:

Q.  Officer Jensen, by whom are you employed?

A.  City of Richfield Police Department.

Q.  How long have you been a police officer for Richfield?

A.  Eight years.

Q.  I'm going to take you back to May 21st of 2014.  Were you involved in the investigation of a robbery in the city of Richfield?

A.  Yes.

Q.  Who was the victim of the robbery?

A.  Malcolm Lyons.

Q.  And did he live at 840 West 65th Street, Apartment 203?

A.  Yes.

Q.  So can you tell us what happened that evening and what you did to investigate the crime?

A.  I was off duty at the time.  I was notified by my supervisor that there had been a shooting and robbery at 840 West 65th Street.  Some detectives and officers were already on scene.  I responded directly to HCMC to speak with Mr. Lyons and find out what happened.  So that's the first thing that I did.

Q.  So Malcolm Lyons was the victim and he had been shot?

A.  Yes.

Q.  In what part of the body?

Jensen - Direct

```
1    A.  The leg.

2    Q.  So you went down to HCMC to talk to him?

3    A.  Yes.

4    Q.  And what did he tell you about what had happened in his

5    apartment earlier that evening?

6    A.  He said that he invited a friend over, that his friend

7    arrived and had brought another individual who he did not

8    know and when they walked up, he let them into the apartment

9    and when they got inside the apartment, the second

10   individual who he didn't know pulled a gun from his

11   waistband and they commenced in a robbery.

12   Q.  Robbing Mr. Lyons?

13   A.  Yes.

14   Q.  And Mr. Lyons claimed that they shot him in the leg?

15   A.  Yes.

16   Q.  Okay.  Were you able to identify -- was he able to

17   identify for you his assailant?

18   A.  Yes.

19   Q.  And how did he do that?

20   A.  He knew his -- the friend that he invited over, he knew

21   his Facebook page, so he located that, and based off of that

22   Facebook page, we located a photo with the first defendant

23   and the second defendant in the same photo which was tied to

24   his Facebook page which had his name on it.

25   Q.  Okay.  So you IDed him through Facebook?
```

Jensen - Direct

1    A.  Yes.

2    Q.  But who did the friend that he knew turn out to be?

3    A.  Marques Armstrong.

4    Q.  Marques Armstrong.  And the other person turned out to

5    be?

6    A.  Dontevius Catchings.

7    Q.  All right.  Meanwhile, had -- did you interview any of

8    the people that were in the apartment at the time of the

9    incident?

10   A.  No.

11   Q.  Some fellow officers did, though?

12   A.  Yes.

13   Q.  And did other people that were in the apartment at the

14   time generally cooperate to what had happened?

15   A.  Yes.

16   Q.  Now, at that point since you had two armed robbery

17   suspects identified, what did you do in terms of putting out

18   any information to fellow officers?

19   A.  So the first individual we identified was Mr. Catchings.

20   We put out what's called a cops letter which is basically an

21   attempt to locate.  It's for officer safety in case anybody

22   comes across that individual.  And we were still downtown

23   Minneapolis, we had just left HCMC when our dispatch

24   notified us that a female had entered the Hennepin County

25   jail to pay some fines for Mr. Catchings which alerted jail

1    staff and then they notified us.

2    Q.  So this is just a few hours after the incident?

3    A.  Yes.

4    Q.  And you happened to be downtown because you had been at

5    HCMC?

6    A.  Yes.

7    Q.  And now you're getting word because of your broadcast

8    that Catchings' girlfriend is at the jail paying a warrant?

9    A.  Yes.

10   Q.  For Catchings?

11   A.  Yes.

12   Q.  Okay.  So what did you do then?

13   A.  We began driving towards the jail.  We told them to just

14   let her go.  And before that could even happen, they said

15   that the female, Catchings' girlfriend, just ran out the

16   front door of the jail, and this was basically as we were

17   right in front of the jail, so we saw her running from the

18   building.

19   Q.  And what -- where did she go?

20   A.  She ran to a white car that was parked nearby.

21   Q.  Did that turn out to be an Oldsmobile Alero?

22   A.  Yes.

23   Q.  Was there anybody else in the car?

24   A.  Yes.

25   Q.  Did you know at that point for sure whether it was

Jensen - Direct

```
 1     Catchings or not in the car?
 2     A.  Well, as the vehicle kind of sped off around the corner,
 3     it drove right past us.  I could see that there were two
 4     black males inside the car which that matched the
 5     description of our suspect, so we followed the car, had
 6     Minneapolis stop -- assist us with stopping the vehicle in
 7     downtown Minneapolis and then we identified Dontevius
 8     Catchings was in the front passenger seat and then there was
 9     a second male identified as Jabari Johnson in the back seat.
10     Q.  Jabari Johnson, he's another one of the co-defendants in
11     this case?
12     A.  Yes.
13     Q.  Okay.  But Mr. Armstrong, to be clear, was not the
14     second male in the car with Catchings?
15     A.  He was not.
16     Q.  But you said Catchings was in the passenger seat?
17     A.  Yes.
18     Q.  All right.  And had the victim, Mr. Lyons, given
19     you -- or no, had some witness given the description of the
20     clothing that one of the robbery suspects was wearing?
21     A.  Yes, officers spoke to multiple people who were in the
22     area at the time of the robbery, and one of the witnesses
23     described one of the males as wearing a camouflage-colored
24     shirt.
25     Q.  And was Mr. Catchings wearing such a shirt?
```

Jensen - Direct

1    A.  He was.  He was wearing a camo shirt.

2    Q.  Okay.  So was he arrested at that point?

3    A.  Yes.

4    Q.  So probable cause robbery I'd assume?

5    A.  Yes.

6    Q.  And was there something observed in plain view in the

7    car at that time?

8    A.  Yes.  The glove box was open.  There was a white cell

9    phone.

10   Q.  And what was the significance of the white cell phone?

11   A.  Mr. Lyons had stated that his white cell phone and some

12   cash and some keys were taken.

13   Q.  By the robbers?

14   A.  Yes.

15   Q.  And did this cell phone seem to match the description --

16   A.  Yes.

17   Q.  -- of the missing cell phone of Mr. Lyons?

18   A.  Samsung Galaxy.

19   Q.  Okay.  So whose car was this, by the way?

20   A.  I believe it was the girlfriend, I want to say.  I don't

21   know who the registered owner was, but I know that her last

22   name was Fields, she was driving.

23   Q.  Okay.  And was there a search warrant obtained for that

24   2001 white Oldsmobile Alero?

25   A.  Yes.

1    Q.  Was the property left in the car until the search

2    warrant was obtained?

3    A.  Yes.  The car went directly from the stop location to

4    our evidence garage at the Richfield PD.

5              MR. PAULSEN:  May I approach, Your Honor?

6              THE COURT:  Sure.

7    BY MR. PAULSEN:

8    Q.  Showing you what's been marked as Government Exhibit 10,

9    is that the search warrant for the Oldsmobile Alero?

10   A.  Yes, it is.

11             THE COURT:  Exhibit 10.

12             MR. SHIAH:  No objection.

13             THE COURT:  Exhibit 10 will be received.

14        (Government Exhibit No. 10 is received.)

15             MR. PAULSEN:  And Your Honor, I'm offering it, but

16   with the understanding, again, I do not agree that

17   Mr. Catchings has standing to challenge the search of

18   someone else's vehicle.

19             THE COURT:  Okay.

20   BY MR. PAULSEN:

21   Q.  The cell phone that was in the car, did that turn out to

22   be Mr. Lyons' cell phone?

23   A.  Yes, it did.

24   Q.  So now you've got Catchings in custody.  Were you still

25   interested in finding Mr. Marques Armstrong?

1    A.  Yes.

2    Q.  And did you do some research on him and come up with a

3    possible address for him?

4    A.  Yes, we did.

5    Q.  Which was what?

6    A.  3341 Oliver Avenue North, Minneapolis.

7    Q.  And did you relay that to fellow officers?

8    A.  Yes.

9    Q.  And are you aware that Mr. Armstrong was arrested and

10   coming -- well, are you aware of the circumstances of his

11   arrest a couple of days later?

12   A.  Yes.

13   Q.  It was May 23rd, wasn't it?

14   A.  Yes.

15   Q.  What happened May 23rd?

16   A.  Officers and deputies from the Hennepin County Violent

17   Offender Task Force were set up on that residence and

18   observed Mr. Armstrong leaving the residence, getting into a

19   vehicle and driving away from that area which was later

20   stopped.

21   Q.  Were you out there on the scene or not?

22   A.  No.

23        MR. PAULSEN:  Okay.  So I have another witness

24   coming up next on that.

25        Before I go on, though, Mr. Shiah, where did

Jensen - Direct

1     he -- there you go.

2          (Mr. Paulsen conferred with Mr. Shiah.)

3               MR. PAULSEN:  Your Honor, I'm told that there is a

4     challenge to the search warrant for Mr. Catchings' DNA

5     sample, so I will offer Government Exhibit 11 which is the

6     search warrant.  I'm informed that he agrees that that can

7     be reviewed on the four corners of the warrant.  So I offer

8     11.

9               THE COURT:  Any objection to Exhibit 11?

10              MR. SHIAH:  No objection for this hearing.

11              THE COURT:  Okay.  Exhibit 11 will be received.

12         (Government Exhibit No. 11 is received.)

13              THE COURT:  Did you offer 10?

14              MR. PAULSEN:  If I didn't, I meant to.  I offer 10

15    now.

16              THE COURT:  No objection to 10?

17              MR. SHIAH:  What was 10, Your Honor?

18              THE COURT:  The search warrant for the car.

19              MR. SHIAH:  No objection.

20              THE COURT:  Okay.  Exhibits 10 and 11 are

21    received.

22    BY MR. PAULSEN:

23    Q.  Well, just so the record is clear, did you subsequently,

24    through investigation, come to question whether it was

25    actually the robbers that shot Mr. Lyons as opposed to

1    someone else who shot Mr. Lyons?

2    A.  Yes.

3    Q.  And it's not -- did that -- when did that information

4    come to light?  Was it that same night that you caught

5    Catchings or was it the next day?

6    A.  That was the next -- the next day, the next several

7    days.

8    Q.  And can you just briefly explain what the -- what the

9    circumstances were that caused you to question his -- the

10   truth of some of his account?

11   A.  After I personally examined Mr. Lyons' pants that he was

12   wearing when he was shot and one of the things I noted was

13   that there was only one hole in the pants where it appeared

14   the bullet had made entry or exited, and if he was shot from

15   the outside of the pants, there should have been two bullet

16   holes.

17   Q.  Because the bullet went through and through his leg?

18   A.  Yes, there was a through-and-through wound on his leg.

19   And there was also what appeared to be gunshot residue on

20   the inside of the pants.

21   Q.  All right.  So you thought it was a possibility that

22   maybe he had a gun in the waistband and shot himself?

23   A.  Yes.

24   Q.  And to be fair, you questioned Mr. Lyons about that

25   later and what was his --

Jensen - Direct

```
1    A.  I did.

2    Q.  -- account the next day when you questioned him?

3    A.  He claimed that Mr. -- when Catchings had the gun, he

4    had lowered it for a second and which gave him an

5    opportunity to grab the gun and pull it straight down, and

6    he said when he pulled the gun straight down, it went inside

7    his pants and that's when the gun went off.

8    Q.  Okay.  And that's what you knew as of May 22nd?

9    A.  Yes.

10   Q.  And then to be fair, and so the record is clear, and the

11   judge has heard this evidence before, but subsequently

12   wasn't it determined that the gun that shot Mr. Lyons was

13   found in Mr. Lyons' own apartment?

14   A.  Yes, it was.

15   Q.  And had his blood on it?

16   A.  Yes.

17   Q.  Okay.  That, I take it, came much later, didn't it, the

18   matching of the gun to the --

19   A.  Yeah.

20   Q.  -- shell casings?

21   A.  That required some ballistic testing and other things

22   from Hennepin County Crime Lab.

23   Q.  So it was long after the arrest of Catchings and

24   Armstrong that we're going to hear about in a minute?

25   A.  Yes.  Yes.
```

1              MR. PAULSEN:  Okay.  Nothing further.

2              THE COURT:  Mr. Shiah.

3              MR. SHIAH:  Thank you.

4                        **CROSS-EXAMINATION**

5    BY MR. SHIAH:

6    Q.  So one thing we've established is Mr. Lyons is a liar?

7    A.  Yes.

8    Q.  He lied to you when he first talked to the officers at

9    the scene about Mr. Catchings, right?

10   A.  Well, at that point we just dealt with the information

11   that we had so.

12   Q.  No, I'm just asking, he lied to you specifically about

13   what happened, correct?

14   A.  Yes.

15   Q.  And then later on you found some more information before

16   you had any ballistics or any scientific evidence and you

17   went back and you gave him another shot, right, about how he

18   got shot?

19   A.  Yes.

20   Q.  And then he came up with another story, right?

21   A.  Yes.

22   Q.  So he lied then, right?

23   A.  Yes.

24   Q.  And then it wasn't until sometime later whenever you got

25   back what we call forensics that you confronted him again

1    and then he finally confessed he shot himself, right?

2    A.  No.

3    Q.  He never did that?

4    A.  No.

5    Q.  All right.  But he gave you another version, is that

6    correct?

7    A.  No.

8    Q.  So who shot him?  Do you know?

9    A.  All I know is the gun that was found in his apartment

10   matched the casing that was on the floor and the evidence of

11   the pants.

12   Q.  And that gun was there before anybody showed up, right?

13   As far as you know?  Or do you know?

14   A.  I don't understand.

15   Q.  Do you know when that gun even made its way to the

16   apartment where this happened?

17   A.  No.

18   Q.  All right.  Do you know whose gun it was?

19   A.  Yes.

20   Q.  Who?

21   A.  Jasmin Villagomez, Lyons' girlfriend.

22   Q.  So that was somebody that was living there.  He got shot

23   with a gun by somebody, presumably his girlfriend, and not

24   some gun that somebody brought there, correct?

25   A.  That was determined later on, yes.

1   Q.  All right.  So at least Mr. Lyons you can't really rely

2   on what he tells you, correct?

3   A.  I guess.

4   Q.  You guess not, right?

5   A.  Well, there was still a robbery and there was still a

6   phone located that was his in a car in Minneapolis.

7   Q.  I know about this and I know about the allegation and I

8   know my client was charged in state court, but it was

9   presumably and primarily based on what Mr. Lyons said,

10  correct?

11  A.  Yes, it was.

12  Q.  And he's a liar, right?

13  A.  Yes, he is.

14  Q.  Okay.  Now, let's move on to this scenario, and that

15  particular night -- and I have your report.  Do you have

16  that in front of you, sir?

17  A.  No.

18  Q.  Did you review it before you came into the courtroom

19  today?

20  A.  Briefly.

21  Q.  Well, how much is briefly?

22  A.  I read over my report quick.

23  Q.  Did you read the specific section that listed the

24  information you had before you stopped that white car?  Did

25  you read that?

Jensen - Cross by Shiah

1    A.  Yes.

2    Q.  And you've been on the force for eight years, correct?

3    A.  Yes.

4    Q.  So I assume you're a trained officer and you know how

5    important these reports are, correct?

6    A.  Yes.

7    Q.  And they should be as detailed as possible, correct?

8    A.  Yes.

9    Q.  Especially when you're putting in the report why you

10   stopped a vehicle or why you arrested somebody, that's

11   important information, correct?

12   A.  Yes.

13   Q.  And I listened when Mr. Paulsen was asking you

14   questions, you heard about this robbery of Mr. Lyons or this

15   allegation, correct?

16   A.  Yes.

17   Q.  And he kind of fingered Mr. Catchings and somebody else,

18   right?

19   A.  Yep.

20   Q.  And then you got this other information about somebody

21   being down at the police station trying to clear warrants,

22   right?

23   A.  Yes.

24   Q.  A female?

25   A.  Yes.

1    Q.  And I believe you weren't sure what her name was, but I

2    think it's, let me see, I wrote it down here, Mr. Catchings'

3    girlfriend, right?

4    A.  Yes.

5    Q.  And would that be Ms. Fields, does that ring a bell?

6    A.  Yes.

7    Q.  Now, all this information you had about whatever

8    happened in Mr. Lyons apartment, was there anything that

9    said about a woman being a part of this alleged robbery?

10   A.  No.

11   Q.  No.  Just two dudes, right?

12   A.  That's correct.

13   Q.  And then when you finally got down, all the information

14   you had was that some lady who may or may not have known

15   Mr. Catchings was trying to clear warrants, is that correct?

16   A.  For our suspect, yes.

17   Q.  Yeah.  Is there anything illegal about that?

18   A.  No.

19   Q.  All right.  And then there was something else about her

20   running out of the police station, right?

21   A.  Yes.

22   Q.  Anything illegal about that?

23   A.  Suspicious, not illegal.

24   Q.  I said anything illegal --

25   A.  No.

1    Q.  -- about running out of a police station, right?

2    A.  Nope.

3    Q.  And you didn't actually see this, this is all

4    information that you were being provided, right?

5    A.  I saw this.

6    Q.  You saw her running out?

7    A.  Yes.

8    Q.  Because you guys had just come from the hospital?

9    A.  Yes.

10   Q.  All right.  So she got in the white car and then you

11   took off, right?

12   A.  Yes.

13   Q.  Did you pull her over?

14   A.  Yes.

15   Q.  Right then?

16   A.  No.

17   Q.  And this is where we're going to get back to the report

18   about what you saw.  You claimed a few minutes ago that the

19   individual in the car matched the description of the

20   suspect.  That's what you just testified to, right?

21   A.  We knew that the two individuals who committed the

22   robbery were black males.  That's -- at that time, that's

23   all we had.

24   Q.  Well, that's a little different.  I'm glad you clarified

25   it, because there's not one word in your report about this

1    individual in the car matching the description of the

2    suspect, there's zip about that, correct?

3    A.  Correct.

4    Q.  So all you had was a black male?

5    A.  Correct.

6    Q.  No height, no weight, nothing, correct?

7    A.  Correct.

8    Q.  And then you see this lady get into a white car and you

9    see two black males, one in the front, one in the back?

10   A.  Correct.

11   Q.  And according to your report, they pulled over, right?

12   A.  Yeah, eventually they did, yes.

13   Q.  Yeah, well, did you have your lights -- do you want to

14   look at your report again?  I'm not trying to make this up.

15   A.  Well, we were both in plain clothes capacity, driving a

16   unmarked police car, not well equipped to conduct a high

17   risk traffic stop so --

18   Q.  And you began -- I'm sorry.  Are you through?

19   A.  No, I'm not.

20   Q.  Okay.  Go ahead.

21   A.  We announced this information to Minneapolis police to

22   have them assist us in conducting the traffic stop.

23   Q.  And you began following the car through downtown

24   Minneapolis, right?

25   A.  Yes.

1   Q.  And all you had at that time was a lady running out of a

2   police station, right?

3   A.  Trying to pay warrants for our suspect.

4   Q.  Well, that's -- I'm getting there.  But you had a lady

5   running out of the police station, right?

6   A.  Yes.

7   Q.  No indication that he was in that car?

8   A.  I suspected that he was in the car.

9   Q.  That's your suspect.  Why, because he's black?

10  A.  No.

11  Q.  Because she's his girlfriend?  What?

12  A.  Yes.

13  Q.  That was it?

14  A.  Yes.

15  Q.  And you didn't make any visual contact.  You had no

16  benefit of a suspect description other than a black male,

17  correct?

18  A.  Correct.

19  Q.  And then you made the decision to stop that car?

20  A.  Yes.

21  Q.  And you pulled it over, and there's no doubt in your

22  mind it was a seizure, they weren't free to go, correct?

23  A.  Correct.

24  Q.  And then based on that, you ended up arresting them,

25  correct?

1    A.  Well, when we removed the occupants of the car, we

2    located Mr. Catchings.

3    Q.  Right.  You got lucky?  You didn't know if he was there

4    or not there, right?

5    A.  No, I didn't know that.

6               MR. SHIAH:  Okay.  I have no further questions.

7               One other thing that we just want to clarify on

8    this identification, because I had raised a motion, Your

9    Honor, Mr. Paulsen and I talked about that a little bit, he

10   mentioned an identification by somebody at the house.  I was

11   told that was not going to be coming in at trial.  I know

12   it's part of this for the hearing, but I just want to make

13   sure I'm right about that.

14              THE COURT:  Mr. Paulsen.

15              MR. PAULSEN:  Well, what I told him about was

16   there was later a photo spread done where the victim,

17   Malcolm Lyons, picked out the I believe both Catchings and

18   Armstrong, and what I told Mr. Shiah is that I don't need to

19   prove up that photo spread issue because I wouldn't be

20   putting in the photo spread at trial.

21              THE COURT:  Okay.

22              MR. PAULSEN:  But if other witnesses back at the

23   house can identify, you know, the robbers come time of

24   trial, I'm not saying we're not going to use that.  I never

25   made that representation.

```
1              MR. SHIAH:  No, I understand that, Judge.

2              THE COURT:  Just to be clear, does what

3     Mr. Paulsen said clarify what you were asking about,

4     Mr. Shiah?

5              MR. SHIAH:  It does.

6              THE COURT:  Okay.  All right.  Hold on.

7     Mr. Birrell, do you have any questions for this witness?

8              MR. PAULSEN:  Oh, certainly.

9              MR. BIRRELL:  I have a couple.  I also have this,

10    I want to clarify my photographic identification, in court

11    identification issue.  Mr. Paulsen and I, I believe, had the

12    same conversation, so the -- my understanding is that

13    there's not going to be any identification evidence offered

14    at trial against Mr. Armstrong and there's not going to be

15    identification by the witness at trial who was showed the

16    photo spread, is that right?

17             MR. PAULSEN:  No, what I said is we're not going

18    to introduce at trial any statement by this officer, for

19    example, that Malcolm Lyons picked Armstrong or Catchings

20    out of the photo spread.  Now, at trial, are we going to

21    call Malcolm Lyons? We probably are.  Can Malcolm Lyons

22    independently identify these people? Yeah.

23             MR. BIRRELL:  Well, we would have to have a

24    hearing to determine that and that was the purpose of making

25    the motion to suppress the identification evidence.  So if
```

1    they want to have Lyons or whoever identify my guy and they

2    had been shown a photo spread, they're going to need to show

3    that there's a basis to have the in court identification

4    other than the photo spread.

5            THE COURT:  I'm sorry.  Your client is Armstrong?

6            MR. BIRRELL:  Yes.  The other point, Your Honor,

7    if I might, is I don't have the photo spreads yet that were

8    displayed to the witness.

9            THE COURT:  All right.  So now I'm confused.  So

10   Mr. Paulsen, is there or isn't there going to be evidence at

11   trial that Mr. Armstrong and Mr. Catchings were the people

12   who robbed Mr. Lyons?

13           MR. PAULSEN:  Yes.  But it won't come from

14   somebody saying they were picked out of a photo spread.  It

15   won't come from this officer saying I showed a photo spread

16   and Lyons picked him out.

17           THE COURT:  But Lyons is going to identify both

18   Armstrong and Catchings as the robbers?

19           MR. PAULSEN:  Yes.  Remember, he knew them and he

20   was able to identify them and show pictures on Facebook to

21   the officers --

22           THE COURT:  Well, I understand you've got --

23           MR. PAULSEN:  -- long before he --

24           THE COURT:  -- a lot of evidence about that, but

25   if they're moving to suppress it, as I understand it,

```
 1    Mr. Armstrong wasn't known to Mr. Lyons, only Mr. Catchings,

 2    and he said I recognized -- they picked some guy out of a

 3    Facebook thing.

 4             MR. PAULSEN:  Yeah.

 5             THE COURT:  And that's how they identified

 6    Armstrong, correct?

 7             MR. SHIAH:  It was just the opposite.  That was my

 8    understanding.

 9             MR. PAULSEN:  That was the opposite.  He knew

10    Catchings, was a friend of his.  I'm sorry.  He knew

11    Armstrong, a friend of his, and then he -- they find the

12    picture of Catchings on Facebook, so that's -- that's when

13    the identification takes place.  It's not days later from a

14    photo spread.

15             THE COURT:  All right.  Well, we will address all

16    of this in whatever memos you're all going to write me, and

17    I'll figure out if we need further hearing or not.

18             MR. BIRRELL:  Okay.

19             THE COURT:  For now, Mr. Birrell, do you have some

20    questions at this time?

21             MR. BIRRELL:  I have just a couple.

22                        CROSS-EXAMINATION

23    BY MR. BIRRELL:

24    Q.  Officer, were you called to the scene of this alleged

25    burglary?
```

```
1    A.  No.

2    Q.  So how did you get involved?

3    A.  Well, I respond with my partner to HCMC.  Some other

4    detectives were already on scene at the apartment.

5    Q.  So you went to the hospital because there was a

6    shooting?

7    A.  Yes.

8    Q.  And that's where you interviewed this person who was

9    shot?

10   A.  Yes.

11   Q.  His name was Lyons, is that --

12   A.  Yes.

13   Q.  Okay.  What was the reason that the responding officers

14   were initially called to Mr. Lyons' domicile?

15   A.  If I remember correctly, it had something to do with a

16   burglary and then as they were responding there was some

17   updates about a shooting or a gun scene.

18   Q.  Who called the police and reported the burglary?

19            THE COURT:  Let me interrupt for a second because

20   I'm getting confused about the words.  Is it a burglary or a

21   robbery?

22   BY MR. BIRRELL:

23   Q.  Well, a burglary I assume is what the call was, is that

24   what you're saying?

25   A.  I believe the initial call was about a burglary.
```

         1              THE COURT:  Okay.  But we're talking about the

         2      same thing, it's the guy comes over, he enters the front

         3      door as an invited guest?

         4              THE WITNESS:  Yes.

         5              THE COURT:  And then shoots the guy or so that's

         6      the claim?

         7              THE WITNESS:  Yes.

         8              THE COURT:  Okay.

         9              MR. BIRRELL:  And then that would become a

        10      robbery.

        11      BY MR. BIRRELL:

        12      Q.  Okay.  But who called in the burglary?

        13      A.  I don't remember.

        14      Q.  Was it Lyons?

        15      A.  I thought it was one of the females that was at the

        16      apartment.

        17      Q.  And how many women were at the apartment, do you know?

        18      A.  Two or three I think.

        19      Q.  So what was it that was said when the telephone call to

        20      the police was made?

        21      A.  I don't -- I don't know.

        22      Q.  Who called you, the officer on the scene?

        23      A.  I think it might have been my patrol lieutenant or

        24      investigative lieutenant.

        25      Q.  So how did Lyons get to the hospital?

1    A.   Ambulance.

2    Q.   Did the officers at the scene talk to Mr. Lyons too?

3    A.   I -- if they did, it was very brief.  I don't remember

4    if they did or not.

5    Q.   Was this a life threatening injury he had as far as you

6    know?

7    A.   It ended up not being one.

8    Q.   How long was he at the hospital before you spoke with

9    him?

10   A.   Maybe an hour.

11   Q.   Did you have the benefit of any other information that

12   Mr. Lyons had provided when you spoke with him at the

13   hospital?

14   A.   I'm sorry, can you repeat that?

15   Q.   When you spoke with Mr. Lyons at the hospital, did you

16   have the benefit of any other information that Mr. Lyons had

17   provided?

18   A.   Very basic information.

19   Q.   Such as what?

20   A.   That the suspects were two black males, that they left

21   in a black four-door vehicle.  That was really about the

22   extent of it.

23   Q.   So Mr. Lyons had told the officers on the scene that he

24   was robbed by two black males and then they, two black

25   males, fled?

1    A.  I don't remember if that's what he said, but the females

2    on scene and other civilian -- or unrelated witnesses gave

3    those same descriptions.

4    Q.  What other unrelated witnesses would these be?

5    A.  People that live in the building or adjacent to the

6    buildings.

7    Q.  I guess we've never asked, what sort of place did

8    Mr. Lyons live in, was it an apartment house?

9    A.  Yes.

10   Q.  Okay.  Was -- do you know how many people lived there,

11   how big it was?

12   A.  If I had to guess, there's maybe a dozen to 20

13   apartments in each building, and they're kind of all --

14   Q.  There's a number of buildings?

15   A.  Yeah, they're all -- they're not connected, but there's

16   a number of buildings kind of in a row.

17   Q.  And you know about these because these are in your

18   jurisdiction?

19   A.  Yes.

20   Q.  So when you met with Mr. Lyons, did you tell me how long

21   you thought he'd been at the hospital?

22   A.  I'd be guessing, but it couldn't have been that long.

23   Maybe an hour.

24   Q.  Was he in pain?

25   A.  No.

```
 1    Q.  Was he medicated?

 2    A.  I don't remember.  I have no idea.

 3    Q.  How long did you speak with him?

 4    A.  Maybe 15, 20 minutes.

 5    Q.  Did you speak with him after that?

 6    A.  Yes.

 7    Q.  After a different time?

 8    A.  Yep.

 9    Q.  When was that?

10    A.  The next day.

11    Q.  Where did you speak with him then?

12    A.  He came to the Richfield PD.

13    Q.  Okay.  So sometime between then and when you spoke with

14    him, first he was released from the hospital?

15    A.  Yes.

16    Q.  And was he on medication, do you know?

17    A.  I have no idea.

18    Q.  Was he limping?

19    A.  Yep.

20    Q.  What time of day did you speak with him at the hospital?

21    A.  Well, the initial call was at 9 o'clock.  I wouldn't

22    have got in, it probably had to have been probably somewhere

23    10, 11, sometime around there.

24    Q.  And he had already received his medical attention, I

25    assume?
```

```
1    A.   Yes.

2    Q.   Was he in the emergency room when you spoke with him?

3    A.   I don't remember exactly the unit he was in.

4    Q.   Was anyone else present when you spoke with him?

5    A.   My partner at the time.

6    Q.   And what was that person's name?

7    A.   Dustin Shorzy [spelled phonetically].

8    Q.   And then what -- so it was around midnight you're

9    thinking?

10   A.   It would have been before midnight I believe.

11   Q.   Okay.  11 o'clock?  I'm just trying to --

12   A.   Yep.

13   Q.   Best you can remember.  What time of day did you speak

14   with him the next day?

15   A.   I don't remember.

16   Q.   Do you remember anything about what time of day it was,

17   morning, afternoon?

18   A.   It might have been morning.  My guess is it would have

19   been either late morning or late afternoon.

20   Q.   Was it your understanding that he had come directly from

21   the hospital to the police station?

22   A.   I have no idea where he came from.

23   Q.   You didn't tell him come on down as soon as you get out?

24   A.   Nope.

25   Q.   Who was with him when he arrived at the police station?
```

1    A.  His girlfriend.

2    Q.  Ms. Fields, is that her name?

3    A.  No, that was Mr. Catchings' --

4    Q.  I'm sorry.

5    A.  -- girlfriend.

6    Q.  Too many players here.  Do you remember her name?

7    A.  Jasmin Villagomez.

8    Q.  Okay.  And was she present while you and he spoke?

9    A.  Yes.

10    Q.  Was the statement recorded?

11    A.  I believe it -- I didn't use my digital recorder, but if

12    I remember, I think I might have hit the -- there's also a

13    camera in the room, I might have turned that on.

14    Q.  So you have an interview room that's sort of rigged up

15    for recording?

16    A.  Yep.

17    Q.  So there might have been video then?

18    A.  Yep.

19    Q.  Did you speak with him after this meeting we just talked

20    about right now?

21    A.  I think so but I don't recall specifically when that

22    would have been.

23    Q.  All right.

24    A.  I did run into him a couple of times, I believe.

25    Q.  Where did you run into him?  Just about or did you make

1    an arrangement to meet with him?

2    A.  Yeah.  I know I was at his apartment to try to talk to

3    him about something.  I think he might have come to the

4    station one more time, but I don't remember specifically.

5    Q.  What were you going out to his apartment to talk to him

6    about?

7    A.  It was to assist the ATF.

8    Q.  In this case?

9    A.  Yes.

10   Q.  What sort of assistance were they asking --

11             MR. PAULSEN:  Your Honor, I think we're getting

12   kind of far afield from the search.

13             MR. BIRRELL:  I think we are entitled to impeach

14   the hearsay declarant with his cooperation if that's where

15   we're going.

16             THE COURT:  Overruled.

17             THE WITNESS:  It was about the firearms that were

18   recovered.

19   BY MR. BIRRELL:

20   Q.  In this matter?

21   A.  In my case.

22   Q.  Which case is your case, just --

23   A.  The robbery, shooting.

24   Q.  Okay.  The one that Lyons has told a number of --

25   A.  Yes.

1    Q.  -- versions of?  So what was his helpful role, what was

2    it to be?

3    A.  I believe they wanted to speak to he or his girlfriend.

4    Q.  And for what purpose was that, do --

5             THE COURT:  Let me interrupt and revisit the

6    objection Mr. Paulsen made, because I was under the

7    impression that the assistance was to help the ATF in this

8    case.  You're talking about helping the ATF in the robbery

9    case of Mr. --

10            THE WITNESS:  From my understanding, my case got

11   tied in to some other stuff that I wasn't involved in

12   and --

13   BY MR. BIRRELL:

14   Q.  Your -- excuse me, your case is tied up in this federal

15   indictment?

16   A.  Yes.

17            THE COURT:  Okay.  Never mind.  Keep going.  I got

18   it.

19            THE WITNESS:  I had a state case initially.

20   BY MR. BIRRELL:

21   Q.  Right.  We have that clarified, I believe.  So what did

22   they want him to do?

23   A.  They just wanted to talk, from my understanding, it was

24   mainly to the girlfriend, because the firearms were

25   registered to her.

1   Q.  Okay.  When did it come to pass that this firearm at the

2   home was tested?  How did that happen?

3   A.  Well, Hennepin County Crime Lab responded to the

4   apartment and they --

5   Q.  When did they do that?  At the time of the crime was

6   reported?

7   A.  Immediately, yep.

8   Q.  Okay.

9   A.  They were summoned to the scene to -- they process all

10  of our large crime scenes.

11  Q.  And did they take the gun?

12  A.  Yes.

13  Q.  Okay.  And what -- what processing did they do of it?

14  A.  Well, I believe they processed it for latent prints and

15  DNA and also ballistics.

16  Q.  What did they discover?

17  A.  They discovered that the blood matched the DNA of Lyons

18  and that the ballistics matched the expelled casing that was

19  found on the kitchen floor.

20  Q.  Okay.  And any other prints or DNA testing?  No?

21  A.  Huh-uh.

22          MR. BIRRELL:  All right.

23          THE COURT:  Is that a no?

24          THE WITNESS:  No, I don't believe there was.

25          ///

```
 1      BY MR. BIRRELL:

 2      Q.  You've got to say it out loud.

 3      A.  No, sorry.

 4              MR. BIRRELL:  Thank you, Your Honor.  That's all I

 5      have right now.

 6              THE COURT:  Anybody else have any questions for

 7      this witness?

 8              MR. PAULSEN:  I do.

 9              THE COURT:  Mr. Paulsen.

10                      REDIRECT EXAMINATION

11      BY MR. PAULSEN:

12      Q.  So just to be clear, Lyons was eventually charged with

13      that gun that was found in the residence and that had his

14      blood on it?

15      A.  Yes.

16      Q.  Because he was a felon?

17      A.  Yes.

18      Q.  And you, in fact, testified in front of this magistrate

19      in that suppression hearing, right?

20      A.  Yes, I did.

21      Q.  Okay.  And getting back to this case, you did -- did you

22      have descriptions of the suspects the night you were out

23      there trying to arrest Mr. Catchings?

24      A.  Yes.

25      Q.  I mean, in your report you seem to have heights and
```

1    description of the clothing that was being worn from

2    multiple sources, is that right?

3    A.  Yes.

4    Q.  Okay.  And in your report it also mentions that the

5    fellow officers when they went out to the scene right after

6    it happened talked to the girlfriend, Villagomez?

7    A.  Yes.

8    Q.  And she said that one of the suspects pointed a silver

9    semiautomatic handgun at her?

10   A.  Yes.

11   Q.  Okay.  So the fact that you now believe that Lyons shot

12   himself with his own gun doesn't mean that the robbers

13   didn't also have a gun, does it?

14   A.  Correct.

15   Q.  In fact, if someone was pulling a gun on you and you had

16   a gun, you might go for it to try to defend yourself?

17   A.  Yes.

18   Q.  Okay.  So you had descriptions of the suspects, you put

19   out the cops alert, and you heard back that -- and you knew

20   that one of them was Catchings and the other was Armstrong?

21   A.  Yes.

22   Q.  You knew all this before the stop of the car?

23   A.  Catchings was identified first.  I'm not sure if we

24   had -- we probably -- another officer identified Armstrong

25   after doing some more research.

Jensen - Redirect

```
1    Q.  But sticking with Catchings for a minute, and then you

2    get a call to Catchings' girlfriend is at the jail paying a

3    warrant for Catchings?

4    A.  Yes.

5    Q.  And you saw her run out and get in this car?

6    A.  Yes.

7    Q.  And that's when you -- and you saw two black males in

8    the car?

9    A.  Yes.

10   Q.  Which, although you couldn't, I assume, see their

11   clothing on them at that point, generically they matched the

12   description of the folks that had been identified by the

13   witnesses at the crime scene?

14   A.  Correct.

15   Q.  And that's when you had them -- the car stopped?

16   A.  Yes.

17   Q.  And right when you came up to the car you saw the

18   clothing that Mr. Catchings was wearing?

19   A.  Yeah.  We didn't initially walk up to the car but

20   we -- we had them exit the car due to the circumstances with

21   a gun being involved, and when he got out of the car, I saw

22   the camouflage.

23   Q.  And at that point it matches the description of the

24   clothing of one of the robbers?

25   A.  Yes.
```

1    Q.  And that's when he's put under arrest?

2    A.  Yes.

3              MR. PAULSEN:  Nothing further.

4              THE COURT:  Thank you.  You're excused.

5              MR. SHIAH:  Judge, may I go back into something,

6    please?

7              THE COURT:  Okay.  You're not excused.  Keep your

8    seat.

9              THE WITNESS:  All right.

10             MR. SHIAH:  All right.  It has to do with the

11   identification because I'm a little older but now I'm

12   confused and now because we had that little bit of

13   understanding or misunderstanding and you want a memo, I

14   just want to make sure I've got it right, and I think he's

15   the guy that can help us, all right.

16                        **RECROSS-EXAMINATION**

17   BY MR. SHIAH:

18   Q.  You did not go to the house that night, or did you, when

19   Mr. Lyons made this initial report, correct?

20   A.  I was not at the house.

21   Q.  And as far as identification, when did you become aware

22   of the fact that Mr. Catchings was IDed?

23   A.  At the hospital.

24   Q.  At the hospital.  From talking to whom?

25   A.  Lyons.

```
1    Q.  So you're telling me, I just want to make sure I've got

2    this right, that when you went to the hospital, which was

3    presumably on the 21st, I think that's when it was, whenever

4    this happened, you're telling me that at that time Mr. Lyons

5    had already identified Mr. Catchings as somebody who had

6    been in that apartment?

7    A.  Yes, that's true.

8    Q.  And he said that to you?

9    A.  Yes.

10   Q.  And is that recorded or anything?

11   A.  The statement was recorded.  I don't know if that

12   identification process happened on the recording.

13   Q.  Now, did you look at the reports of the other officers

14   in this case?

15   A.  Not for a long time, no.

16   Q.  Do you remember Officer Ogren?

17   A.  Detective Ogren, yes.

18   Q.  And I'm looking at your report, and I'm trying to figure

19   it out, maybe I missed it or something, is there some place

20   that you wrote down that you went to the hospital and he

21   identified to you that Mr. Catchings was at that apartment?

22   I mean, I looked through this.  I didn't see anything about

23   that.  Am I missing something?

24   A.  I don't know.  I was at the hospital.  I don't know if I

25   put it in my report or not.
```

1    Q.  Well, if you look at the other reports, and I'm just

2    going by what I'm reading, it looks like Mr. Catchings' name

3    didn't come up until after Mr. Lyons came to the police

4    station because you guys told him to come down to Richfield

5    the next day to give a statement, right?

6    A.  Yes.

7    Q.  Do you remember that?  Were you a participant in that at

8    all?

9    A.  Yes.

10   Q.  Were you there when they finally still didn't know who

11   the person was and they were talking about Facebook, do you

12   remember that business?

13   A.  I'm -- I guess I'm confused.

14   Q.  Well, that's two of us.  But my point is, according to

15   at least Officer Ogren, he knew about Kease.  Do you know

16   who Kease is?

17   A.  Yes.  And just to be clear, when I was at the hospital,

18   I was in direct communication with Detective Ogren --

19   Q.  That's great.

20   A.  -- passing this information along to him, and this was

21   all happening at the same time.

22   Q.  But I want to make sure that I know when the name

23   Dontevius Catchings first came up in the investigation from

24   your vantage points.

25   A.  At HCMC.

```
1    Q.  And I should be able to find that somewhere in a report

2    or in a statement that Mr. Lyons presumably gave to you?

3    A.  Yes.

4    Q.  Okay.  And as far as the business with Facebook, what

5    was your understanding about when he was shown, and he, I'm

6    talking about Mr. Lyons, was shown Facebook?

7    A.  When did that happen?

8    Q.  Yeah.

9    A.  As he was laying in the hospital bed.

10   Q.  Well, then these reports are either wrong or I'm getting

11   really old because it talks at least in one of the reports,

12   am I misinterpreting this, about him coming to the police

13   station the next day?

14           MR. PAULSEN:  Yes.  Your Honor, I'm looking at

15   Officer Ogren's report, and it looks to me that on May 21st,

16   which is the day of the incident, he's got in here that

17   Lyons goes on Facebook and identifies Kease, who is

18   Armstrong, and the other person as Dontevius Catchings.

19   It's right in the report.

20           MR. SHIAH:  Well, the one I have -- we can argue

21   about that later, but the one I have indicates that when

22   they came down to the police station.  But were you at the

23   hospital with Facebook at all?

24           THE WITNESS:  Yes.

25           ///
```

1    BY MR. SHIAH:

2    Q.  All right.  And you were showing him the pictures?

3    A.  Yes.

4    Q.  Is that anywhere in your report?

5    A.  I don't know.

6    Q.  Well, let my just clarify this.

7           MR. SHIAH:  May I approach, Your Honor?

8           THE COURT:  Sure.

9    BY MR. SHIAH:

10   Q.  Do you recognize what I'm placing in front of you?

11   A.  Yes.

12   Q.  And what is that, please?

13   A.  That's my police report.

14   Q.  All right.  Now, maybe I missed it, is there anything in

15   here about Facebook?  And you can go through it.  I don't

16   want to --

17   A.  No, there's not.

18   Q.  Okay.  And then here there's a section about statement

19   of Lyons at HCMC, right?

20   A.  Yes.

21   Q.  That's I presume that's what you're talking about, that

22   occurred on May 21st, 2014, right?

23   A.  Yep.

24   Q.  And then it says the unknown male was -- you're talking

25   about an unknown male, that's not Mr. Kease, right?

1    A.  Correct.

2    Q.  Presumably that may be Mr. Catchings, right?

3    A.  Yes.

4    Q.  And this is right when you're talking about it you're

5    saying that he was later identified as Dontevius Catchings.

6    A.  Yes.

7    Q.  So he wasn't identified as Dontevius Catchings then?

8    A.  At the hospital.

9    Q.  He was not?

10   A.  Yes, he was.

11   Q.  Does this say he was later identified as Dontevius Ahmad

12   Catchings?

13   A.  I see what you're saying.  It's my report.  I'm telling

14   you he was identified at the hospital.

15   Q.  But it doesn't say that in your report?

16   A.  No.

17   Q.  Any reason why?

18   A.  I didn't put that in there because we don't typically

19   like to disclose our investigative techniques used to

20   identify people and so that's why it wasn't in there.

21   Q.  But you do as a good investigator want to memorialize

22   what the heck happened, correct?

23   A.  Yes.

24   Q.  You think it might have been important that if he says

25   yeah, that's the dude that robbed me, that should be in

1    here?

2    A.  It's in Detective Ogren's report.

3    Q.  I'm asking about you and your report.

4    A.  He was identified.

5    Q.  Not my question.  Do you think it should have been in

6    your report?

7              MR. PAULSEN:  This may be getting into argument at

8    this point, Your Honor.

9              THE COURT:  Sustained.

10             MR. SHIAH:  I have nothing further.

11             THE COURT:  Just to make sure I'm clear, so what

12   did you use in the hospital to show Mr. Lyons the Facebook

13   page that had the photo with Mr. Catchings and

14   Mr. Armstrong?

15             THE WITNESS:  It was either mine or my partner's

16   cell phone.

17             THE COURT:  Okay.  And you were able to pull up

18   Mr. Lyons' Facebook page because he would give you whatever

19   username, passwords needed to get into his Facebook page,

20   correct?

21             THE WITNESS:  He logged into his Facebook.  From

22   there he was friends with --

23             THE COURT:  On your phone?

24             THE WITNESS:  Yes.

25             THE COURT:  He logged into his Facebook page?

```
 1                 THE WITNESS:  Yes.

 2                 THE COURT:  And identifies Mr. Armstrong as his

 3      friend that he invited over that night?

 4                 THE WITNESS:  Yep.

 5                 THE COURT:  And then said there's another guy that

 6      was with him that I didn't know, correct?

 7                 THE WITNESS:  Correct.

 8                 THE COURT:  And then while looking at the Facebook

 9      page finds a photo of Mr. Armstrong and this other male, is

10      that correct?

11                 THE WITNESS:  Yes.

12                 THE COURT:  And then from the Facebook page itself

13      you were able to identify this other male as being

14      Mr. Catchings or Mr. Lyons was able to do that?

15                 THE WITNESS:  We were.

16                 THE COURT:  Okay.  And did Mr. -- did you tell

17      Mr. Lyons who that other person was?

18                 THE WITNESS:  Well, his Facebook name was

19      Dontevius Catchings.

20                 THE COURT:  And that was -- I guess how did that

21      come about?  How did you discover his name was Catchings?

22                 THE WITNESS:  Because when you tag somebody -- if

23      you take a photo with multiple people that have Facebook

24      profiles and you tag somebody else, that name is basically

25      placed directly underneath the Facebook photo so that you
```

1      can see who is who in that photo.

2              THE COURT:  So looking at the photograph on

3      Mr. Lyons' Facebook page, the photo of Mr. Armstrong says

4      under it Armstrong?

5              THE WITNESS:  His Facebook profile was Kease Rip

6      Ray'jon or something.

7              THE COURT:  Okay.  So a nickname for

8      Mr. Armstrong?

9              THE WITNESS:  Yes.

10             THE COURT:  And then under Mr. Catchings'

11     photograph was the name Dontevius Catchings?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  Any other questions?

14                        **RECROSS-EXAMINATION**

15     BY MR. SHIAH:

16     Q.  Appreciate the Court's inquiry, but all that information

17     that you just provided in response to those questions,

18     there's not one word about that process, there is not one

19     word about the name Dontevius Catchings appearing underneath

20     the photo, none of that is in any of -- your report, right?

21     A.  Correct.

22     Q.  Nothing.  Did you memorialize these pictures?  Are they

23     still available?

24     A.  I don't know if they are.

25             MR. SHIAH:  Well, I'm going make a request for

 1    them, Your Honor.  I've requested -- and I know there was a

 2    specific reference to Facebook photographs in the

 3    Indictment, etc.  I've requested them as it relates to my

 4    client, and I have not seen anything yet.

 5              THE COURT:  All right.

 6              MR. SHIAH:  And I think that's appropriate.

 7              THE COURT:  Okay.  Thank you.  You're excused.

 8              MR. PAULSEN:  Well, just --

 9              THE COURT:  I'm sorry, Mr. Paulsen.

10              MR. PAULSEN:  In terms of memorializing it, may I

11    approach, Your Honor?

12                          **REDIRECT EXAMINATION**

13    BY MR. PAULSEN:

14    Q.  I'm looking at Officer Ogren's report, and he says that

15    "officers with Lyons were able to have Lyons show them this

16    party in photos with Kease and Facebook identified him as

17    user Dontevius Catchings."  Is he talking about you when he

18    says "officers with Lyons"?

19    A.  Yes, he is.

20    Q.  So it is memorialized not in your report but in Ogren's

21    report?

22    A.  Yes.

23              MR. PAULSEN:  All right.  Nothing further.

24              THE COURT:  Thank you.  You're excused.  Next

25    witness.

 1              MR. PAULSEN:  Detective Eric Fleck.

 2              THE COURT:  Do you want to come forward and get

 3       sworn in, please, sir.

 4          (The witness is sworn.)

 5              THE COURT:  You can have a seat.  State your name

 6       and spell your last name for the court reporter, please.

 7              THE WITNESS:  My name is Erik Fleck.  E-R-I-K.

 8       F-L-E-C-K.

 9                         **DIRECT EXAMINATION**

10       BY MR. PAULSEN:

11       Q.  And who do you work for?

12       A.  I work for the Hennepin County Sheriff's Office.

13       Q.  And you're a deputy there?

14       A.  I am.

15       Q.  And for how long?

16       A.  I was hired in September of 1999.

17       Q.  I want to take you back to May 23rd of 2014.  Were you

18       involved in the arrest of Marques Armstrong following

19       allegations of a robbery and a victim Malcolm Lyons?

20       A.  Yes, sir.

21       Q.  And where -- where did you go to try to attempt to

22       arrest him?

23       A.  We went to the address of 3341 Oliver Avenue North in

24       the city of Minneapolis.

25       Q.  And was that a known address for him?

Flick - Direct

```
1    A.  It was, among others.

2    Q.  So what did you see happen outside of 3341 Oliver Avenue

3    North?

4    A.  We saw an individual matching Armstrong's description

5    come from the address and get into a black four-door sedan

6    parked in front.

7    Q.  And did you know what he was wanted for?

8    A.  Yes.

9    Q.  Was it that robbery a couple of days earlier?

10   A.  Yes, in Richfield, I believe.

11   Q.  In Richfield.  And by the way, are you with any

12   particular organization, division of --

13   A.  At the time I was with the Violent Offender Task Force.

14   I was a sergeant with them.  I'm now currently assigned to a

15   different unit.

16   Q.  Were you familiar with Mr. Armstrong?

17   A.  Yes.

18   Q.  As a result of being a part of that Violent Offender

19   Task Force?

20   A.  Yes, sir.

21   Q.  So when you saw this person come out of the residence,

22   where did the person go?

23   A.  He went and got into a black sedan into the front

24   passenger seat of this black sedan parked in front.

25   Q.  And did you believe it was, in fact, the wanted person,
```

Flick - Direct

1    Mr. Armstrong?

2    A.  At that moment it was aired out over the radio that it

3    was believed to be but not confirmed yet until a couple of

4    blocks later.

5    Q.  What happened a couple of blocks later?

6    A.  One of the deputies that was with us on the surveillance

7    detail saw and I believe positively identified Armstrong

8    with a photo.

9    Q.  And this is before the stop occurs?

10   A.  Yes, sir.

11   Q.  And was he the driver or the passenger?

12   A.  He was the front seat passenger.

13   Q.  So was a felony stop made at that point?

14   A.  He first went to a store located at the corner of 36th

15   and Penn, and after he came out of the store, got into the

16   passenger seat again, he was stopped at the corner of 36th

17   and Penn.

18   Q.  Okay.  And were you present shortly after the car was

19   stopped?

20   A.  Yes.  As the car was stopped, I actually ordered for it

21   to be stopped at that location.

22   Q.  And tell us who was in the car.

23   A.  Marques Armstrong and a female driver.

24   Q.  And whose car did it turn out to be?

25   A.  I believe it was the female that was driving.

1   Q.  And so it wasn't Marques Armstrong's car?

2   A.  No, sir.

3   Q.  Did you participate in getting him out of the car?

4   A.  I was there for the extraction, but I did not assist by

5   putting hands on to extract him, though.

6   Q.  Okay.  I thought you were the one that eventually ended

7   up handcuffing him?

8   A.  You know, I would have to refer to my report as far as

9   actually handcuffing him.  I know I was there at the time

10  when he was removed from the car and then placed on the

11  ground.

12  Q.  All right.  At any rate, at some point did you notice a

13  weapon?

14  A.  I did.

15  Q.  Tell us about that.

16  A.  It was a black and -- or silver and black handgun, large

17  framed, pointed towards the rear seat, and it was laying

18  what would be in between his feet, Marques Armstrong's feet

19  on the front passenger side floor boards.  As stated, the

20  barrel was pointing towards the rear, the magazine was

21  pointed towards the front passenger door and it was an

22  extended magazine.

23  Q.  So it was loaded?

24  A.  Yes, sir.

25  Q.  And could you see this gun from your position outside

Fleck - Direct

1     the car?

2     A.  Yes, sir.

3     Q.  So it was in plain view?

4     A.  It was.

5     Q.  What kind of gun was it?

6     A.  It was a Beretta, I believe.

7     Q.  And did it turn out to be stolen or not stolen?

8     A.  It was a stolen firearm.

9     Q.  And did it have an extended magazine?

10    A.  It did.

11    Q.  And it was just a female and Armstrong in the car?

12    A.  Yes, sir.

13    Q.  And did the female say anything about whether it was her

14    gun or not?

15    A.  I only know what I heard, and I heard she denied

16    knowledge of the firearm.

17            MR. PAULSEN:  No further questions.

18            THE COURT:  Mr. Birrell.

19            MR. PAULSEN:  Oh, sorry, I got a search warrant I

20    should introduce at this point.  There was a follow-up

21    search warrant, I believe it's the same day, let me just

22    check, May 23rd, 2014, I should have -- probably should have

23    put in through the previous witness because it's Rian

24    Jensen's search warrant, but it says search warrant for 3341

25    Oliver Avenue North, Government Exhibit 18, I offer it at

1     this time.

2              MR. BIRRELL:  No objection for this hearing.

3              THE COURT:  Okay.  What's the Exhibit No.?

4              MR. PAULSEN:  18.

5              THE COURT:  Okay.  Exhibit 18 will be received.

6         (Government Exhibit No. 18 is received.)

7              MR. PAULSEN:  Now I have nothing further.

8              THE COURT:  Mr. Birrell.

9              MR. BIRRELL:  Thank you.

10                      **CROSS-EXAMINATION**

11    BY MR. BIRRELL:

12    Q.  Detective -- is it detective or deputy?

13    A.  It's actually sergeant now.

14    Q.  Sergeant, all right.

15    A.  Yes, sir.

16    Q.  Thank you.  Sergeant Fleck, right?

17    A.  Yes, sir.

18    Q.  Did you write a report in this case?

19    A.  I did, sir.

20    Q.  Did you write it with Stanger?

21    A.  I wrote a supplement to Officer Stanger's report, sir.

22    Q.  So if the word "I" is in there, is that you or he?

23    A.  It depends on which report you're referring to, sir.

24    Q.  Well, okay, I'm looking at this supplemental report

25    created by Stanger, comma, Bill, last modified by Fleck,

1    comma, Eric?

2    A.  That would be Officer Stanger would be "I" in that

3    report.  My report was a separate report from that one.

4    Q.  Okay.  So you went on to arrest Mr. Armstrong, is that

5    right?

6    A.  Yes, sir.

7    Q.  And that was on May 23rd, 2014?

8    A.  Yes, sir.

9    Q.  And was there a complaint filed or what was the

10   circumstance?

11   A.  It was a probable cause pickup for aggravated robbery.

12   Q.  So it was a probable cause pickup.  There was no legal

13   process yet, is that right, there was no court paper

14   authorizing you to arrest him?

15   A.  I'm sorry, sir, I can't remember at this point if there

16   was actually a physical document saying arrest this party or

17   not.

18   Q.  Did you read any of these reports before you came to

19   court today?

20   A.  I did, sir.

21   Q.  Today did you read them?

22   A.  I read mine, sir.

23   Q.  All right.  Does it say in your report?

24   A.  It does not.

25   Q.  Did you look at Stanger's report?

```
 1    A.  I did not.

 2    Q.  Okay.  Did you understand you were going to be asked to

 3    testify today?

 4    A.  Yes, sir.

 5    Q.  About what happened?

 6    A.  Yes, sir.

 7    Q.  Did you think it would be a good idea to read your

 8    reports?

 9    A.  Yes, sir.

10    Q.  Why didn't you read Stanger's report that you modified?

11    A.  It's not my report.  I can testify to mine.

12    Q.  So when you modified it, it -- what was your purpose in

13    modifying Stanger's report?

14    A.  The modification is just an approval of the report.

15    Q.  Okay.

16    A.  As sergeant, I approved the report.

17    Q.  Okay.  So all right.  So Stanger says that there was a

18    PC put out to arrest him for aggravated robbery.  Do you

19    dispute that?

20    A.  I don't, sir.

21    Q.  Okay.  As far as you know that's true?

22    A.  Yes, sir.

23    Q.  You don't have any memory of any legal process

24    authorizing you or anyone else to arrest Mr. Armstrong?

25    A.  As far as a warrant or --
```

Flick - Cross by Birrell

1  Q.  Yeah, something from a judge, that the judge signed --

2  A.  No.

3  Q.  -- or that the Court issued, nothing like that?

4  A.  Not to my recollection, sir.

5  Q.  And you don't have any documents here today saying

6  otherwise, right?

7  A.  Correct.

8  Q.  Okay.  And so how many people went out to arrest

9  Mr. Armstrong?

10  A.  In all, there was I would -- I would hazard to guess at

11  about 12 people, sir.

12  Q.  12 people.  All right.  And these were all officers from

13  your department or not?

14  A.  My unit as well as some uniformed personnel with marked

15  squad cars.

16  Q.  Okay.  And you're with Hennepin County Sheriff's Office?

17  A.  Yes, sir.

18  Q.  So were you the person in charge of this matter?

19  A.  I was.

20  Q.  All right.  So you went out to -- you and your group

21  went out there with the purpose to arrest Mr. Armstrong?

22  A.  Yes, sir.

23  Q.  Okay.  And so you waited until he left his house?

24  A.  Yes, sir.

25  Q.  And was that your decision to wait?

```
 1    A.  Well, based on probable cause we won't go into a house
 2    to arrest him, sir.
 3    Q.  I know.  When he came out of the house you can arrest
 4    him right there, though, right?
 5    A.  Outside of the house, yes, sir.
 6    Q.  But you didn't do that?
 7    A.  No, sir.
 8    Q.  Why not?
 9    A.  Because he would have fled on foot.
10    Q.  All right.  Okay.  So then you waited until he got in
11    the car?
12    A.  Yes, sir.
13    Q.  Did the car commit any traffic violations?
14    A.  I don't recall, sir.
15    Q.  That wasn't the reason you stopped the car, though?
16    A.  That's true.
17    Q.  The reason you stopped the car was because somebody
18    confirmed for you that Mr. Armstrong was in the car?
19    A.  Yes, prior to the stop.  And then prior to the stop I
20    also confirmed visually that it was him.
21    Q.  You recognized him?
22    A.  Yes, sir.
23    Q.  Okay.  What time of day was this?
24    A.  It was approximately 11:10 hours.
25    Q.  In the morning?
```

1    A.  Just before noon, yes, sir.  I apologize.

2    Q.  No, no, that's all right.  Just clarifying.  All right.

3    And so tell me about the stop.  How did that happen?

4    A.  We followed him from 3341 Oliver as the female drove

5    directly to the convenience store on the northwest corner of

6    36th and Penn.  Surveillance officers saw Marques Armstrong

7    get out of the front passenger seat, go into the store and a

8    couple of minutes later come out of the store, get into the

9    vehicle, front passenger seat again, and then pull out to

10   the south in the parking lot and then turned eastbound on

11   36th up to the stop sign.

12        At that point I decided that was a good location

13   for the stop.  I ordered the marked squads to move in, and

14   because of the area, there was quite a few people on the

15   northwest corner waiting for a bus or otherwise and then

16   across the street on Penn.

17        I also asked VOTF officers to gear up, meaning

18   putting on vests or jackets clearly placarded with sheriff

19   or police and assist on that stop, knowing that he was a SUB

20   gang member and known to carry firearms.

21        The stop was conducted at that location.  As the

22   stop was made, the marked squads pulled up on to the front

23   bumper of the car as it faced eastbound and there was

24   unmarked cars that pulled up on the rear bumper, in effect

25   blocking the vehicle from leaving.

1          I had pulled up from the south in case Marques was

2      to jump out of the car and run south, that would have been

3      covered.  As I did such, I could clearly see it was him in

4      the front passenger seat.  He looked at the squads and then

5      he turned and he looked at me to his right over his right

6      shoulder.  I say to me but he wasn't looking at me, he was

7      looking --

8      Q.  In your direction?

9      A.  -- in my direction.  He had a look of shock on his face,

10     his eyes were wide, his mouth was open, and to me, it looked

11     like he was looking for an avenue of flight.  Instead, he

12     turns back around and looks back at the deputies who were

13     pointing guns at him at this point, ordering him out of the

14     vehicle.  I seen him lean forward and look down between his

15     legs and then lean back and put his hands in the air.

16     Q.  What was he wearing?

17     A.  I believe he was wearing a hoodie, a hooded sweatshirt,

18     but I can't recall.

19     Q.  Sort of the end of May there, May 23rd?

20     A.  Yes.

21     Q.  What was the weather, do you remember?

22     A.  That day it was beautiful.

23     Q.  Warm?

24     A.  It was fairly warm, bright sunshine, clear skies.

25     Q.  So do you remember he was wearing a hoodie or what do

1    you remember?

2    A.  I don't believe I have it in my report.  I can look to

3    refresh my memory.  But I seem to recall somebody airing out

4    over the radio a description of what he was wearing, and I

5    thought he was wearing a hooded sweatshirt.

6              MR. BIRRELL:  May I approach him for a minute?

7              THE COURT:  Sure.

8              MR. BIRRELL:  Thanks.

9    BY MR. BIRRELL:

10   Q.  I'm going to give you your report.  I don't remember.

11   It starts here, I believe.  Just take your time.  Read it to

12   yourself.  And if you -- when you're done, let me know.

13   A.  Sir, this is not my report.

14   Q.  Okay.  Well, this is you, right?

15   A.  Again, last modified by --

16   Q.  Okay.  Well, is this you?

17   A.  That is me.  Yes, sir.

18   Q.  All right.  Any luck?

19   A.  No, sir.  I do not mention what he was wearing.

20   Q.  All right.  So -- and you don't remember?  Or do you

21   remember?

22   A.  At this point I'll say I do not remember.

23   Q.  All right.  Was this gun tested that was found?

24   A.  I'm sorry, tested for?

25   Q.  Prints, DNA, whether it had been fired, run through

1    whatever that system is, that sort of thing?

2    A.  Yes, I believe it was.

3    Q.  What were the results?

4    A.  If I remember correctly, it was used in two previous

5    shootings.  And I don't recall what the results were for the

6    DNA or fingerprint testing, sir.

7    Q.  Okay.  Now, you say, were you the person that seized the

8    weapon?

9    A.  I'm sorry.  I'd have to look at my report again.

10   Q.  All right.  Let me ask you this.  Did you see the weapon

11   in the car?

12   A.  Yes, I did.

13   Q.  Where were you standing when you saw it?

14   A.  Initially I was standing on the outside of the door as

15   it was opened.

16   Q.  Outside the passenger side door?

17   A.  Yes, sir.

18   Q.  And was -- let me just ask you a question.

19   A.  Sure.

20   Q.  Was Mr. Armstrong still in the car when you first saw

21   the weapon?

22   A.  No, sir.

23   Q.  He's already out of the car?

24   A.  He was out of the car.

25   Q.  Where was he?

1   A.  In the process of being taken to the ground.

2   Q.  All right.  So more than ten feet from the car? Question

3   mark?

4   A.  He or I?

5   Q.  He.

6   A.  He was, no, I would say within -- his feet were inches

7   from the car probably.

8   Q.  Okay.  Let me just -- let's do this.  Somebody goes up

9   to the passenger side door and opens the door?

10  A.  Yes, sir.

11  Q.  That was a police officer?

12  A.  That was Officer Stanger and Deputy Barsmiths [spelled

13  phonetically] were both at the passenger side.

14  Q.  So they pulled open the door and they reached in and

15  they grabbed Mr. Armstrong?

16  A.  Yes, sir.

17  Q.  And pulled him out of the car?

18  A.  Yes, sir.

19  Q.  And put him on the ground?

20  A.  Yes, sir.

21  Q.  And then handcuffed him, I assume?

22  A.  Yes, sir.

23  Q.  And then took him elsewhere?

24  A.  Yeah, to the back of the car.

25  Q.  Okay.  While they were doing that, those things, you

1    were standing nearby?

2    A.  Yes, sir.

3    Q.  Okay.  When was the first time you could see the gun in

4    the car?

5    A.  He was already on the ground.  I had already asked him

6    who he was, if his name was Marques.

7    Q.  And what did he say?

8    A.  He said -- he said Marques, yes.

9    Q.  Okay.  Did you ask him any other questions?

10   A.  Not that I can recall at that time.

11   Q.  Was there a later time that you talked to him?

12   A.  Not that I can recall.

13   Q.  Okay.  Did the driver of the car, was she still in the

14   car when you saw the gun first?

15   A.  I don't believe so.  I think she was already out.  I

16   wasn't paying attention to her.  She wasn't my focus, I

17   guess.

18   Q.  Okay.  So she may or may not have been in the car, is

19   that what you're saying?  Or --

20   A.  I would say no, at that time we would have had both of

21   them on -- in control by that time.

22   Q.  So was the idea to take both people out at the same

23   time?

24   A.  It probably happened that way.  That's not necessarily

25   the way we would like to have it happen.  It -- we like to

1    deal with the main threat first.

2    Q.  Okay.  You perceived Mr. Armstrong to be the main

3    threat?

4    A.  Absolutely, yes.

5    Q.  So he was the person you wanted out of the car first?

6    A.  Yes.

7            MR. BIRRELL:  Thanks.  I don't have any other

8    questions, Your Honor.

9            THE COURT:  Anybody else have questions for this

10   witness?

11           MR. PAULSEN:  I just want to clarify, when I was

12   asking him about handcuffing, I was looking at the other

13   guy's report too, so that was my mistake.

14           THE COURT:  Okay.  Thank you.  You are excused.

15           MR. PAULSEN:  Justin Merten.  Just so you know

16   where we're going, Your Honor, this is he want

17   20 -- or -- yeah, September 20th of 2014, goes -- I'm sorry,

18   well, wrong page.  That was Owens and Mr. Owens isn't

19   challenging that I'm told.  So what we're on now is to

20   Mr. Parker.  The date is November 2nd of 2012, this relates

21   to Count 6 of the Indictment, and it relates to what we

22   claim is an abandoned gun by Mr. Parker found in an alley.

23           THE COURT:  Okay.

24           MR. PAULSEN:  And this is Justin Merten.

25           THE COURT:  Mr. Merten, do you want to come

1    forward and get sworn in, please, sir.

2         (The witness is sworn.)

3              THE COURT:  Have a seat, state your name and spell

4    your last name for the court reporter, please.

5              THE WITNESS:  Justin Merten.  M-E-R-T-E-N.

6                        **DIRECT EXAMINATION**

7    BY MR. PAULSEN:

8    Q.  Is it Officer Merten?

9    A.  Yes.

10   Q.  By whom are you employed?

11   A.  With the Minneapolis Police Department.

12   Q.  How long have you been a Minneapolis police officer?

13   A.  Approximately 18 years.

14   Q.  I'm going to direct your attention back to November 2nd

15   of 2012.  Did you have an encounter with defendant Darryl

16   Parker that day?

17   A.  Yes.

18   Q.  Before we get to that, can you tell us what your duties

19   were that day?  Were you on some sort of a detail?

20   A.  Yeah, I would -- I was assigned to FBI Safe Streets Task

21   Force as an investigator.  And we were conducting

22   surveillance at a funeral of a well-known gang member.

23   Q.  And that was a member of what gang?

24   A.  Gangster Disciples.

25   Q.  Do you remember his name?

Meiren      Direct

1    A.  Victor Gaddy.

2    Q.  And is it customary for law enforcement to do

3    surveillance at gang funerals?

4    A.  It is.  And specifically if we have credible information

5    that there may be gang violence.

6    Q.  That's sometimes there's a catalyst for gang violence --

7    A.  Yes.

8    Q.  -- I assume?

9    A.  Yes.

10   Q.  Because had Mr. Gaddy died naturally or unnaturally?

11   A.  Unnaturally.

12   Q.  Was it a murder?

13   A.  No.  He was shot and killed by police --

14   Q.  Okay.

15   A.  -- during an attempted arrest.

16   Q.  All right.  So did you take any precautions to try to

17   ensure that there wouldn't be any violence at these -- at

18   this funeral?

19   A.  Yes.  That --

20   Q.  Did that involve use of a informant?

21   A.  Yes, I have a confidential reliable informant who would

22   -- or associates in Gangster Disciple circles, and it would

23   be normal for him to be at this funeral, and I requested

24   that he would attend the funeral, which he said he was, and

25   he would -- if there was any -- any issues, he would

Meiden - Direct

```
 1    communicate those to me.
 2    Q.  During the funeral, did he communicate some information
 3    to you?
 4    A.  Yes.  He said that he had identified some people who
 5    were in possession of firearms or a person in possession of
 6    a firearm.
 7    Q.  And this was inside of the funeral home or?
 8    A.  Yes.  Yep.  And this information was timely and I was
 9    receiving it real-time.
10    Q.  And initially who did he identify as being in possession
11    of a firearm?
12    A.  I'm sorry, could you repeat that?
13    Q.  Who did he identify as being in possession of a firearm?
14    A.  He gave a description that I later determined to be
15    Jabari Johnson.
16    Q.  And is Jabari Johnson one of the defendants in this
17    case?
18    A.  Yes.
19    Q.  And he is a 1-9 gang member, to your knowledge?
20    A.  Yes, I believe so.
21    Q.  All right.  So what did you do in response to this
22    information?
23    A.  I continued to receive timely information so that I
24    could identify who this person was, because at this time
25    these people were inside a building and we were outside, and
```

Meixell - Direct

1   I received ongoing information, was able to determine the
2   travels of Jabari and into a parking lot and ultimately into
3   a vehicle.
4   Q.  So you put Jabari Johnson into a vehicle?
5   A.  Yes.
6   Q.  And does it turn out that somebody else is in that car
7   with him?
8   A.  Yes.
9   Q.  Who is that?
10  A.  Darryl Parker, John Bradley.
11  Q.  Okay.
12  A.  And last name Robinson.  I forget his first name,
13  Marques Robinson.
14  Q.  Or is it Brandon Robinson?
15  A.  Brandon Robinson, yes.
16  Q.  Okay.  And how many of those are 1-9 gang members?
17  A.  I know Darryl Parker and Jabari Johnson as 1-9.  I
18  wasn't real familiar with John Bradley who I knew he
19  went -- used the moniker "White John."  My understanding is
20  Brandon is SUB which is closely affiliated with 1-9 and walk
21  in the same circles so.
22  Q.  So based on the information, did you and other officers
23  follow this vehicle?
24  A.  Yes.
25  Q.  And did there come a time when the vehicle went into an

1    alley?

2    A.  Yes.

3    Q.  And that was behind what -- what address?

4    A.  It was in the 1700 block between Irving and Girard.

5    Q.  And do you now know that -- well, let's see.  Did other

6    officers observe somebody get out of the vehicle at that

7    point?

8    A.  Yes.  Later on I was advised that some of my partners

9    had observed that.

10   Q.  And who was the person that got out of the car in the

11   alley?

12   A.  I was -- he was identified as Darryl Parker.

13   Q.  Okay.  And we're going to hear from those -- from one of

14   those officers later about what they saw and what they found

15   in the alley, but continuing with you, did there come a time

16   when this car was stopped?

17   A.  Yes.

18   Q.  Tell us about that.

19   A.  After the vehicle had left the alley, it stopped for a

20   short period of time in the block on Girard and then the

21   vehicle traveled away, blocks away, and law enforcement made

22   the decision to stop the vehicle.

23   Q.  Going back to the incident where the -- where somebody

24   got out of the vehicle and did something in the alley, do

25   you have any reason to believe that maybe they had detected

Meiren   Direct

1    surveillance by that point?

2    A.  Yes.  At that time we suspected they were trying to

3    maybe conceal their location.  Initially the vehicle was in

4    the funeral procession.  I had requested a marked squad to

5    stop that vehicle as soon as possible because of the close

6    proximity of the funeral procession, other law enforcement

7    made the decision to hold off on stopping the vehicle, so

8    essentially it looked like a squad pulling up tight behind a

9    suspect vehicle and then pulling off, and just incident to

10   after calling off the stop the vehicle dipped into the

11   alley, and so, you know, in my mind, I believed that these

12   people were, you know, attempting to get out away from the

13   marked squad.

14            MR. GOETZ:  Objection; speculation, Your Honor.

15            THE COURT:  Sustained.  Next question.

16   BY MR. PAULSEN:

17   Q.  All right.  But the car pulled out of the funeral

18   procession and went into an alley?

19   A.  Yes.

20   Q.  And that's when somebody later identified as Parker got

21   out and did something in the alley that we'll hear about?

22   A.  Yes.

23   Q.  Okay.  And then did Parker get back in the car at some

24   point?

25   A.  Yes.

Meffert - Direct

```
 1    Q.  And now the car is moving again with the same people in
 2    it?
 3    A.  Yes.  Correct, yes.
 4    Q.  And that's when you decided to stop it?
 5    A.  Yes.
 6    Q.  Now, what happened when the car was stopped?
 7    A.  Initially someone fled on foot from the vehicle.
 8    Q.  Which one was that?
 9    A.  Robinson.
10    Q.  Just as the car was being stopped, he got out and ran?
11    A.  That's my understanding.
12    Q.  Okay.
13    A.  I was not at the location of the stop of the vehicle.
14    Q.  Was Robinson caught?
15    A.  Yes.
16    Q.  And did somebody retrace his steps and find something?
17    A.  Eventually, yes.  Later on we recovered a gun.
18    Q.  Along the flight that Robinson had taken?
19    A.  Yes.
20    Q.  Okay.  Meanwhile, the other three, what was it, Parker
21    and Johnson, Jabari Johnson, and the other guy, Bradley,
22    were in the car?
23    A.  Yes, sir.
24    Q.  And by this point had some other officers gone back to
25    the alley and found something?
```

Meixen - Direct

1    A.  Yes.  I returned -- I arrived at the scene of the stop

2    and met with the officers who had conducted a stop on the

3    vehicle, and I was contacted by Sergeants Zebro and Straka,

4    and they told me they had recovered a gun.

5    Q.  From where?

6    A.  From the alley.

7    Q.  From the alley.  Where Parker had been seen getting out?

8    A.  Yes.

9    Q.  Okay.  So then did they come back to this car that was

10   stopped and see if they could identify the person that they

11   had seen in the alley?

12   A.  Yes, they traveled to where we were, where the vehicle

13   was, where Darryl Parker was and his associates, and they

14   identified Parker as the person that they had seen in the

15   alley.

16   Q.  Okay.  And we'll hear from Sergeant Straka in a minute.

17   But at that point, with all of this information, did you

18   make any arrest of Mr. Parker?

19   A.  Yes.  I arrested Darryl Parker.

20   Q.  For?

21   A.  For prohibited person.

22   Q.  Was he the -- did you know he was a convicted felon at

23   the time?

24   A.  Yes, I did.

25   Q.  So you had probable cause possession of the gun found in

Meifert - Direct

1    the alley?

2    A.  Yes.

3              MR. PAULSEN:  Now, I was going to introduce some

4    search warrants for -- through you, but I'm told that

5    there's no challenge, this is item 15, I'm told there is not

6    going to be a challenge to the search warrant for the Apple

7    iPhone seized from Parker on that date?

8              MR. GOETZ:  Correct, Your Honor.  No challenge to

9    the search warrant, although we do challenge the seizure of

10   the phone itself as a product of the unlawful stop.

11             MR. PAULSEN:  Oh, all right.  Well, then let me

12   cover that.

13   BY MR. PAULSEN:

14   Q.  Did he have a cell phone on him?

15   A.  Yes.

16   Q.  Okay.  And that's the one that was later -- Parker had

17   the cell phone on him?

18   A.  Yes.

19             MR. PAULSEN:  And that's the one that was later

20   searched pursuant to a search warrant that is not being

21   challenged, so I won't offer the search warrant.

22             Likewise, there was a later search warrant for a

23   DNA sample from Parker, and I'm told that's not being

24   challenged either?

25             MR. GOETZ:  Again, no challenge to the warrant but

Meiler - Direct

1     challenge to the process as fruit of the poisonous tree.

2              MR. PAULSEN:  So I won't offer Exhibits 15 and 16,

3     Your Honor.

4     BY MR. PAULSEN:

5     Q.  And with that -- well, just to -- since while we're on

6     the subject of the search warrant for the iPhone, there was

7     one done, a search warrant on the iPhone?

8     A.  Yes.

9     Q.  And are you familiar with some photos that were found on

10    Mr. Parker's iPhone?

11    A.  Yes.

12             MR. GOETZ:  Object; relevance, Your Honor.  This

13    is all after the stop.

14             MR. PAULSEN:  He's right.

15             THE COURT:  Sustained.

16             MR. PAULSEN:  Okay.  Nothing further.

17             THE COURT:  All right.  We'll take a recess --

18             MR. PAULSEN:  Oh, you know what, can I ask him one

19    last question?  It goes back to an earlier search.

20    Literally one or two questions?

21             THE COURT:  Yep.

22    BY MR. PAULSEN:

23    Q.  We heard earlier about a search of an upper duplex on

24    Lyndale where a gun was found?

25    A.  Yes.

1    Q.  And this related to a Nitelen Jackson?

2    A.  Yes.

3    Q.  Were you someone that followed up later in that case and

4    went and questioned Nitelen Jackson?

5    A.  Yes.

6    Q.  And what did he say about any connection he did or did

7    not have with that upper apartment of Lyndale?

8    A.  He denied any association with that address, claimed he

9    resided at a different location with his girlfriend.  I

10   believe he mentioned it was his girlfriend.

11   Q.  But he denied ever having been to that upper apartment

12   on Lyndale?

13   A.  Yes.  Yes, sir.

14   Q.  And definitely said he didn't live there?

15   A.  Yep.

16   Q.  And never had --

17   A.  Denied any association with the location.

18          MR. PAULSEN:  Nothing further.

19          THE COURT:  All right.  It's 1 o'clock.  We'll

20   take a recess and reconvene at 2:15.

21       (Lunch recess taken at 12:57 p.m.)

22                    *    *    *    *    *

23

24

25

1          (2:20 p.m.)

2                              **IN OPEN COURT**

3               THE COURT:  The record should reflect that

4     Mr. Bender -- Mr. Bender, thank you -- Mr. Bender's present

5     in the courtroom and was not here this morning, and that's

6     your client, Mr. Engh, correct?

7               MR. ENGH:  Correct.

8               THE COURT:  Okay.  Mr. Goetz, I believe you are

9     up.

10              MR. GOETZ:  Yes, thank you, Your Honor.

11                          **CROSS-EXAMINATION**

12    BY MR. GOETZ:

13    Q.  Good afternoon.  I think you talked about was it Victor

14    Gaddy?

15    A.  Yes.

16    Q.  You indicated he was a member of Gangster Disciples?

17    A.  Yes, that's my information.

18    Q.  What was the information you had that led you to

19    conclude that he was a member of the Gangster Disciples?

20    A.  Just general knowledge from law enforcement but also

21    from an informant who said that he was an associate.

22    Q.  The same CRI that you've referenced in your direct

23    examination?

24    A.  Yes.

25    Q.  And you said that that informant was providing you

1    real-time information, so he was at the funeral, stepping

2    aside, calling you and telling you what he had seen and

3    heard?

4    A.   He was at the funeral and in contact with me by phone.

5    Q.   Was he telling you what he had heard?

6    A.   He didn't give me the basics.  I didn't have time.

7    Things were rapidly moving.  I didn't understand how he

8    knew.  He just called me and said I had some guys -- the

9    context was there's some guys here with a gun.

10   Q.   Okay.  We'll come back to that.  One of the names that

11   he gave you or names that at least that you record is Jabari

12   Johnson, is that right?

13   A.   Jabari Johnson is mentioned in my report.

14   Q.   Right.  And he was the I guess the target of your

15   followup investigation on this day trying to find the gun,

16   and that's why you stopped the vehicle that ultimately led

17   to the arrest of Mr. Parker, my client, right?

18   A.   I had preliminary information on a person who I later

19   determined to be Jabari Johnson based on a clothing

20   description.

21   Q.   Right.  So I wanted to ask you some questions about

22   Jabari Johnson.  Now, you testified on direct examination

23   that he was a known 1-9 member, is that right?

24   A.   Yes.

25   Q.   Your report indicates that he was a GD street gang

Meitten - Cross by Goetz

1    associate.  Do you recall writing that?

2    A.  I don't.

3    Q.  Would you dispute that that's in your report?

4    A.  No.  But most 1-9 gang members are also associates of

5    Vice Lord gang.  We have cliques and typically it's not

6    uncommon for them to associate with another gang, so I don't

7    recall the context in which I wrote that, but it makes sense

8    to me, being that he's attending this funeral.

9    Q.  All right.  Well, you understand that this is a case

10   that involves allegations of conspiracy involving 1-9 and

11   the Stick Up Boys, correct?

12   A.  I do.

13   Q.  And so I want to try to get some clarity about some of

14   these groups and who is connected with who as far as it led

15   to your basis of stopping this vehicle, all right?

16   A.  Okay.

17   Q.  So the Gangster Disciples, is that a separate gang from

18   the 1-9 Dipset or is it the same gang or what?  Can you

19   clarify that, please?

20   A.  I have experience with the 1-9 street gang.  I have a

21   basis of knowledge about the Gangster Disciples.  I'm very

22   familiar with the 1-9 street gang because I conducted a

23   wiretap on them within several years prior of stopping

24   Jabari, so that's how I'm familiar with Jabari because of

25   his interactions with the targets of my wiretap

Meinen - Cross by Goetz

```
 1    investigation.
 2    Q.  When did you do that wiretap?
 3    A.  Approximately 2009.
 4    Q.  And Jabari Johnson was on that wire or mentioned?
 5    A.  That's how I became familiar with who he was.
 6    Q.  Was Darryl Parker on that wire?
 7    A.  During that investigation, that's how I became familiar
 8    with Thirsty.
 9    Q.  The 1-9's, correct me if I'm wrong, but they're -- would
10    you agree that they're sort of a homegrown gang, Minneapolis
11    based?
12    A.  Yes.
13    Q.  And the GD's, Gangster Disciples, they're out of Chicago
14    primarily?
15    A.  My understanding is that's where that gang started.
16    Q.  And you know Mr. Parker is from Chicago, correct, he's
17    not from Minnesota?  Were you aware of that?
18    A.  I don't remember that, no.
19    Q.  So what's the difference between a GD street gang
20    associate and a member of the 1-9's, if any, as you use
21    those terms?
22    A.  I would classify a 1-9 gang member as someone who
23    routinely associates with other members of 1-9 street gang.
24    Typically they hang or reside in a certain area of
25    Minneapolis and they may typically be with other people who
```

1   identify themselves as 1-9 and involved in crimes committed

2   by those people.

3   Q.  Okay.  Are you familiar with the criteria adopted by the

4   BCA, Minnesota Bureau of Criminal Apprehension, I think it

5   was a couple of years ago, 2012, seven criteria to be

6   applied to determine whether somebody is or is not a gang

7   member or gang associate?

8   A.  I have not reviewed it, but I have read it.

9   Q.  So when you're using in your report the term "street

10  gang associate" or "street gang member," is that based on

11  the application of this criteria or is that your own

12  phraseology?

13  A.  That's in terms of my investigation and who is

14  associating with who.

15  Q.  So specifically as to Mr. Parker, my client, Darryl

16  Parker, you called him Thirsty, is there any gang file that

17  you're aware of that applied the BCA criteria to Mr. Parker

18  and determined that he met that criteria to be a member of

19  the 1-9's?

20  A.  I have not reviewed any file as such.

21  Q.  Do you know whether any such file exists?

22  A.  I don't.

23  Q.  So the funeral was of Victor Gaddy, a known Gangster

24  Disciple member, and you had information from your informant

25  that one person you later determined to be Jabari Johnson

Meiren - Cross by Goetz

1    had a gun, is that right?

2    A.  Yes.

3    Q.  Your report reads that your CRI said that several

4    persons attending the funeral were in possession of

5    firearms, is that accurate?

6    A.  Yes.

7    Q.  Did the CRI ever tell you that Mr. Parker was one of

8    those people who was in possession of a gun?

9    A.  The description I had was a male, black, with a leather

10   coat, and he referenced a ball cap.

11   Q.  With multiple designs, gray and blue baseball cap,

12   right?

13   A.  Sounds correct.

14   Q.  And that fit the description of Mr. Johnson, correct?

15   A.  Yes.

16   Q.  It didn't fit the description of Mr. Parker because he

17   was wearing a hoodie that day, is that right?

18   A.  I believe that's correct.

19   Q.  Gray hooded sweatshirt?

20   A.  Yes.

21   Q.  So to get a specific answer, then, did your CRI give you

22   any information that Mr. Parker was in possession of a

23   firearm at that funeral?

24   A.  No.

25   Q.  The basis of the information, I want to ask you some

Meffert - Cross by Goetz

1    questions about that now.  Did this CRI tell you that he saw

2    Mr. Johnson, Jabari Johnson, in possession of a firearm at

3    the funeral?

4    A.  I don't remember the specific words.  He just indicated

5    that this person had a gun.

6    Q.  So the basis of your knowledge, then, you don't know

7    whether or not that's something the CRI saw or if he heard

8    from some other person, you don't know the basis of his

9    knowledge, I guess?

10   A.  No, the only thing I was going on is his reliability

11   from our prior relationship and cases.

12   Q.  Okay.  Reliability is kind of a separate question.  I'm

13   just asking the foundation or the basis.  So you just -- he

14   just said he's got a gun and that's all the details he gave

15   you, is that right?

16   A.  Yes.  Correct.

17   Q.  And how -- do you know how long that funeral was?

18   A.  I couldn't give a time.  It would be inaccurate.

19   Q.  This funeral was at the Shiloh Temple, Broadway and

20   Girard, north Minneapolis, is that right?

21   A.  Yes.

22   Q.  Did the CRI call you and tell you about Mr. Johnson

23   possessing the gun early in the funeral or late in the

24   funeral?

25   A.  I believe the information happened very quickly, and it

Meiten - Cross by Goetz

1    was just before people started letting out of the funeral --

2    Q.   Okay.

3    A.   -- and the procession leaving, so I would describe, when

4    the information was provided to us, things were in motion

5    very quickly.

6    Q.   And was Mr. Johnson, you saw him at some point leave the

7    Shiloh Temple, is that right?

8    A.   Yes.

9    Q.   And he walked to ultimately he walked to a vehicle,

10   correct?

11   A.   Yes.

12   Q.   And that was this red Ford Explorer with Michigan

13   plates?

14   A.   Yes.

15   Q.   Was anybody with Mr. Johnson as they walked from the

16   Shiloh Temple to the vehicle?

17   A.   I did not see Johnson get into the vehicle.

18   Q.   Did you have any reports that Mr. Parker was with

19   Mr. Johnson at that -- during that period of time?

20   A.   No.

21   Q.   So then Mr. Johnson is observed getting into the vehicle

22   and the vehicle is observed I think you said it was as part

23   of this funeral procession for awhile?

24   A.   It appeared to be, yes.

25   Q.   Do you know who was in the vehicle with Mr. Johnson at

Meffert - Cross by Goetz

1    that point?

2    A.  No.

3    Q.  The vehicle is observed near 17th and Girard, and that's

4    when it dips into the alley, is that right?

5    A.  Yes.

6    Q.  And a short time later the vehicle basically goes around

7    the block and parks in the front of 1719 Girard Avenue

8    North, is that right?

9    A.  Correct.

10   Q.  And according to your report, that's the first time that

11   Mr. -- there's any mention of Mr. Parker being specifically

12   observed is when he's in front of 1719 Girard Avenue North?

13   A.  Yes.

14   Q.  Is that right?  So whether or not Mr. Parker was in the

15   vehicle at any point in time prior to standing in front of

16   the house at 1719 Girard Avenue North you don't know one way

17   or the other, is that right?

18   A.  I did not see -- I don't recall Parker exiting the

19   vehicle.

20   Q.  So it would not be inaccurate or you wouldn't be able to

21   dispute, then, that Parker actually walked from the funeral,

22   the Shiloh Temple to that address?  You don't know one way

23   or the other, correct?

24   A.  I don't know one way or the other.  I'd be speculating.

25   Q.  It's -- this 1719 Girard Avenue North, that's maybe

1    about two, three blocks away from the Shiloh Temple?  It's

2    not very far, is it?

3    A.  Within two blocks.

4    Q.  So at any time up until that point did you have eyes on

5    Mr. Johnson yourself?

6    A.  Could you repeat the question?

7    Q.  Sure.  At any time up until this period of time when the

8    Ford Explorer pulls into the front of 1719 Girard Avenue

9    North, did you, yourself, have any eyes on Mr. Johnson?

10   A.  I don't recall seeing him.  I would have I guess -- if I

11   saw his face, I would recognize him because I knew who

12   he -- what he looked like.  I don't recall -- the first time

13   seeing him was in the back after he had been pulled out of

14   the car at the stop.

15   Q.  Okay.  But the person who was said to have the gun, he

16   was obviously a person of interest and law enforcement were

17   keeping an eye on him and where he was going, correct?

18   A.  Correct.  I observed who I believed -- later determined

19   to be Johnson walking southbound on the west side of the

20   church and then disappeared in the lot, and I received

21   further info from my CI identifying the car.

22   Q.  Did you see anything -- did you see Mr. Johnson carrying

23   a handgun?

24   A.  No.

25   Q.  Did you see anything on his person that would be

1    consistent with a handgun, a bulge or anything like that?

2    A.  No.  I was observing this through binoculars to the

3    north.

4    Q.  Did you receive any reports from any other officer up to

5    that point that they had seen Mr. Johnson in possession of a

6    handgun?

7    A.  No.

8    Q.  Did you receive any reports from another officer, I see

9    a bulge or something consistent with them possessing a

10   handgun?

11   A.  No.

12   Q.  So then Mr. Parker and Mr. Johnson then are in front of

13   1719 Avenue North -- or 1719 Girard Avenue North, they go

14   into that address, is that right?

15   A.  I remember seeing people in the front yard, two in

16   front, and my eye was intermittent on that block.

17   Q.  Your report indicates Parker and Johnson then approached

18   and entered 1719 Girard Avenue North.  Do you remember?

19   A.  If that's what my report says.  I don't -- my memory

20   doesn't recall that.

21   Q.  Do you take my word for it or do you want to look at

22   your report?

23   A.  No, it sounds familiar.

24   Q.  Do you know, then, how long, and if you can't remember,

25   tell me, do you know how long Parker and Johnson were in

1      that address?

2      A.  If I was going to estimate a time from following them

3      from the funeral until the time they traveled away after

4      stopping at the block, to me it would be five minutes, ten

5      minutes, and that's just a wide estimate.

6      Q.  And the CRI was not with them reporting what was going

7      on inside that house, was he?

8      A.  No.

9      Q.  So then at some point they come out of the front of the

10     house and they get back into the red Ford Explorer, correct?

11     A.  Yes.

12     Q.  Do you know who was driving the red Ford Explorer at

13     that point?

14     A.  No.

15     Q.  Then law enforcement follows it and it's ultimately

16     stopped in the area of 8th and Humboldt?

17     A.  Yes.

18     Q.  That's about nine blocks away, something like that?

19     A.  Roughly, yes.

20     Q.  During that period of time, no officer reported the

21     vehicle having any kind of traffic violations, correct?

22     A.  I can't think of specifically although -- no.

23     Q.  All right.

24     A.  Not after they had left the house.

25     Q.  The basis for the stop here, the sole basis, was the

Meiren - Cross by Goetz

```
1    information that you had received from the CRI that Jabari

2    Johnson had a gun.  That was it, correct?

3    A.  Absolutely.

4    Q.  And at no time did you or any other officer observe

5    anything that would be corroborative of that information,

6    correct?

7    A.  I don't agree.

8    Q.  Tell me what you observed that was corroborative.

9    A.  Initially when we had planned to do the stop immediately

10   after the vehicle had left the church at our direction, at

11   my direction, to have this vehicle stopped, a squad came up

12   behind it to do the traffic stop, and at this point this

13   vehicle appeared to be part of the procession of the

14   funeral, and the squad pulls up behind and the next thing we

15   see the vehicle dipping into an alley.  And based on my

16   experience and, you know, hearing what's going on through

17   surveillance officers, if I was going to a funeral of an

18   associate, I would go see my friend or family buried, I

19   wouldn't dip into an alley.  You know, it seemed abnormal.

20   Q.  Did --

21   A.  So that's an indicator, especially with the information

22   that I had received from my informant, that maybe, you know,

23   I believed that crime is afoot based on their behavior.

24   Q.  Anything -- anything else other than that pulling into

25   the alley?
```

1   A.  No.

2   Q.  The vehicle when it was ultimately pulled over, it

3   didn't -- there was no attempt to flee, correct?

4   A.  When it had been pulled over someone fled on foot from

5   the vehicle.

6   Q.  But I'm talking about the vehicle itself, that vehicle

7   never sped off or there's no high-speed chase or --

8   A.  I don't really remember what the patrolman

9   had -- nothing comes to mind.

10  Q.  If that had happened, that would be something that you

11  would note, would you agree?  There was a high-speed chase

12  involving a vehicle in these circumstances?

13  A.  That would be an indicator, yes.

14  Q.  Yeah.  But you didn't indicate that in your report, did

15  you?

16  A.  No.

17  Q.  And when the stop occurred, there's no reports of

18  Mr. Parker engaging in any kind of furtive conduct, correct?

19  A.  I'm not aware.

20  Q.  And Mr. Parker's person was searched after he was taken

21  out of the vehicle, is that right?

22  A.  That's my understanding.

23  Q.  And a cell phone was recovered from his person, is that

24  your understanding?

25  A.  Yes.

Meiren - Cross by Goetz

1    Q.  And there was subsequently something on the nature of a

2    showup identification when you brought the two St. Paul

3    Sergeants Zebro and Straka and pointed Mr. Parker out who

4    was in the back of the squad car, that was a showup

5    identification that happened as a result of him, Parker,

6    being taken into custody, correct?

7    A.  Yes.

8              MR. GOETZ:  May I just have a moment, Your Honor?

9              THE COURT:  Sure.

10         (The defendant conferred with his attorney.)

11             MR. GOETZ:  Thank you, officer.  That's all the

12    questions I have.

13             THE COURT:  I have a question before -- so at some

14    point I recall your testimony was that defendant Parker was

15    seen getting out of the vehicle and putting something in a

16    garbage can or no, that's not you?

17             THE WITNESS:  No, I didn't observe that.

18             THE COURT:  Never mind.

19             MR. PAULSEN:  That's the next witness, Your Honor.

20             THE COURT:  Okay.  I'm getting ahead of myself.

21             MR. PAULSEN:  Do you have --

22             MR. WOLD:  I do.

23             MR. PAULSEN:  You have questions?

24             MR. WOLD:  I do, yeah.

25             MR. PAULSEN:  I'll go last.

```
 1                THE COURT:  Mr. Wold.

 2                MR. WOLD:  Thank you.

 3                        CROSS-EXAMINATION

 4     BY MR. WOLD:

 5     Q.  Officer Merten, my name is Peter Wold.  I represent

 6     Nitelen Jackson.  You talked about him just before we had

 7     the lunch break today.  Do you recall that?

 8     A.  Yes.

 9     Q.  And you talked about a conversation you had with him

10     that was at the Hennepin County Adult Detention Center, do

11     you recall?

12     A.  Yes.

13     Q.  And that conversation was precipitated by a search

14     warrant that you sought and received and visited him to

15     serve that warrant on, fair?

16     A.  Yes.

17     Q.  Okay.  And why did you seek the search warrant, sir?

18     A.  I was conducting a drug investigation of a person

19     associated with that address.

20     Q.  Okay.  With what address?

21     A.  Where the Lyndale address, I'm sorry, the numbers escape

22     me.

23     Q.  4019?

24     A.  Yes.

25     Q.  Okay.
```

1    A.  Where magazine and gun had been -- or a phone had been

2    recovered and a gun had been -- and maybe some spent casings

3    and blood-like substance that had been recovered out of that

4    address and so I was conducting some follow-up.

5    Q.  Okay.  And who was the drug investigation focussed on,

6    sir?

7    A.  Damon Young.

8    Q.  Excuse me?

9    A.  Damon Young.

10   Q.  Damon Young.  And you had information about Nitelen

11   Jackson before you went to the Hennepin County detention

12   center, correct?

13   A.  Yes.

14   Q.  And in fact, there were items discovered on January 2nd,

15   2013, that displayed his fingerprints?

16   A.  Yes.

17   Q.  Okay.  Did you do any other background checks on

18   Mr. Jackson before you visited him at Hennepin County

19   detention center?

20   A.  Yes.  I read some reports about maybe some arrests and

21   kind of who he ran with.

22   Q.  Okay.  And were you aware of connections he had to that

23   address at 4019?

24   A.  Other than his prints on the phone and I believe it was

25   a magazine, I didn't see any connection.

1    Q.   Okay.  You didn't see any -- did you visit the place?

2    A.   No.

3    Q.   Okay.  And when you say you didn't see any connection,

4    what do you mean you didn't see any connection?

5    A.   I didn't -- I didn't locate any paper trail or any

6    connections by associations to --

7    Q.   Okay.

8    A.   -- the -- people who resided there who were on paper

9    there, utility bills and routine check that we follow-up on.

10   Q.   Okay.  And who were the utility bills in the name of?

11   A.   It was a -- I don't recall.  I don't remember the

12   utility bills in the case.  A cable bill came up to a female

13   who I knew to be associated with Damon Young.

14   Q.   Okay.  And did her name, in fact, appear on the lease?

15   A.   Yes.

16   Q.   Okay.  And you then had this conversation with

17   Mr. Jackson.  You told him why you were there, correct?

18   A.   Yes.

19   Q.   And you told him that at that scene were found his

20   fingerprints, correct?

21   A.   Yes.

22   Q.   By the record checks you had done, you knew he was a

23   felon, true?

24   A.   Yes.

25   Q.   And you told him that there was a firearm or magazine or

Meiden - Cross by Wold

1    other things that would be a criminal offense for a felon to

2    have possession of?

3    A.  I believe that that may have come up in our

4    conversation.  I don't remember the specifics, but yes.

5    Q.  Okay.  But --

6    A.  It was the topic of the conversation.

7    Q.  Correct.  And after you told Mr. Jackson why you were

8    there and the things that were found at that address,

9    including the firearms, he denied being at that address,

10   true?

11   A.  Yes.

12   Q.  And, in fact, also there was his phone that had his

13   fingerprints on it, true?

14   A.  I believe it was his phone, yes.

15   Q.  Okay.  Well, in fact, do you -- are you aware of the

16   search that was done on the phone?  It was in police

17   custody, correct?

18   A.  Yes.

19   Q.  Okay.

20   A.  During the conversation he denied it.  I think he said

21   he -- he sold phones on the street and maybe that's why his

22   fingerprint was on it.

23   Q.  Okay.  Are you familiar with the search that was done

24   with the phone thereafter, sir?

25   A.  Not the particulars.

Straka - Direct

1    Q.  Well, it proved that his information was all over the

2    phone, true?

3    A.  Yes.

4    Q.  Okay.  And that was a phone that was found at that

5    residence?

6    A.  Yes.

7             MR. WOLD:  Thanks.  I have no other questions.

8             THE COURT:  Okay.  Any other questions?

9             MR. PAULSEN:  I'll waive redirect, Your Honor.

10            THE COURT:  I'm sorry?

11            MR. PAULSEN:  I'll waive redirect.

12            THE COURT:  Okay.  Thank you.  You're excused.

13            MR. PAULSEN:  Sergeant Rich Straka.

14            THE COURT:  Come forward and get sworn in, please,

15   sir.

16       (The witness is sworn.)

17            THE COURT:  Have a seat, state your name and spell

18   your last name for the court reporter, please.

19            THE WITNESS:  Richard Straka, S-T-R-A-K-A.

20                        **DIRECT EXAMINATION**

21   BY MR. PAULSEN:

22   Q.  Sergeant Straka, by whom are you employed?

23   A.  The St. Paul Police Department.

24   Q.  How long?

25   A.  Twenty-two years with St. Paul and seven years with the

Strand - Direct

1    state patrol.

2    Q.  I want to take you back to November 2nd of 2012.  Were

3    you working at a funeral detail that we heard about?

4    A.  Yes.

5    Q.  All right.  And at a certain point were you part of a

6    follow of a car that was supposed to have Mr. Johnson in it?

7    A.  We received information from Officer Merten that a

8    vehicle documents there was a gun in a car.

9    Q.  Okay.

10   A.  So we were a part of that overall detail.

11   Q.  And you were trying to follow it away from the funeral

12   site?

13   A.  Yes.

14   Q.  Did you see him go back into an alley behind 1719

15   Girard?

16   A.  Yes.

17   Q.  And did you see him getting out there?

18   A.  No, I did not.

19   Q.  Did you see anybody in the alley?

20   A.  Yes.

21   Q.  So you didn't see the person get out of the vehicle but

22   you saw a person in the alley?

23   A.  Yes, after the vehicle left the alley.

24   Q.  Okay.  So is it possible someone got out of the car?

25            MR. GOETZ:  Objection; speculation, Your Honor.

Strand - Direct

1           THE COURT:  Overruled.

2    BY MR. PAULSEN:

3    Q.  How long after the car left the alley did you see the

4    person in the alley?

5    A.  Probably about two minutes.

6    Q.  Okay.  And could you see what the person was doing, if

7    anything?

8    A.  Yes.

9    Q.  What were they doing?

10   A.  The individual was walking eastbound from 1311 18th

11   Avenue North.  In the backyard of that address there was a

12   garbage can, one of the taller ones.  The individual stopped

13   behind the garbage can and then started walking again across

14   the alley through the backyard of 1719 Girard Avenue North.

15   Q.  Okay.  And do you know where this person eventually

16   went?

17   A.  Shortly afterwards I saw the same individual in the back

18   seat of a Minneapolis squad car.

19   Q.  Okay.  And was that after the -- a certain vehicle had

20   been stopped by the police?

21   A.  Yes.

22   Q.  And was that the same vehicle you guys had been

23   following earlier?

24   A.  Yes, it was the same vehicle that we observed in the

25   alley.

Strahe - Direct

1    Q.  All right.  And so had this person been in that vehicle

2    when the police stopped it?

3    A.  Yes.

4    Q.  Now, did you and your fellow officer, was it Zebro?

5    A.  Yes.

6    Q.  Dan Zebro, Z-E-B-R-O.  Did you see the person?

7    A.  Yes.

8    Q.  Did you find anything there?

9    A.  Yes.

10   Q.  What did you find?

11   A.  A .45-caliber handgun.

12   Q.  And what was its condition?

13   A.  It was loaded and cocked.

14   Q.  And after finding the gun, did you go over to where that

15   car had been stopped and the people were being detained?

16   A.  Yes.

17   Q.  And did you -- what observations did you make?

18   A.  The same individual that both of us seen in the alley

19   walking through the alley was in the back seat of a

20   Minneapolis squad.

21   Q.  And who was that person?

22   A.  Darryl Parker.

23   Q.  And about how long was it after you had seen Parker in

24   the alley before you got back to the scene and identified

25   him?

Strand - Direct

```
1    A.  I'm guessing 20 minutes or so.  We recovered the gun,

2    took photographs of the gun, so it took awhile for us to

3    finish that and then the stop had been made already.

4    Q.  And then you went over, and after doing that, after

5    recovering the gun and photographing it, that's when you

6    went to identify the person?

7    A.  Yes.

8              MR. PAULSEN:  All right.  That's all I have, Your

9    Honor.

10             THE COURT:  Mr. Goetz.

11             MR. PAULSEN:  Oh, well.

12             THE COURT:  Are you done or are you not done?

13             MR. PAULSEN:  I've got a picture of the gun if you

14   want to see it, but if you don't want to see it.

15             THE COURT:  Mr. Goetz, you're up.

16             MR. GOETZ:  Thank you, Your Honor.

17                          CROSS-EXAMINATION

18   BY MR. GOETZ:

19   Q.  Good afternoon, sergeant.

20   A.  Good afternoon.

21   Q.  Sergeant, what -- what was your assignment in this

22   detail?

23   A.  Our assignment was we were on this detail because of the

24   threat of violence.

25   Q.  And what were you tasked with doing, though?
```

1    A.  We were basically in the area of the funeral and we were

2    basically listening for any information that was being put

3    out regarding any criminal activity or anything that could

4    be occurring for the safety of individuals at that funeral

5    or that area.

6    Q.  So were you directed to this specific alley between

7    17th, 18th and Girard or did you just happen to drive by

8    there on the patrol of the area?  How did you get to that

9    alley?

10   A.  We had received information from the other squads

11   working that vehicle, the red Explorer with Michigan plates,

12   was in that area, so we were basically driving around that

13   area trying to do surveillance on that vehicle.

14   Q.  And when is the first time that you saw that vehicle?

15   A.  I believe it was when we parked on 18th Avenue North and

16   observed the vehicle in the alley behind a Girard address

17   facing northbound.

18   Q.  So the vehicle was already in the alley, then, when you

19   saw it?

20   A.  Yes.

21   Q.  Was it stopped?

22   A.  Yes, it was.

23   Q.  Do you know -- you don't know how long it had been

24   there, correct?

25   A.  Correct.

Strand - Cross by Goetz

1    Q.  And did you ever see anybody get out of that vehicle?

2    A.  No, I did not.

3    Q.  Did you ever see anybody get into that vehicle?

4    A.  I did not.

5    Q.  And then at some point the vehicle drives away, correct?

6    A.  Yes.

7    Q.  But you still maintain surveillance of that alley?

8    A.  Yes.

9    Q.  And you've testified it was about two minutes after that

10   that you saw Mr. Parker, the person that you subsequently

11   identified as Mr. Parker?

12   A.  Yes.

13   Q.  And you saw him as he was walking eastbound across the

14   alleyway?

15   A.  Prior to crossing the alley he was actually in the

16   backyard of 1311 - 18th Avenue North, so it would have been

17   the west side of the alley.

18   Q.  So can you describe for us the garbage can that you

19   mentioned, what did that look like?

20   A.  I believe it was one of the taller garbage cans that put

21   out in the -- in your alley or in your front yard through

22   Waste Management or whatever.  It was one of the taller.

23   Q.  One of the City of Minneapolis issues, the brown ones?

24   We're not talking about a dumpster?

25   A.  No.

Strand - Cross by Goetz

```
 1    Q.  Or anything like that?

 2    A.  It was just one of the big garbage cans.

 3    Q.  Okay.

 4    A.  The plastic ones.

 5    Q.  And you testified that you saw Mr. Parker stop behind

 6    the garbage can?

 7    A.  Yes.

 8    Q.  How long was he stopped behind that garbage can?

 9    A.  Momentarily.

10    Q.  And in your report you don't have any indication that

11    you observed him ducking down or throwing any object or any

12    kind of observation like that?

13    A.  That's correct.

14    Q.  That's because I take it you didn't observe any such

15    thing, correct?

16    A.  Did not.

17    Q.  You didn't observe him, in particular, throwing any gun,

18    correct?

19    A.  I did not, no.

20    Q.  So I mean, the garbage cans are about, what, up to my

21    elbow, something like that?  Roughly?

22    A.  I took photos of it.  I'm guessing it was one of

23    those -- I don't live in Minneapolis or work in Minneapolis

24    that often so whatever the Waste Management ones are so.

25    Q.  Were you --
```

Strand - Cross by Goetz

1    A.  I'm guessing they're about four feet tall.

2    Q.  Were you able to see Mr. Parker's upper torso at all

3    times as he stopped behind that garbage can, say from his

4    mid chest up?

5    A.  I honestly can't tell you how much of his body I saw.

6    It would depend on his height and the height of the garbage

7    can is what I could see.

8    Q.  Okay.  So he stops behind the garbage can for a matter

9    of seconds, you don't observe him stooping down or anything,

10   and then he walks on across the alley, is that right?

11   A.  Yes.

12   Q.  What clothes do you remember him wearing?

13   A.  Jeans, a gray sweatshirt and a gray baseball hat.

14   Q.  Do you remember what type of sweatshirt?

15   A.  I do not.

16   Q.  Did it have a hood on it, do you remember one way or the

17   other?

18   A.  I do not.

19   Q.  And after Mr. Parker crosses the alley, what do you do

20   and your partner, do you stay in the alley?  Do you move to

21   another location?  What do you do?

22   A.  We were starting to go southbound in the alley, we

23   stopped, we started moving up and we were able to observe

24   him crossing through the backyard towards the front of 1719

25   Girard Avenue North towards the sidewalk, and that is the

1      last we saw of him.

2      Q.  And then what did you do after that?

3      A.  After that we got out of our vehicle and started looking

4      around, and on the west side of the garbage can is where we

5      observed the .45-caliber handgun.

6      Q.  Thanking back to that red Ford Explorer, how far away

7      was that red Ford Explorer from the area of where you

8      eventually recovered that handgun?

9      A.  It was right there.  It was the vehicle was parked in

10     the alley northbound.  It would have been, if there was a

11     driveway there, 1719 Girard Avenue North.

12     Q.  Okay.  So you don't know obviously who put the handgun

13     there or how long it had been there, you just know you found

14     it when you did, correct?

15     A.  Yes.

16              MR. GOETZ:  No further questions.

17              THE COURT:  Anybody else have any questions for

18     this witness?

19                       **REDIRECT EXAMINATION**

20     BY MR. PAULSEN:

21     Q.  Well, do you know who --

22              THE COURT:  Mr. Paulsen.

23              MR. GOETZ:  Objection; speculation.

24              MR. PAULSEN:  He opened the door, Your Honor.

25              MR. GOETZ:  He also said he didn't know, Your

Ledman - Direct

1    Honor.

2              THE COURT:  Sustained.

3              MR. PAULSEN:  Okay.  We'll save it for trial.

4    Nothing further.

5              THE COURT:  Thank you.  You're excused.

6              THE WITNESS:  Thank you.

7              MR. PAULSEN:  Your Honor, I'm going to take a

8    witness out of order, we've got a conflict, and Mr. Ledman.

9    This goes to Mr. Armstrong.

10             THE COURT:  Mr. Ledman, do you want to come

11   forward and get sworn in, please, sir.

12        (The witness is sworn.)

13             THE COURT:  Have a seat.  State your name, spell

14   your last name for the court reporter, please.

15             THE WITNESS:  Thank you.  My name is Daniel

16   Ledman, L-E-D-M-A-N.

17                     **DIRECT EXAMINATION**

18   BY MR. PAULSEN:

19   Q.  By whom are you employed?

20   A.  I'm sorry, sir?

21   Q.  Who do you work for?

22   A.  Minneapolis Police Department.

23   Q.  For how long?

24   A.  Since January of 2007.

25   Q.  I want to take you back to --

1              MR. PAULSEN:  For the record, Your Honor, this is

2     an incident on April 27th of 2014.  It's overt act 13 in the

3     indictment involving Marques Armstrong and a gun in the car.

4     BY MR. PAULSEN:

5     Q.  So were you on duty on April 27th, 2014?

6     A.  Yes, sir.

7     Q.  And it was about 11:00 p.m. that night were you involved

8     in a traffic stop?

9     A.  Yes, sir.

10    Q.  Tell us where you were and what caused this traffic

11    stop.

12    A.  We observed a vehicle failed to signal a left-hand turn,

13    an eastbound turn onto Lowry from Oliver Avenue North.

14    Q.  And what did you do after observing the illegal left

15    turn?

16    A.  We attempted a traffic stop.

17    Q.  You said you "attempted a traffic stop."  What happened?

18    A.  We initiated a traffic stop at Lowry and Morgan and the

19    vehicle continued to drive for seven more blocks.

20    Q.  When you say "traffic stop," what does that involve?

21    A.  Code three lights and then the vehicle didn't stop after

22    a block so we turned on our siren as well and then it

23    continued even further.

24    Q.  How far did it go after you had your lights and siren on

25    before it finally stopped?

1   A.  Approximately two more blocks, sir.

2   Q.  Is that unusual?

3   A.  Yes.

4   Q.  Was there any reason it couldn't have stopped earlier if

5   it had wanted to?

6   A.  Absolutely not.

7   Q.  Any doubt in your mind they knew that there was a police

8   car behind them?

9   A.  Yes, they knew.

10  Q.  So when you get the car stopped, let's find out who,

11  first of all, who the driver was?

12  A.  The driver was Mr. Deloney, I believe.  I'm not sure of

13  the pronunciation.

14  Q.  D-E-L-O-N-E-Y?

15  A.  Sounds right, sir.

16  Q.  Okay.  And was there a front seat passenger?

17  A.  Yes, sir.

18  Q.  Who was that?

19  A.  Mr. Strickland.

20  Q.  And who was in the back seat?

21  A.  Mr. Armstrong.

22  Q.  Marques Armstrong?

23  A.  Yes, sir.

24  Q.  So just those three people?

25  A.  Yes, sir.

Ledman - Direct

1   Q.  What happened after you got -- after the car finally

2   stopped?

3   A.  Well, my partner and I were the only squad there, so we

4   held the vehicle until other squads could arrive to assist.

5   Q.  And when the other squads arrived, what happened?

6   A.  The occupants were taken out of the vehicle.

7   Q.  As that was going on, did you notice any contraband or

8   anything illegal in the passenger -- or in the -- yeah, in

9   the passenger compartment of the car?

10  A.  Yes, sir.

11  Q.  What did you notice?

12  A.  Me personally?

13  Q.  Yes.

14  A.  I observed an open container of alcohol in the back seat

15  and then along with ammunition, boxes of ammunition in plain

16  view.

17  Q.  All right.  Was there -- did anybody notice any

18  marijuana?

19  A.  Yes.

20  Q.  Tell us about that.

21  A.  The first occupant that was taken out was the driver, my

22  partner dealt with him, and right as he approached the

23  vehicle, he said he smelled marijuana from the vehicle.

24  Q.  Okay.  Was there any search done of this vehicle?

25  A.  Yes, sir.

Ledman - Direct

1    Q.  What was the purpose of the search?

2    A.  Due to the smell of marijuana, the observed open

3    container of alcohol in plain view.

4    Q.  Anything about the driving behavior?

5    A.  Absolutely that contributed, along with the front seat

6    passenger was not listening to my orders as well.

7    Q.  I'm sorry, he wasn't what?

8    A.  He wasn't listening to my orders.

9    Q.  Okay.  In addition to all of that, had there been

10   any -- you were in what location again?

11   A.  We were at Lowry and James at the time of the stop,

12   where they stopped.

13   Q.  And had there been any warning, any alert a little bit

14   earlier in the evening?

15   A.  In regards to gang activity?

16   Q.  Yes.

17   A.  Yes, sir.

18   Q.  Tell us about that.

19   A.  Approximately an hour prior to the search -- or to

20   traffic stop we got a switch sent over our squad computer

21   saying that a gang known by the Stick Up Boys, there was

22   going to be some sort of confrontation between them and

23   another gang.

24   Q.  And where was -- according to this alert, where was the

25   confrontation supposed to take place?

Ledman - Direct

1    A.  I believe it was around 15th and Newton.

2    Q.  And how far away were you at the time of this illegal

3    left turn?

4    A.  Well, we were at Lowry which is roughly 30 seconds so

5    just about a mile and a half, two miles away.

6    Q.  So it was in the same area where this alert was supposed

7    to happen with the Stick Up Boys gang activity?

8    A.  Yes, sir.

9    Q.  Okay.  And did you know Marques Armstrong from before?

10   A.  I'm heard the name before, sir.

11   Q.  Do you know whether he was a member of the Stick Up

12   Boys?

13   A.  I knew he was a gang member but not which gang, sir.

14   Q.  So there was a search of this vehicle, and was anything

15   found in the vehicle?

16   A.  Yes, sir.

17   Q.  What was found?

18   A.  Like I previously mentioned, several boxes of

19   ammunition, open container of alcohol and two handguns were

20   located as well.

21   Q.  Where were the handguns found?

22   A.  They were hidden behind the -- you have to open the

23   driver door to get to the compartment, but it's almost where

24   the fuse box area is, you have to pop off the lid, and they

25   were both slid in there, one on top of the other.

```
 1   Q.  You -- were they loaded?

 2   A.  Both were loaded.

 3   Q.  And were those, the guns seized then for processing for

 4   prints and DNA and so forth?

 5   A.  Yes, sir.

 6            MR. PAULSEN:  Nothing further.

 7   BY MR. PAULSEN:

 8   Q.  Oh, if I didn't ask you, did I ask you this, whose car

 9   was this?

10   A.  I don't recall, sir.

11   Q.  But Armstrong was not the driver, that was Deloney?

12   A.  Yes, sir.

13            MR. PAULSEN:  And I've said this before, Your

14   Honor, but standing, passenger in a vehicle doesn't have

15   standing.

16            THE COURT:  Okay.  Mr. Birrell.

17                    CROSS-EXAMINATION

18   BY MR. BIRRELL:

19   Q.  You stopped the car because of an illegal left turn?

20   A.  Yes, sir.

21   Q.  Were you planning to stop it anyways?

22   A.  It was a traffic stop for a signal violation.

23   Q.  I understand that.  Were you looking to stop the car for

24   some reason?

25   A.  No, sir.
```

1    Q.  So you -- this gang alert had nothing to do with your

2    stopping the car?

3    A.  We had no idea who was in the car, sir.

4    Q.  So can you answer my question: did the gang alert have

5    anything to do with your stopping the car?

6    A.  No, sir.

7    Q.  Okay.  I noticed you were asked about it and wondered if

8    that had something to do with it.  So you just stopped it

9    because it made an illegal left turn?

10   A.  That was the, yes.

11   Q.  Is there any other reason you stopped it?

12   A.  After the traffic stop it crossed the double white line

13   as well.

14   Q.  Okay.  But you stopped it initially because of the turn

15   signal --

16   A.  Yes.

17   Q.  -- violation?

18   A.  Absolutely, yes, sir.

19   Q.  What time of day was this?

20   A.  Roughly 2300 hours.

21   Q.  So 11 o'clock at night?

22   A.  Correct.

23   Q.  So was it -- did the car turn left at an intersection?

24   A.  It was at Lowry and Oliver.

25   Q.  Is that when it failed to put its turn signal on?

Ledman - Cross by Birrell

```
 1    A.  Yes, sir.

 2    Q.  How long had you been following it?

 3    A.  We were approximately a block away behind it.

 4    Q.  So you just happened to see it?

 5    A.  Yes, sir.

 6    Q.  Did you know the driver?

 7    A.  No, sir.

 8    Q.  Did you -- had you seen the car before?

 9    A.  No, sir.

10    Q.  Okay.  So when you stopped it, you didn't know who was

11    in the car?

12    A.  No, sir.

13    Q.  Is that right?

14    A.  Yes, sir.

15    Q.  And so you didn't approach the car, you called in for

16    backup?

17    A.  Yes, sir.

18    Q.  So you could inquire further into this turn signal

19    violation?

20    A.  They didn't stop for multiple blocks with lights and

21    sirens, so yes, sir, we waited for backup.  We were out

22    numbered as well.

23    Q.  Two blocks, is that how far they didn't stop?

24    A.  Three blocks, sir.

25    Q.  Three blocks.
```

1    A.  Yes, sir.

2    Q.  Was there any other traffic out?

3    A.  Very light traffic.

4    Q.  What was the weather like?

5    A.  I don't recall.

6    Q.  It was dark, right?

7    A.  Lowry is fairly light.

8    Q.  So you could see inside the car?

9    A.  Yes, we could see that there were three occupants.

10   Q.  Couldn't see who it was?

11   A.  No, sir.

12   Q.  So you said the driver's name was Mr. Deloney?

13   A.  Yes, sir.

14   Q.  Is that right?  Did you arrest him that night?

15   A.  Yes, sir, he was arrested.

16   Q.  What did you arrest him for?

17   A.  PC weapons, sir.

18   Q.  Did he have a record?

19   A.  I don't recall.

20   Q.  When you say "PC weapons," what is it that you mean?

21   A.  Arrested for a firearm.

22   Q.  He couldn't have a firearm because why?

23   A.  Because he had no permit.

24   Q.  Okay.  So you arrested him for being in possession of a

25   pistol without a permit.  Is that what you did?

1    A.  What we typically do, we notify our sergeant of the stop

2    and then they tell us what to book them for, sir.

3    Q.  Okay.  So do they tell you whether to arrest him or what

4    the charge was?

5    A.  Just to arrest him for PC weapons and have the

6    investigator speak with him.

7    Q.  Did they speak with him?

8    A.  I don't know, sir.

9    Q.  Did you?

10   A.  No, sir.

11   Q.  Okay.  Then there was a person in the front seat named

12   Strickland?

13   A.  Yes, sir.

14   Q.  Did he get arrested too?

15   A.  Yes, sir.

16   Q.  Did you know him?

17   A.  No, sir.

18   Q.  Okay.  Did you talk to him?

19   A.  In regards to what, sir?

20   Q.  Anything that came up that night?

21   A.  Other than getting him into custody, did I talk to him?

22   Giving him orders, yes.

23   Q.  Giving him what, orders?

24   A.  Giving him orders, yes.

25   Q.  Did you talk to him about what was happening or what had

1    happened?

2    A.  Well, I told him he was under arrest, yes.

3    Q.  Did he say anything to you?

4    A.  I don't recall, sir.

5    Q.  Okay.  And then Mr. Armstrong was in the back seat?

6    A.  Yes, sir.

7    Q.  Was he behind the passenger or the driver?

8    A.  I don't recall.

9    Q.  How long did you sit there and wait for the other car to

10   arrive?

11   A.  I'm not sure, sir.

12   Q.  Well, give me your best estimate.

13   A.  I'd have to -- I didn't see the squad video.  It has

14   been almost a year, so I don't --

15   Q.  So you don't know?

16   A.  You'd have to look at the squad video, yes, sir.

17   Q.  I'm not going to look at it.  You just tell me if you

18   know or not.

19   A.  I don't recall.

20   Q.  All right.  And then another squad car arrived?

21   A.  Multiple did, sir.

22   Q.  How many was there?

23   A.  Several.

24   Q.  What did you say when you asked for help or whatever it

25   was you did?

1    A.  Actually the vehicle didn't stop right away so squads

2    just self assigned.  They know to keep the air clear just in

3    case, you know, somebody runs into the car, stops, you know,

4    so they just self assigned and showed up.

5    Q.  So they were listening to your description that the car

6    wasn't stopping?

7    A.  Yes, sir.

8    Q.  And then everybody showed up?

9    A.  Correct.

10   Q.  Okay.  All right.  So then did you walk up to the car

11   when the other people arrived?

12   A.  I don't recall exactly how we got up to the car.

13   Q.  Well, did you have any way to get to the car besides

14   walking there?

15   A.  No.  No.

16   Q.  Okay.  So you walked up to the car?

17   A.  Eventually with other officers, yes, sir.

18   Q.  Okay.  Were you the first person to arrive at the car?

19   A.  I don't recall.

20   Q.  Were you in charge or was someone else in charge?

21   A.  Well, usually driver calls out the occupants, so my

22   partner would probably be the one to talk to.

23   Q.  Okay.  So your partner was driving the squad car?

24   A.  Yes, sir.

25   Q.  And you were the passenger?

```
 1    A.  Yes, sir.

 2    Q.  So was he in charge of what was going on?

 3    A.  Typically, yes, the driver calls out people from the

 4    vehicle on a stop, on a felony stop.

 5    Q.  All right.  When you arrived at the car, what kind of

 6    car was it?

 7    A.  I believe it was a Chevy Impala.

 8    Q.  All right.  So when you arrived at the Chevy, what did

 9    you do?

10    A.  I stood by and we took out --

11    Q.  Tell me, where were you standing by the car?

12    A.  By the squad car?

13    Q.  By the Chevy, where were you standing by the Chevy?

14    A.  On the passenger side.

15    Q.  And did you have a flashlight or?

16    A.  Yes, sir.

17    Q.  Were you shining it in the car?

18    A.  I'm sure I was, sir.

19    Q.  Do you remember?

20    A.  No, but it's nighttime, so I'm sure I had my flashlight

21    out.

22    Q.  All right.  Do you remember having the flashlight out or

23    not?

24    A.  You'd have to look on squad video.  It would be on squad

25    video.
```

1    Q.  We're just interested in what you remember.  You said it

2    was light so?

3    A.  Yeah.

4    Q.  Did you need a flashlight?

5    A.  Well, it depends.  It could be dark inside a vehicle

6    too.

7    Q.  Did you have your gun out?

8    A.  Yes, sir.

9    Q.  All right.  When you looked in the car, you said you

10   could see a can of something or container of alcohol?

11   A.  A bottle of, yes, alcohol.

12   Q.  A bottle of what, do you remember?

13   A.  Tequila, I believe.

14   Q.  And where was it?

15   A.  Back seat.

16   Q.  On the floor, on the seat?

17   A.  Floorboard, I believe.

18   Q.  On which side?

19   A.  I don't recall.

20   Q.  And could you see anything else in the car besides the

21   three people and the bottle of tequila?

22   A.  Yes, when we got closer, I observed a box of ammunition.

23   Q.  Where was that?

24   A.  I noticed some on the front seat and then there was

25   also, when we took out the last occupant, Mr. Strickland,

```
 1    there was a box on the door handle.

 2    Q.  When you arrived at the car, you could see a box of

 3    ammunition in the front seat?

 4    A.  As we approached it, sir.

 5    Q.  Where in the front seat was it?

 6    A.  I believe the center console area on the floor in

 7    between the driver and the front passenger.

 8    Q.  All right.  So when you saw the three people, you saw

 9    the bottle of tequila, you saw the box of ammunition, did

10    you see anything else when you were standing outside of the

11    car?

12    A.  Not that I recall, sir.

13    Q.  All right.  Now, tell me about these guns that were

14    found.  They were found in a compartment?

15    A.  Yes, sir.

16    Q.  And the compartment is up by the driver?

17    A.  Yes, sir.

18    Q.  And to get at this compartment you have to open the

19    front door?

20    A.  Yes, sir.

21    Q.  So it's forward of the front door on the passenger side

22    of the car?

23    A.  I'm sorry?

24    Q.  If I opened -- if the front door was opened, is it in

25    the middle that is revealed when you open the front door
```

```
 1      next to the driver?

 2      A.  A -- if you open the door, and there's probably two

 3      hinges on the door, it's towards the top hinge, and it's

 4      almost like a fuse box that you have to pop open a panel,

 5      and they were right there inside that.

 6      Q.  So are they inside the door or inside the body of the

 7      car?

 8      A.  The body of the car, sir.

 9      Q.  I see.

10      A.  Yes.

11      Q.  And you can't get at these unless the front door is

12      open?

13      A.  Yes, sir.

14      Q.  And obviously the purpose was to hide them?

15      A.  I couldn't say for sure, sir.

16      Q.  What other purpose would there be?

17      A.  Most likely to conceal them.

18      Q.  Okay.  And these guns were tested apparently?

19      A.  I couldn't tell you, sir.

20      Q.  You don't have any information that the guns were tested

21      and had anything at all to do with Mr. Armstrong?

22      A.  I don't deal with any of that, sir.

23      Q.  Okay.  Who found the guns?

24      A.  Officer Meeth.

25      Q.  How did he know to look for them?
```

```
 1    A.  Ammunition.  We had gang members in the vehicle.

 2    Q.  These people in the front, Deloney and Strickland, are

 3    they gang members?

 4    A.  When I contacted our dispatch to check --

 5    Q.  Mm-hmm.

 6    A.  -- Deloney and Armstrong came up as Stick Up Boy gang

 7    members.

 8    Q.  What kind of ammunition was there in the front seat?

 9    A.  It was 30/30 rifle rounds, 44 meg and .22-caliber

10    rounds, sir.

11    Q.  And what kind of pistols were found?

12    A.  A .22 and a .357-revolver.

13              MR. BIRRELL:  Thank you.  I don't have any other

14    questions, Your Honor.

15              THE COURT:  Was Mr. Armstrong arrested that night?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  What was he charged with?

18              THE WITNESS:  All three of them were booked for PC

19    weapons, sir.

20              THE COURT:  Anybody else have questions?

21    Mr. Paulsen.

22              MR. PAULSEN:  May I approach, Your Honor?

23              THE COURT:  Sure.

24              ///

25              ///
```

Ledman - Redirect

1                    **REDIRECT EXAMINATION**

2     BY MR. PAULSEN:

3     Q.  See if this refreshes your recollection on who the owner

4     of the vehicle was.

5              According to the report, who was the owner of the

6     vehicle?

7     A.  The driver of the vehicle, sir.

8     Q.  Mr. Deloney?

9     A.  Yes, sir.

10             MR. PAULSEN:  Nothing further.

11             MR. BIRRELL:  May I consult with Mr. Armstrong?

12             THE COURT:  Sure.

13         (The defendant conferred with his attorney.)

14             MR. BIRRELL:  I don't have any other questions.

15             THE COURT:  Okay.

16             MR. PAULSEN:  We're done with that issue, Your

17     Honor.

18             THE COURT:  Okay.

19             MR. PAULSEN:  The next one is Sergeant Biederman,

20     John Biederman.

21             THE WITNESS:  Thank you.

22             THE COURT:  You're excused.

23             THE WITNESS:  Thank you.

24             THE COURT:  Come forward, please, sir.

25         (The witness is sworn.)

```
1              THE COURT:  Have a seat, state your name and spell
2        your last name for the court reporter, please.
3              THE WITNESS:  John.  Last name is Biederman, B as
4        in boy, I-E-D as in David, E-R-M-A-N.
5              MR. PAULSEN:  Your Honor, this goes to
6        Mr. Arm -- let's see.  I'm on the wrong page here.  It goes
7        to Mr. Woods.  And it relates to Count 7 of the Indictment,
8        some guns found in a backyard at a house in north
9        Minneapolis.
10                         DIRECT EXAMINATION
11       BY MR. PAULSEN:
12       Q.  Sergeant Biederman, by whom are you employed?
13       A.  City of Minneapolis Police Department.
14       Q.  For how long?
15       A.  Since 1997.
16       Q.  Are you assigned to Safe Streets?
17       A.  No, I'm not.  I'm assigned to the weapons unit as well
18       as the SWAT team.
19       Q.  Okay.  You're an MPD weapons unit and SWAT team?
20       A.  Yes, sir.
21       Q.  Okay.  So I want to take you back to August 6th of 2014.
22       Did you participate in some activity at 1321 Newton Avenue
23       North?
24       A.  Yes.
25       Q.  What caused you to go to 1321 Newton Avenue North that
```

Biederman - Direct

1    day?

2    A.  I had received information from an informant that told

3    me that there was a male possessing a handgun and dealing

4    heroin in the backyard and back alley of the address.

5    Q.  Okay.  And was this informant someone you had worked

6    with before?

7    A.  Yes.

8    Q.  Did you consider the person reliable?

9    A.  Yes, sir.

10   Q.  And do you know how the informant knew that there was

11   heroin dealing going on in the backyard?

12   A.  They had witnessed it.

13   Q.  And same with respect to a person who was said to have a

14   gun back there?

15   A.  Yes, sir.

16   Q.  So what did you do in response to -- well, and how

17   recent was this information?

18   A.  Within that day.

19   Q.  So what did you do in response to this information?

20   A.  Well, I considered setting up surveillance on the area,

21   but I determined that it was not feasible to set up

22   to -- not to set up surveillance without being detected by

23   the people in the backyard, so I assembled a group of police

24   officers and came up with the plan to drive down the alley

25   as well as past the front of the house.

Biederman - Direct

```
 1    Q.  And what time of day did that take place?

 2    A.  In the evening time.

 3    Q.  Was it still light out or was it --

 4    A.  Yes, it was still light out.

 5    Q.  Where were you?

 6    A.  When we pulled up?

 7    Q.  Yeah.

 8    A.  I was --

 9    Q.  Were you in the alley or in front?

10    A.  I pulled up front.

11    Q.  But some other folks pulled down the alley?

12    A.  Yes.

13    Q.  Were these marked squads, unmarked squads?

14    A.  It was a mix.

15    Q.  What happened when the police officers drove down the

16    alley?

17    A.  They recognized one of the parties that I had described

18    to him as having the narcotics take off running.

19    Q.  Okay.  And for the record that was -- was that somebody

20    named -- nicknamed Tay Tay?

21    A.  Yes.

22    Q.  Which is not Marquis Woods, the defendant in this case,

23    but somebody else?

24    A.  That is somebody else.

25    Q.  So that person ran, started running.  Were there other
```

1    people that ran?

2    A.  Yes.

3    Q.  Tell us about that.

4    A.  Well, Mr. Woods as well as another individual ran from

5    the rear of the house to the front of the house where they

6    were met by policeman in the front yard and they gave up.

7    Q.  Was Mr. Woods pat searched at that point?

8    A.  Yes.

9    Q.  Did you do that or did that -- was that Mr. -- or

10   Sergeant House who did that?

11   A.  Sergeant House did that.

12   Q.  Were you aware of what was found on Mr. Woods?

13   A.  Some marijuana.

14   Q.  Anything besides the marijuana?

15   A.  Not that stands out.

16   Q.  Okay.  We'll leave that for Mr. House.  How many -- how

17   many folks were there at this 1321 Newton that day would you

18   say?

19   A.  There were --

20   Q.  Not police but the people that were already there.

21   A.  There were several.

22   Q.  Five, ten?

23   A.  Closer to ten than five.

24   Q.  Was there any searching done in the backyard?

25   A.  Yes, there was.

Biederman - Direct

1    Q.  Can you describe the situation in the backyard, what

2    sort of property was out there?

3    A.  When law enforcement pulled up, some of these guys were

4    sitting around a table playing cards or some sort of game,

5    and underneath that table law enforcement recovered a

6    handgun.  There was also a fan that --

7    Q.  Well, let's take it one step at a time.  This table,

8    first of all, some people who run from the backyard had been

9    sitting there?

10   A.  Yes.

11   Q.  Do you know if Mr. Woods was one of those people?

12   A.  Yes.

13   Q.  And then so the police went back in the yard and looked.

14   I think we have a picture here.

15          MR. PAULSEN:  As a matter of fact, Your Honor, I'm

16   going to offer three photographs at this time.  They're

17   Exhibits 17-1, 17-2 and 17-3.

18          MR. RICHMAN:  No objection, Your Honor.

19          THE COURT:  Okay.  Exhibit 17-1, 17-2 and 17-3 are

20   received.

21      (Government Exhibit Nos. 17-1, 17-2, 17-3 are

22   received.)

23   BY MR. PAULSEN:

24   Q.  Okay.  What are we seeing in 17-1?

25   A.  The three-tiered white table.  You can see some cards on

Biederman-Direct

1     top along with what appears to be a cell phone and some

2     chairs around it.  That's the backyard.

3     Q.  And then what's on the bottom shelf?

4     A.  A pillow.

5     Q.  17-2, when the pillow was removed, what was found on the

6     bottom shelf of that white table?

7     A.  A Glock handgun with an extended magazine.

8     Q.  And 17-3 is another angle of the same gun?

9     A.  Yes, sir.

10    Q.  Was it loaded?

11    A.  I believe it was.

12    Q.  And when you say "extended magazine," is that this

13    longish part that sticks out at the bottom of the gun?

14    A.  Yep.  You can see that magazine comes out from the

15    bottom of the handgun there, it's about twice as long as a

16    normal magazine.

17    Q.  Then you started to talk about some other guns that were

18    found?

19    A.  Yes, there was a van that was also parked in the

20    backyard that contained two more handguns, some ammunition

21    and an amount of what I believe to be crack cocaine.

22    Q.  So all of this, all of these guns were found outside in

23    the backyard?

24    A.  Yes.

25    Q.  Or in the van?

Biederman - Direct

```
1    A.  Or in the van, which was in the backyard.

2    Q.  How far was that van from the white table that we just

3    saw?

4    A.  It was relatively close.  It's a small, compact

5    backyard.

6    Q.  And let's see, was Mr. Woods taken into custody that

7    day?

8    A.  Yes.

9    Q.  For what?

10   A.  He was taken to be interviewed.

11   Q.  Was he released, then, after being interviewed?

12   A.  Yes, he was.

13   Q.  And he wasn't charged with the weapons at that time,

14   though, was he?

15   A.  No.

16   Q.  Did he give a DNA sample when he was at the station?

17   A.  He did.

18   Q.  And how was that obtained?

19   A.  Officer Muro, who interviewed him, got a voluntary

20   buccal swab sample from him.

21         MR. PAULSEN:  No further questions.

22                     CROSS-EXAMINATION

23   BY MR. RICHMAN:

24   Q.  Sergeant Biederman, I'm Robert Richman.  I represent

25   Marquis Woods.  What did you review to prepare for your
```

Biederman - Cross by Richman

1    testimony today?

2    A.  My report.

3    Q.  Did you review any of the reports of the other officers?

4    A.  I did.

5    Q.  I'm sorry, did you?

6    A.  I did, sir.

7    Q.  And in addition to your report, do you have any -- do

8    you have any notes other than your report?

9    A.  Do I have any handwritten notes?

10   Q.  Yes.

11   A.  No.

12   Q.  You said that you and the other officers first went to

13   1321 Newton Avenue North because you had received

14   information from a confidential informant, is that right?

15   A.  Yes, sir.

16   Q.  And you said that you considered this informant to be

17   reliable, is that right?

18   A.  Yes, sir.

19   Q.  For what period of time had you been working with this

20   informant?

21   A.  Several weeks to a month or two.

22   Q.  The informant gave you information that there were some

23   black males in the rear of 1321 Newton Avenue North selling

24   heroin, is that right?

25   A.  Yes.

Biederman - Cross by Richman

1    Q.  And in particular he identified someone; in fact, he

2    identified Tay Tay, correct?

3    A.  Yes, sir.

4    Q.  And you subsequently, upon arriving at the location,

5    determined that Tay Tay was Chevonte [spelled phonetically]

6    Champion, correct?

7    A.  Yes.

8    Q.  And in addition to giving you the name Tay Tay, he gave

9    a physical description of this person, is that right?

10   A.  As well as clothing, yes.

11   Q.  Okay.  So he described him as a light-skinned black

12   male, correct?

13   A.  Yes.

14   Q.  18 to 19 years old?

15   A.  True.

16   Q.  With short braids, correct?

17   A.  I believe so.

18   Q.  And wearing a white shirt and black pants, correct?

19   A.  I'd have to see my report to confirm that part but --

20        MR. PAULSEN:  I'll agree with it, Your Honor, I'm

21   following along in the report, if you want to save time.

22   BY MR. RICHMAN:

23   Q.  In addition to giving you a description of Tay Tay, did

24   he describe did or identify anyone else who was involved in

25   selling heroin?

Biederman - Cross by Richman

1    A.  No.

2    Q.  In addition, the CRI -- the CRI identified where this

3    was taking place by street address, correct?

4    A.  True.

5    Q.  And he also gave you a description of that location,

6    correct?

7    A.  Yes, he did.

8    Q.  And he told you that it was a single family home with a

9    detached garage, correct?

10   A.  Yes.

11   Q.  And that on the garage were the numbers 1321, correct?

12   A.  Yes.

13   Q.  And he told you that there was a blue or gray van parked

14   in the rear yard, correct?

15   A.  That is true.

16   Q.  And so given the detail of that information, would you

17   agree that it appeared as if he was describing what he was

18   seeing at the time that he was speaking to you, correct?

19   A.  I'm not sure I understand the question.  Are you asking

20   me if he was physically in the backyard when they called me?

21   Q.  Yes.  Was that your impression?

22   A.  No.

23   Q.  Your impression was that that person had left the

24   vicinity, is that right?

25   A.  Yes.

```
1    Q.  Did you know one way or the other?  Did you have a

2    conversation about where the CI was at the time that he was

3    talking to you?

4    A.  No, but based on the way he was speaking with me, I knew

5    that he was alone.

6    Q.  Because he was being forthright if someone were to

7    overhear him, is that right?

8    A.  True.

9    Q.  You said that Mr. Paulsen asked you how recently this

10   information -- well, first of all, you understood from the

11   CRI that he had personally observed the things that he was

12   telling you, correct?

13   A.  Yes.

14   Q.  That Tay Tay had a gun and was selling heroin, correct?

15   A.  Yes.

16   Q.  Did he give you a description of the gun?

17   A.  No.

18   Q.  Other than describing the van, did he have any

19   information about the contents of the van?

20   A.  No.

21   Q.  So before entering the van, you had no reason to believe

22   that there were guns in the van?

23   A.  No.

24   Q.  You said on direct something to the effect that the

25   observations that the CRI had made had been sometime that
```

Biederman - Cross by Richman

```
1    day, correct?
2    A.  Yes.
3    Q.  But isn't it true that you understood that the
4    information was very, very recent?
5    A.  Well, I suppose you have to quantify "very, very
6    recent."
7    Q.  Well, you said that --
8            MR. PAULSEN:  Your Honor, I'm going to object at
9    this point because there's no need for this and it could
10   identify the informant.
11           THE COURT:  Well, let's do this, actually.  How
12   much longer do you think you're going to be if I let you ask
13   these questions?
14           MR. RICHMAN:  How much longer?
15           THE COURT:  Yeah.
16           MR. RICHMAN:  Well, I think I have probably
17   another 20 minutes, Your Honor.
18           THE COURT:  Okay.  Let's take a recess.  Everybody
19   except Mr. Engh gets a recess.  And we're going to have
20   another matter that's going to take about ten minutes.  I'm
21   going to do that and just record that on our digital
22   recorder so the court reporter gets a recess, and we will
23   return at 3:45.
24           MR. RICHMAN:  I do have a change of plea at 4:30,
25   Your Honor and --
```

```
1              MR. PAULSEN:  So do I.

2              THE COURT:  Is that the same as Mr. Paulsen's?

3              MR. RICHMAN:  Yes.

4              THE COURT:  We'll figure out how to work around

5     that.  Thank you.

6          (Recess taken.)

7              THE COURT:  Okay.  Everybody have a seat.  We're

8     back -- everybody back in their place.  Officer, you're

9     still under oath.  All the defendants are here and in their

10    seats, counsel is here.  Mr. Richman, you're up.

11             MR. RICHMAN:  There was an objection just before

12    we broke, but I will withdraw that question.

13             THE COURT:  What was the question?  You'll

14    withdraw that question?

15             MR. RICHMAN:  I'll withdraw that question and ask

16    a different question.

17             THE COURT:  Okay.  We'll see if it generates an

18    objection as well.

19                   CROSS-EXAMINATION (Cont'd)

20    BY MR. RICHMAN:

21    Q.  Sergeant, you testified on direct that you had

22    considered the possibility of surveillance on the property,

23    correct?

24    A.  Yes.

25    Q.  But you decided that that wasn't feasible without being
```

222

1    detected by the people in the backyard, correct?

2    A.  Yes, sir.

3    Q.  Did you have any information that there were people in

4    the backyard other than from the CRI?

5    A.  No.

6    Q.  So you understood that the information from the CRI was

7    current information, correct?

8    A.  Relatively, yes.

9    Q.  This was an ongoing situation, correct?

10   A.  Yes.

11   Q.  And you had reason to believe that when you arrived at

12   the property there would still, from what you had been told,

13   be people in the backyard, correct?

14   A.  Yes.

15   Q.  How much time elapsed between the information that you

16   had received from the CRI and arriving -- the first officers

17   arriving at 1321 Newton Avenue North?

18   A.  I don't know that I could give an exact time, but I

19   would estimate it to be less than an hour.

20   Q.  And during that time did you apply for a search warrant?

21   A.  No.

22   Q.  Or make arrangements for a search warrant to be obtained

23   while you were controlling the property at 1321 Newton?

24   A.  I did not, sir.

25   Q.  Or did anyone?

Biederman - Cross by Richman

1    A.  No, sir.

2    Q.  But you testified that you met with other officers and

3    decided that a marked squad would drive up the alley, is

4    that right?

5    A.  More than one, yes.

6    Q.  And other officers would be at the front of the house,

7    correct?

8    A.  Yes, sir.

9    Q.  And I don't recall, I may have already asked you this

10   question, but other than the information about Tay Tay, did

11   the CRI provide any other information about any other

12   individual?

13   A.  He stated there were other individuals there, but no

14   noteworthy information about any of them other than their

15   physically being present.

16   Q.  And no descriptive information other than black males?

17   A.  Correct.

18   Q.  At the time that you received this information, did you

19   have information about 1321 Newton Avenue North, that

20   address, other than the information you had just received

21   from the CRI?

22   A.  No.

23   Q.  So that was not an address that you knew that you were

24   familiar with?

25   A.  No.  I knew nothing about it, other than the numbers

Biederman - Cross by Richman

1    that he provided me.

2    Q.  And you had no information that that address was

3    associated in any way with gang activity?

4    A.  Correct.

5    Q.  You said that you were in the front of the house, is

6    that right?

7    A.  Yes.

8    Q.  And other officers were in the rear?

9    A.  Correct.

10   Q.  And were you receiving radio transmissions as to the

11   observations that they were making?

12   A.  No.

13   Q.  Well, at some point you became aware that officers had

14   identified or observed someone in the back of the residence

15   who fit the description of Tay Tay, correct?

16   A.  Yes.

17   Q.  Fit both the physical description and he fit the

18   clothing description, correct?

19   A.  Correct.

20   Q.  And were you -- at some point you said that some of the

21   people in the backyard ran toward the front where they

22   surrendered themselves, correct?

23   A.  Yes.

24   Q.  And one of those individuals was the person who matched

25   the description of Tay Tay, correct?

Biederman - Cross by Richman

```
 1    A.  Correct.

 2    Q.  And he subsequently was identified, as you've said, as

 3    Mr. Champion, correct?

 4    A.  Yes, sir.

 5    Q.  And he agreed that he also went by the name Tay Tay,

 6    correct?

 7    A.  That is correct, sir.

 8    Q.  In fact, that was a question that you put to him?

 9    A.  It was.

10    Q.  Were you in a position in the front of the house to see

11    the individuals who ran around the house to the front from

12    the back?

13    A.  At some point, yes.

14    Q.  How many individuals did you see run from the back?

15    A.  At least two.

16    Q.  Were there more than two?

17    A.  I recall seeing two.

18    Q.  And do you know from the other officers how many

19    individuals were observed in the back when the officers

20    first arrived?

21    A.  I don't recall that.

22    Q.  Were you -- did you participate at all in the search at

23    the back of the house?

24    A.  At some point I went to the back of the house to assist

25    in the searching, but I didn't locate anything of note.
```

1    Q.  So you were not the one that located any of the guns,

2    for example?

3    A.  Correct.

4    Q.  The back of the house -- but you did see the layout of

5    the back of the house, is that correct?

6    A.  It is.

7    Q.  And so there is a door from the back of the house that

8    opens on to the backyard, correct?

9    A.  Yes.

10   Q.  And then there is also a front door in the front of the

11   house, correct?

12   A.  Yes, sir.

13   Q.  And in addition to the people who were in the back of

14   the house, there were people who came out of the house into

15   the front, correct?

16   A.  I don't recall how they got out of the house, but there

17   were people that were in the house that at some point came

18   outside.

19   Q.  Okay.  And so when you say that there were, you know,

20   approximately ten individuals, some of those were in the

21   back, some of them in the front and some of them were in the

22   house at the time that the police arrived, correct?

23   A.  Yes, sir.

24   Q.  And all of them were detained at least on the scene and

25   identified, correct?

1    A.  Yes.

2    Q.  So what -- how long would you say that this entire

3    operation at 1321 Newton lasted from the time that the first

4    officer arrived until you left the scene?

5    A.  I could only guess.  I don't recall.

6    Q.  Approximately.

7    A.  If I was going to guess, I would guess somewhere between

8    45 minutes and an hour and a half.

9    Q.  Okay.  So there were a lot of people, so there was a

10   substantial amount of time just going through the process of

11   getting identification from everybody, correct?

12   A.  Trying to identify them took the majority of the time.

13   Q.  And during that time, all of those people were pat

14   searched, correct?

15   A.  Yes.

16   Q.  And detained, at least for that period of time, correct?

17   A.  Correct.

18   Q.  They were all on the ground in front of the house?

19   A.  Or sitting on the stoop.

20   Q.  And was DNA -- DNA swabs collected from everyone?

21   A.  I believe so.

22   Q.  You said that you, in preparation for your testimony

23   today, reviewed not only your own report but the reports of

24   other officers, correct?

25   A.  Yes, sir.

1    Q.  So, for example, Officer Yang prepared a report that he

2    pursued Tay Tay from the back to the front of the house,

3    correct?

4    A.  Yes.

5    Q.  And his partner, Officer McDonald, also pursued Tay Tay,

6    correct?

7    A.  I believe so, yes.

8    Q.  There was also an officer who pursued Mr. Powell,

9    correct?

10    A.  Yes, Isaiah Powell.

11    Q.  Do you know whether any of the officers pursued

12    Mr. Woods?

13    A.  I can't specifically recall.

14    Q.  At the time that the police first arrived, you said that

15    there were four men seated around that plastic cart,

16    correct?

17    A.  Yes.

18    Q.  And the cart had various levels, is that right?

19    A.  Yes, three.

20    Q.  And we saw some photographs, 17-1, I think, which showed

21    that there was a pillow on the lower level, is that right?

22    A.  Yes.

23    Q.  And would you agree that the gun that was recovered was

24    not visible until the pillow was removed?

25    A.  I would agree with that.

Biederman - Cross by Richman

1    Q.  Was heroin found at the property?

2    A.  I don't believe so.

3    Q.  And someone searched Mr. Champion, Tay Tay, correct?

4    A.  Yes.

5    Q.  Did he have any guns or drugs, any contraband on him?

6    A.  I don't believe so, no.

7    Q.  Following this episode at 1321 Newton, did you have

8    further conversations with the CRI about what he had

9    observed?

10   A.  I don't specifically recall any.

11   Q.  If you had, would you have prepared a report about it?

12   A.  It's possible.

13   Q.  There was an individual who had been seated at the

14   table, Mr. Greer, correct?

15   A.  I believe so, yes.

16   Q.  And he remained at the table when the others ran,

17   correct?

18   A.  Yes.

19   Q.  Do you know who detained him?

20   A.  I do not.

21   Q.  And presumably he was also pat searched?

22   A.  Yes.

23   Q.  Do you know whether anything was found on him?

24   A.  I don't recall anything being found on him.

25   Q.  The police on the scene, as you've described, searched

1    the back of the house, correct?

2    A.  Excuse me?

3    Q.  They searched the back of the house?

4    A.  Yes.

5    Q.  The police?  And they searched the van, correct?

6    A.  Yes.

7    Q.  And they searched the house itself, correct?

8    A.  They went in the house and cleared it of people.

9    Q.  And there were no search warrants obtained for any of

10   those searches, correct?

11   A.  That is correct, sir.

12   Q.  The van was subsequently towed into police custody,

13   correct?

14   A.  Yes.

15   Q.  And was a further search and inventory done of the van?

16   A.  When it got to the impound lot?

17   Q.  Yes.

18   A.  No, sir.

19   Q.  Was any forensic analysis done of the van?

20   A.  No, sir.

21   Q.  What was the reason that it was towed?

22   A.  I intended on giving it some thought as to whether or

23   not I would go back and re-search the van more thoroughly

24   and then I decided against that.

25   Q.  And so then was the van then released?

1    A.  I don't recall if the van was released or not.

2    Q.  So it might still be in police custody?

3    A.  It very well may be.

4    Q.  Do you know who the title owner of the van was?

5    A.  No, I have no idea.

6    Q.  In the search of the van or the house or the car, was

7    there anything found connecting Mr. Woods to that property?

8    A.  Not that I recall.

9    Q.  Where in the van were the firearms found?

10   A.  Well, you can picture a cargo van, it has the driver's

11   door and the passenger door up-front, and then behind the

12   passenger door there's the two doors that one would open to

13   get into the back larger compartment of the van, and they

14   were behind that door.

15   Q.  Were they together?

16   A.  Well, they were both in the back of the van, but they

17   weren't physically touching or anything like that.

18   Q.  And all three guns were submitted for forensic analysis,

19   correct?

20   A.  Yes.

21   Q.  Fingerprints, DNA?

22   A.  Yes.

23   Q.  And do you know what the results of that analysis was?

24   A.  I don't have them memorized, although I do know that

25   some DNA came back on some of the guns.

Biederman - Cross by Richman

1    Q.  At the time that Marquis Woods was arrested at the

2    property, you said he was transported away from the property

3    to be interviewed, is that right?

4    A.  With three others, yes.

5    Q.  And then was -- and the three others being Powell,

6    Champion and Greer, correct?

7    A.  That is correct, sir.

8    Q.  And then -- and all three of them -- all four of them

9    were interviewed and then released, is that right?

10   A.  It is.

11   Q.  Prior to this encounter with Mr. Woods, did you have

12   previous knowledge of Mr. Woods?

13   A.  I had no idea who he was.

14   Q.  Did you have any information that he was associated with

15   any gang?

16   A.  No.

17        MR. RICHMAN:  I have nothing further, Your Honor.

18   Thank you, officer.

19        THE COURT:  Anybody else have questions for this

20   officer?

21        MR. PAULSEN:  I have a couple real quick ones.

22        THE COURT:  Okay.  I have some too, so before you

23   go, I'll go.

24        So let me make sure I understand, you had

25   information from an informant and when you drove by people

1    began to scatter.  Was Woods one who scattered?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  And he went from where to where are

4    where?

5              THE WITNESS:  I wasn't the one that drove through

6    the backyard, I was in the front, but when other law

7    enforcement drove through the alley, he ran from the

8    backyard around the house to the front.

9              THE COURT:  Okay.  And you said he was arrested.

10   Did you -- was he arrested for committing any crime?

11             THE WITNESS:  Well, he was not free to leave.

12             THE COURT:  Okay.

13             THE WITNESS:  He was placed into handcuffs so we

14   could investigate the situation.

15             THE COURT:  Okay.  And then you took him

16   downtown -- or took him to the police station to be

17   interviewed?

18             THE WITNESS:  We took him to a police facility at

19   41st and Dupont Avenue North.

20             THE COURT:  But he wasn't charged with any crime?

21             THE WITNESS:  No, he was never charged.

22             THE COURT:  He wasn't booked for anything?

23             THE WITNESS:  No, we never took any of these

24   people to jail.

25             THE COURT:  Did you have probable cause to believe

```
1    he had committed a crime?

2              THE WITNESS:  I believe so.

3              THE COURT:  What crime do you think he committed

4    and what's the evidence of it?

5              THE WITNESS:  Well, there was also cocaine in the

6    back of the car and one of the firearms was stolen.

7              THE COURT:  And you knew that when you arrested

8    him?

9              THE WITNESS:  Yes, we ran the firearms.  And we

10   knew that -- we suspected it to be cocaine.  We didn't have

11   a test.

12             THE COURT:  And those -- the cocaine and the guns

13   all came from the van?

14             THE WITNESS:  One of the guns was from underneath

15   the table where they were playing cards.  Two of the guns

16   and the cocaine were from the van, sir.

17             THE COURT:  Okay.  Mr. Paulsen, you have some more

18   questions?

19             MR. PAULSEN:  Oh, just a few.

20                    REDIRECT EXAMINATION

21   BY MR. PAULSEN:

22   Q.  I guess I didn't ask you this, but was Mr. Woods a

23   convicted felon?

24   A.  I don't know, sir.

25   Q.  Okay.  And you testified about that, we're going to hear
```

Biederman - Redirect

```
 1    about it in a minute from another officer, he had some
 2    marijuana on him?  You testified --
 3    A.  I would have to review the reports.
 4    Q.  Well, we'll call the next witness.  Let me talk -- ask
 5    you about this van.  One of these reports says that the van
 6    was open and unsecured.  Would you agree with that?
 7    A.  Yes, unlocked.
 8    Q.  Okay.  And as far as you know, the van did not belong to
 9    Mr. Woods?
10    A.  I don't believe so.
11    Q.  And Mr. Woods didn't live at 1321 Newton?
12    A.  I don't recall.
13    Q.  Let's see if you've got an address for him on here.
14    Which -- oh, there it is.  It says here Woods, Marquis
15    Deshawn, 4618 Emerson Avenue North?
16    A.  Yes, sir.
17    Q.  So that's the address you had for him as of that date?
18    A.  Yes.
19             MR. PAULSEN:  All right.  Nothing further.
20             THE COURT:  Okay.  Thank you.  You're excused.
21             Before you call your next witness, let me just
22    report.  My chambers has been in touch with Judge Tunheim's
23    chambers.  They expect him to be ready for the change of
24    plea at 4:45.  Tunheim's chambers is going to text my
25    chambers who is going to text my law clerk sitting here in
```

house - Direct

1    the courtroom and then everybody's anticipating that's

2    likely to occur at 4:45.

3                MR. PAULSEN:  Thank you.  Next witness is

4    Sergeant Chris House.

5                THE COURT:  Do you want to come forward and get

6    sworn in, please, sir.

7                THE WITNESS:  Yes, sir.

8          (The witness is sworn.)

9                THE COURT:  Have a seat, state your name and spell

10   your last name for the court reporter, please.

11               THE WITNESS:  Christopher House, H-O-U-S-E.

12                       **DIRECT EXAMINATION**

13   BY MR. PAULSEN:

14   Q.  And are you a sergeant with the Minneapolis Police

15   Department?

16   A.  I am.

17   Q.  For how long?

18   A.  Almost 18 years.

19   Q.  I want to take you back to August 6th of 2014.  Were you

20   part of a police operation out of 1321 Newton?

21   A.  Yes, sir.

22   Q.  And we've heard about it already, so just to get right

23   to it, did you approach from the rear or from the front?

24   A.  From the front.

25   Q.  And did you end up having any contact with defendant

1    Marquis Woods?

2    A.  Yes, sir.

3    Q.  Where did you have contact with him?

4    A.  In the front yard of that address.

5    Q.  Where did he come from, could you tell?

6    A.  From the backyard of that address.

7    Q.  And were you the one that pat searched him?

8    A.  I was.

9    Q.  What did you notice, if anything, about him before you

10   pat searched him?

11   A.  He had been trying to remove something from his front

12   right pant pocket.

13   Q.  And did you go into -- or pat down and go into that

14   pocket?

15   A.  I did.  I could see into the pocket.

16   Q.  What did he have?  What did Mr. Woods have in his pants

17   pocket?

18   A.  Marijuana, cash and a digital scale.

19   Q.  Describe the quantity of the marijuana.  What size was

20   it?

21   A.  Roughly the size of a baseball.

22   Q.  And that was in his pants pocket?

23   A.  Yes, sir.

24   Q.  And you said there was a scale as well?

25   A.  Yes, sir.

House - Direct

1    Q.  And where was that?

2    A.  Same pocket.

3    Q.  And some money?

4    A.  Yes, sir.

5              THE COURT:  That's an awfully big pocket.  You've

6    got a baseball and a scale in the same pocket?

7              THE WITNESS:  Small scale like the size of maybe a

8    wallet.

9              THE COURT:  Okay.

10             MR. PAULSEN:  Okay.

11   BY MR. PAULSEN:

12   Q.  And cash currency, how big of a wad of cash?

13   A.  I don't remember the exact amount, but it was a

14   significant amount.

15   Q.  Do you know whether he was a convicted felon on the day

16   of the arrest?

17   A.  I do not know that.

18             MR. PAULSEN:  All right.  That's all I have for

19   Sergeant House.

20             THE COURT:  Was the money in the same pocket as

21   the scale and the baseball?

22             THE WITNESS:  Yes, sir.

23             MR. SHIAH:  That was my question.

24             THE COURT:  Okay.

25   BY MR. PAULSEN:

house - Direct

1    Q.  When you say "baseball-sized marijuana," was it compact

2    or was it loose or?

3    A.  No, it was fairly compact.

4    Q.  Okay.

5    A.  Compacted, yeah.

6             MR. PAULSEN:  Okay.  Nothing further.

7             THE COURT:  Okay.  Thank you.  Mr. Richman.

8                    **CROSS-EXAMINATION**

9    BY MR. RICHMAN:

10   Q.  Sergeant House, you were assigned to the front perimeter

11   of the house, is that right?

12   A.  Yes, sir.

13   Q.  And you understand that there were other squads

14   approaching from the rear, is that right?

15   A.  Yes, sir.

16   Q.  And were you in radio communication with those officers?

17   A.  Yes, sir.

18   Q.  And so did you know that there were individuals running

19   from the rear to the front before you saw them appear?

20   A.  I don't recall if I heard the radio per se.

21   Q.  But the first that you saw of Mr. Woods was as he was

22   coming around the side of the house toward the front of the

23   house, is that right?

24   A.  Yes, I had been stationed on perimeter and I could see

25   the front and the north side of the house.

1    Q.  And so just as you're facing the house, is the north

2    side the right or the left of the house?

3    A.  On the right as you're facing.

4    Q.  Okay.  So you could see the front and the north side of

5    the house, you said?

6    A.  Correct.

7    Q.  And Mr. Woods came around the north side into the front,

8    correct?

9    A.  Correct.

10   Q.  And was ordered to the ground?

11   A.  Yes, sir.

12   Q.  And he went to the ground, he complied?

13   A.  Eventually, yes.

14   Q.  And did you see anyone else come from that same

15   direction?

16   A.  There was a second party with him.

17   Q.  That was Mr. Powell?

18   A.  Yes, sir.

19   Q.  Who was in the front, Mr. Powell or Mr. Woods?

20   A.  It was Mr. Woods.

21   Q.  And other than those two individuals, did you see anyone

22   else coming around that side of the house?

23   A.  Not that I recall.

24   Q.  There were also individuals coming out of the front door

25   of the house, correct?

1   A.  Eventually, yes.

2   Q.  And in total, when everyone was assembled in the front

3   yard, there were quite a large number of people who were at

4   this gathering, correct?

5   A.  I don't remember an exact number, but there were

6   several.

7   Q.  10 to 12 people?

8   A.  Could be.

9   Q.  And they were all prone on the ground as people

10  were -- as officers were identifying them, correct?

11  A.  No, as we were identifying them, they were sat up and

12  made as comfortable as could be.

13  Q.  On the ground?

14  A.  Yes, sir.

15  Q.  Okay.  And so you pat searched Mr. Woods, correct?

16  A.  Yes, sir.

17  Q.  How was he dressed, do you recall?

18  A.  Long baggy shorts.  They might have even been pants.  As

19  I recall, they were fairly long, pretty loose-fitting,

20  though.  As far as his top, I don't recall.

21  Q.  And you don't recall how much money it was that you

22  seized from him?

23  A.  I don't recall we seized any money from him.

24  Q.  Oh, but you found some money and returned it to him, is

25  that right?

```
 1    A.  Yes.

 2    Q.  And is it -- so all that you seized was the scale and

 3    the marijuana?

 4    A.  Yes, sir.

 5    Q.  Did he have a phone on his person?

 6    A.  Not that I recall.

 7    Q.  Did he have a wallet?

 8    A.  I don't recall.

 9    Q.  In addition to speaking to Mr. Woods, you also

10    interviewed -- or spoke to Mr. Spivey, Rogers, Mills and

11    Bridewell, correct?

12    A.  Yes, sir.

13    Q.  And do you know where they had come from?

14    A.  No, sir.

15    Q.  But they were just on the ground nearby to where

16    Mr. Woods and Mr. Powell were?

17    A.  I don't know if they were brought from somewhere else or

18    I don't know where they came from.

19    Q.  And Mr. Spivey actually lived at that address, correct?

20    A.  I don't know that.

21    Q.  Well, did you get identification from Mr. Spivey?

22    A.  I believe so.

23             MR. PAULSEN:  I'll stipulate that the report says

24    that Spivey lives at 1321 Newton if that's the question.

25             THE COURT:  Does that satisfy --
```

```
 1              MR. RICHMAN:  Yes.  That was the --
 2    BY MR. RICHMAN:
 3    Q.  So if the report indicates that Mr. Spivey lives at 1321
 4    Newton, would you agree that he lived at that same --
 5    A.  Sure.
 6    Q.  -- address where this incident occurred?
 7    A.  Sure.
 8    Q.  And you understood, sir, was it -- you know, from your
 9    observations, this appeared to be some sort of a party or
10    social gathering, correct?
11    A.  Yes, sir.
12    Q.  And so there were a number of people there, male and
13    female, just spending time with each other, correct?
14    A.  Sure.
15    Q.  Throughout the house and the yard, correct?
16    A.  I believe so.
17    Q.  And from the information that you have, you don't know
18    how many people had been in the backyard before the police
19    arrived, correct?
20    A.  Correct.
21    Q.  Or, for that matter, in the van?
22    A.  Correct.
23    Q.  Did you participate in the search of the back portion of
24    the house at all?
25    A.  No, sir.
```

1    Q.  Or the van?

2    A.  No, sir.

3    Q.  But you understood -- you learned at some point that two

4    guns were found in the van and one was found under the table

5    in the backyard, correct?

6    A.  Yes, sir.

7    Q.  And prior to the encounter that you had with Mr. Woods

8    on this day, did you have any previous knowledge of

9    Mr. Woods?

10   A.  I don't know.  Not that that I know of, I guess, at the

11   time.

12   Q.  And you had no information that he was associated with

13   any gang?

14   A.  Me personally, no.

15              MR. RICHMAN:  Thank you, Your Honor.  Nothing

16   further.

17              THE COURT:  Anybody else have questions for this

18   officer?

19              Anything else, Mr. Paulsen?

20              MR. PAULSEN:  Nothing further.

21              THE COURT:  Okay.  Thank you.  You're excused.

22              THE WITNESS:  Thank you, sir.

23              MR. PAULSEN:  Officer Ricardo Muro on the same

24   transaction we just talked about.

25              THE COURT:  Do you want to come forward and get

1    sworn in, please, sir.

2         (The witness is sworn.)

3              THE COURT:  Have a seat and state your name and

4    spell your last name for the court reporter, please.

5              THE WITNESS:  First name is Ricardo.  Last name is

6    Muro, M-U-R-O.

7                         **DIRECT EXAMINATION**

8    BY MR. PAULSEN:

9    Q.  Who do you work for?

10   A.  The City of Minneapolis.

11   Q.  Police officer?

12   A.  Yes, sir.

13   Q.  How long?

14   A.  Approximately 14 years now.

15   Q.  Okay.  I want to take you back to August 6th of 2014.

16   Did you have contact with Mr. Marquis Woods that day?

17   A.  Yes, I did.

18   Q.  Where was that contact?

19   A.  It was at the what we call SOC, Special Operations

20   Center, and located 4119 Dupont Avenue North.

21   Q.  In north Minneapolis?

22   A.  Yes, sir.

23   Q.  And just to quickly, were you interested in getting a

24   DNA sample from him?

25   A.  Yes, I was.

Muir - Direct

1    Q.  And did you ask him whether he would consent to do so?

2    A.  Yes, I did.

3    Q.  Did he consent?

4    A.  Yes, he did.

5    Q.  Did you threaten him or promise him anything to get him

6    to consent?

7    A.  No.

8    Q.  Was the consent voluntary?

9    A.  Yes, it was.

10   Q.  And did you then get a DNA swab from him?

11   A.  Yes, I did.

12          MR. PAULSEN:  Nothing further.

13                      **CROSS-EXAMINATION**

14   BY MR. RICHMAN:

15   Q.  Had you been present during the police operation at 1321

16   Newton Avenue North?

17   A.  I got there -- I guess I got there at the end.  When I

18   got there, everybody had been in custody or I was basically

19   there for five minutes.

20   Q.  And then were you instructed to go and interview the

21   four suspects?

22   A.  Yes, sir.

23   Q.  Because in -- and you did that at the Special Operations

24   Center, is that right?

25   A.  Yes, sir.

1    Q.  Had you -- did you transport Mr. Woods to the Special

2    Operations Center?

3    A.  No, I did not.

4    Q.  He was already there?

5    A.  By the time I arrived, yes.

6    Q.  But and some other officer transported him there?

7    A.  Yes, sir.

8    Q.  And you interviewed Mr. Woods as well as Mr. Powell,

9    Champion and Greer, correct?

10   A.  Yes, sir.

11   Q.  And did you record the interview that you conducted with

12   Mr. Woods?

13   A.  Yes, I did.

14   Q.  And at the same time as this interview you asked

15   Mr. Woods to agree to the collection of a DNA sample from

16   cheek cell scrape, correct?

17   A.  Correct.

18   Q.  And the interview related to the guns that were located

19   at the property, correct?

20   A.  Correct.

21   Q.  And so he understood that you wanted a DNA sample in

22   order to try to connect him through DNA to possession of

23   these guns, correct?

24   A.  Correct.

25   Q.  And he had no problem with giving you a DNA swab,

1    correct?

2    A.  That's correct.

3    Q.  In your interview with Mr. Woods, did he explain to you

4    that he was there for a social gathering?

5    A.  Yes, sir.

6              MR. RICHMAN:  I have nothing further, Your Honor,

7    but I have not yet received a copy of this recorded

8    interview.  The government has indicated in its responsive

9    pleading that it doesn't intend to introduce the interview

10   itself at trial so suppression of that statement is not at

11   issue, but to the extent that it is relevant, the content of

12   the interview is relevant to any of the other motions, I

13   reserve the right to recall any of these officers once I've

14   had an opportunity to review the content of that statement.

15             THE COURT:  What's the status of the --

16             MR. PAULSEN:  We just discussed this today, and as

17   soon as I get the Scales tape, I will turn it over.

18             THE COURT:  Okay.

19             MR. PAULSEN:  I didn't know it was an issue until

20   now.

21             THE COURT:  Okay.

22             MR. RICHMAN:  Thank you, Your Honor.

23             THE COURT:  Thank you.  Anybody else have

24   questions for this witness?

25             Any redirect, Mr. Paulsen?

Coleman - Direct

```
1              MR. PAULSEN:  No, Your Honor.
2              THE COURT:  Okay.  Thank you.  You're excused.
3              THE WITNESS:  Thank you.
4         (The witness is sworn.)
5              THE COURT:  Have a seat, please state your name
6    and spell your last name for the court reporter, please.
7              THE WITNESS:  My name is Michael Coleman,
8    C-O-L-E-M-A-N.
9              MR. PAULSEN:  And, Your Honor, as just a heads up,
10   this goes to overt acts 10 and 11 in the Indictment and
11   relates to Mr. Bender, and it occurred on February 1st of
12   2013.  It's going to be a vehicle stop and recovery of a
13   gun.
14             THE COURT:  Okay.
15                      DIRECT EXAMINATION
16   BY MR. PAULSEN:
17   Q.  Investigator Coleman, who do you work for?
18   A.  The city of Brooklyn Center, Minnesota, Hennepin County.
19   Q.  Okay.  And how long have you been a police officer?
20   A.  Almost nine years.
21   Q.  I want to take you back to February 1st of 2013.  Were
22   you investigating an aggravated robbery that had occurred I
23   think it was about a week prior to that?
24   A.  Correct.  There were -- there were a couple that were
25   involved.
```

1    Q.  Okay.  The one I'm talking about is the so-called

2    Craigslist robbery?

3    A.  Yes, correct.

4    Q.  All right.  When did that Craigslist robbery occur?

5    A.  There was one on January 25th.

6    Q.  And is that the one where Mr. Combs ended up being the

7    victim?

8    A.  I'm not sure of the victim's name in that incident.

9            THE COURT:  All right.  January 25th of what year

10   are we talking about?

11           THE WITNESS:  2013.

12           THE COURT:  Okay.

13   BY MR. PAULSEN:

14   Q.  Anyway, what was your understanding of what had

15   happened?

16   A.  That the victim had responded to an ad on Craigslist

17   inquiring about the sale of an iPhone.  The victim met with

18   the supposed seller of that iPhone and was robbed.

19   Q.  Okay.  So the victim was coming to buy an iPhone that he

20   had seen advertised on Craigslist?

21   A.  Correct.

22   Q.  And when they went to the -- I think the victim had

23   someone else in the car with him maybe?

24   A.  Yes.

25   Q.  And when they arrived at the meet spot, the person got

1    robbed of the money he was going to use to buy the iPhone?

2    A.  Yes.

3    Q.  So you were investigating that robbery.  And had you

4    focussed on a particular suspect by the time of this

5    February 1, 2013, incident?

6    A.  Yes, I had.

7    Q.  And who was the first original suspect?

8    A.  That individual was Montel Johnson.

9    Q.  And how had Montel Johnson become a suspect?

10   A.  He was listed as a suspect in a previous robbery in the

11   city of Brooklyn Center that occurred on January 7th of

12   2013.  In regards to this Craigslist ad, the phone number

13   that was associated to the posting was one that was known to

14   be used by Montel Johnson.

15   Q.  So the Craigslist ad offering the phone for sale had a

16   phone number to be called, which is how the victim got ahold

17   of the person, and that phone number comes back to Montel

18   Johnson?

19   A.  Yes.

20   Q.  All right.  So he is a suspect.  Was anything done in

21   kind of an undercover capacity on February 1, 2013, to

22   advance the investigation?

23   A.  It was done, it was on January 31st, the day before.

24   Q.  Oh, good.  The day before.  Okay.  What was done?

25   A.  An undercover officer placed a phone call to the number

Coleman - Direct

```
 1    that was posted on the Craigslist ad, presumably Montel
 2    Johnson's phone number, inquiring about the sale of the
 3    phone, wishing to purchase the iPhone.
 4    Q.  So the ad was still up, in other words?
 5    A.  Correct.
 6    Q.  And it was the same phone number as in the previous
 7    victimized situation?
 8    A.  Yes.
 9    Q.  So the undercover called the number, talked to somebody.
10    And was there an agreed upon meet spot to come and buy the
11    phone?
12    A.  Yes, there was a Walgreen's business located near 43rd
13    Avenue and Chicago Avenue South in Minneapolis.
14    Q.  And did you and fellow officers suspect that maybe the
15    same thing was going to happen as happened to the previous
16    victim?
17    A.  Yes.
18    Q.  So what did you do?
19    A.  We conducted surveillance at a location Montel was said
20    to be at.  He had -- Montel had previous contact or
21    communication with his probation officer on that date.  He
22    provided her an address that he was at, so we conducted
23    surveillance of that address.  Shortly after the phone call
24    was placed, the undercover officer maintained communication
25    with a male on the other side -- on the other line, and
```

Coleman - Direct

1    shortly thereafter a vehicle had pulled up to that address,

2    and undercover officers maintained surveillance as they left

3    that area.

4    Q.  So just so I'm clear, this Montel Johnson was on

5    probation?

6    A.  Correct.

7    Q.  And did the probation officer confirm that that was

8    Johnson's phone number, the Craigslist number?

9    A.  Yeah, his probation officer had talked to him by phone

10   and said that had he called her from that phone number on

11   that day.

12   Q.  All right.  So now you've got a meeting where the

13   undercover is supposed to go meet with the person who you

14   set up the deal with?

15   A.  Correct.

16   Q.  And rather than actually -- well, did you see a vehicle

17   arrive at the appointed meet spot?

18   A.  There was a vehicle that arrived that picked up an

19   individual from the location that we were conducting

20   surveillance at that was a white Chevrolet Malibu.  We

21   followed that vehicle to the area of the Walgreen's.

22   Q.  So now there's two people in the car?

23   A.  There's a female driver, a front seat male passenger and

24   then a back seat male passenger that was picked up from the

25   previous location.

Coleman - Direct

1    Q.  So is this the suspect vehicle now?

2    A.  We're thinking so, yes.

3    Q.  And was there anything done to confirm that this is

4    the -- the suspects were in this vehicle?

5    A.  While we were conducting surveillance of the vehicle,

6    the undercover officer again was maintaining communication.

7    Officers that were following that vehicle had related to us

8    that when we indicated that the phone call was being placed

9    to the Craigslist ad or the person that the undercover

10   officer had spoken to that an individual in the back seat of

11   that vehicle was seen picking up the phone and talking on

12   the phone.

13   Q.  Okay.  So that matched up.  And then the suspect vehicle

14   went to the appointed location?

15   A.  Yes.

16   Q.  And rather than send the undercover officer in, did you

17   do something else with respect to the car?

18   A.  What's that?

19   Q.  Did you just stop the car without sending the undercover

20   person in to meet with them?

21   A.  Yeah, the undercover officer did not meet with them.

22   Q.  So did you have some marked squads --

23   A.  There was one marked squad that was assisting us.  The

24   rest of us were in plain clothes wearing raid vests that

25   either said "sheriff" or "police" on them.

Coleman - Direct

```
1    Q.  All right.  So who turned out to be in this car?

2    A.  The driver was identified as, she was an adult female,

3    as Lashunda Roberts, the front seat passenger was identified

4    as Tywin Bender and the back seat passenger was identified

5    as Montel Johnson.

6    Q.  And whose car was this?

7    A.  Lashunda Roberts, the driver.

8    Q.  Were the suspects removed from the vehicle?

9    A.  Yes.

10   Q.  And was there anything found during the search of the

11   vehicle?

12   A.  Under the front passenger seat was a loaded firearm.

13   Q.  And who had been sitting in the front passenger side?

14   A.  Tywin Bender.

15   Q.  And did that gun turn out to be a stolen gun?

16   A.  It did.

17   Q.  Smith & Wesson .40-caliber?

18   A.  Correct.

19   Q.  And was Mr. Bender arrested that day?

20   A.  He was.

21   Q.  For what?

22   A.  Aggravated robbery and prohibited person in possession

23   of a firearm.

24   Q.  So he was a felon?

25   A.  Correct.
```

```
 1            MR. PAULSEN:  No further questions for this
 2     witness.  Oh, the search warrants.  Are we challenging the
 3     search warrants?
 4            MR. ENGH:  Yeah.
 5            MR. PAULSEN:  Your Honor, there was a search
 6     warrant obtained soon thereafter, February -- same day, I
 7     guess, February 1st, for a buccal swab from Tywin Bender,
 8     and I guess that is being challenged, so I'll offer
 9     Government Exhibit 6.
10            MR. ENGH:  No objection to this hearing.
11            THE COURT:  Exhibit 6 will be received.
12         (Government Exhibit No. 6 s received.)
13            MR. PAULSEN:  And there will be another witness on
14     a photo spread issue, so we won't go into that right now.
15            THE COURT:  Okay.  Mr. Engh, do you have
16     questions?
17            MR. ENGH:  Thank you.
18                        CROSS-EXAMINATION
19     BY MR. ENGH:
20     Q.  Is it Investigator Coleman?
21     A.  Sergeant.
22     Q.  Sergeant, I'm sorry.
23     A.  Investigator at the time.  That's okay.
24     Q.  My name is Paul Engh.  I have a few questions for you on
25     behalf of Mr. Bender.
```

1    A.  Sure.

2    Q.  Your initial suspect in the Craigslist robberies was

3    Montel Johnson, isn't that correct?

4    A.  Correct.

5    Q.  It was his phone that was used in connection with the

6    Craigslist ads?

7    A.  Correct.

8    Q.  And he was the individual on probation that you were

9    under -- that you had under surveillance, is that correct?

10   A.  Yes.

11   Q.  In fact, in addition to the surveillance you talked

12   about, you watched him go to and from the courthouse to see

13   his probation officer, is that correct?

14   A.  I don't believe we ever watched Mr. Johnson come from

15   the courthouse.

16   Q.  You were aware that he had been there, correct?

17   A.  His -- sorry, his probation office was actually a

18   residence.  It wasn't physically downtown so.

19   Q.  I see.  Okay.  So what occurred here is that a singular

20   telephone was used and that was Mr. Johnson's, right?

21   A.  Correct.

22   Q.  You have no evidence that Mr. Bender's phone, if he had

23   one, was used in this Craigslist robbery scheme, is that

24   correct?

25   A.  Correct.

1    Q.  And an undercover officer began speaking to the phone

2    number and soon learned that he was speaking to Mr. Johnson,

3    isn't that correct?

4    A.  A male.

5    Q.  Do you have any reason to say or to believe that the

6    undercover officer was speaking to Mr. Bender?

7    A.  I can't say one way or the other.

8    Q.  You can't tell either way, is that right?

9    A.  No.

10   Q.  There was a Facebook entry mentioned in your police

11   report which was owned by Mr. Johnson, is that correct?

12   A.  Correct.

13   Q.  And it indicates that the victim was contacted by

14   Mr. Johnson via Mr. Johnson's Facebook account, is that

15   right?

16   A.  That's regarding a robbery on January 7th.

17   Q.  And that's the one earlier in Brooklyn Center, is that

18   correct?

19   A.  Correct.

20   Q.  And Mr. Johnson was the named suspect in that robbery as

21   well, correct?

22   A.  Correct.

23   Q.  Mr. Bender, by contrast, was not named as the suspect in

24   the Brooklyn Center robbery you've just mentioned, am I

25   right?

1    A.  No, he was not.

2    Q.  So what occurred here is that you planned to make an

3    arrest under the pretense that an officer was going to go

4    and buy one of these cell phones, is that right?

5    A.  Right.

6    Q.  And he was going to pay 400 or $500 in cash which was

7    occurring under these Craigslist robberies, is that correct?

8    A.  Correct.

9    Q.  Okay.  And the car itself was a Chevrolet Malibu?

10   A.  Yes.

11   Q.  Or a Chevrolet passenger car, I should say?

12   A.  Yes, that's correct.

13   Q.  And that was followed eventually to the 43rd and Chicago

14   area in south Minneapolis, am I right about that?

15   A.  Yes, you are.

16   Q.  And by the time it got to 43rd and Chicago, you could

17   tell that there were individuals in the car, right?

18   A.  Correct.

19   Q.  And at one point a phone call was made into the car or

20   at least someone answered a phone in the car, isn't that

21   correct?

22   A.  Correct.

23   Q.  And the person who answered the phone in the car was in

24   the back seat , correct?

25   A.  Correct.

1    Q.  Mr. Bender, by contrast, was in the front seat, am I

2    right?

3    A.  Right.

4    Q.  And you know now that the individual who answered the

5    phone in the back seat was Mr. Johnson himself?

6    A.  Correct.

7    Q.  Fair?  In fact, when the car was driving and under

8    surveillance, you did not know that Mr. Bender himself was

9    in the car, fair?

10   A.  No, I did not.

11   Q.  Did you have identification of Mr. Johnson in the car by

12   contrast?

13   A.  No, we did not.

14   Q.  You didn't really know who was in the car?

15   A.  Correct.

16   Q.  You had a good suspicion, though, it was Mr. Johnson,

17   fair?

18   A.  Fair.

19   Q.  Had you met him before, Mr. Johnson?

20   A.  No.

21   Q.  And you had not met Mr. Bender before either, right?

22   A.  No, I was aware of both of those individuals and who

23   they are.

24   Q.  Okay.  And then what had occurred is that the car was

25   stopped, is that right?

1    A.  Correct.

2    Q.  And the individuals ordered out of the car?

3    A.  Correct.

4    Q.  And your basis for arresting Mr. Bender is that he was

5    in the front seat of the car, is that correct?

6    A.  Yes, he was in the front seat.

7    Q.  But you have no evidence as you sit here today

8    that -- or at the time of your arrest, I should say, that

9    Mr. Bender was ever on the phone or negotiated for the sale

10   of this cell phone or iPhone, is that correct?

11   A.  No, he did not, no.

12   Q.  So he was taken out of the front passenger seat and

13   arrested immediately, right?

14           THE COURT:  Let me interrupt for a minute,

15   Mr. Engh, because I've just received word that Judge Tunheim

16   is summoning your colleagues, and I have no control over

17   that.

18           MR. ENGH:  All right.

19           THE COURT:  So we're going to break.  How long,

20   this is a change of plea?

21           MR. PAULSEN:  Yes.  I think it's about 45 minutes.

22           THE COURT:  All right.  Let's break.  Here's your

23   choice, gentlemen and ladies.  We can reconvene tomorrow

24   morning at 8:30 -- how long do you think it's going to take

25   to finish this whole thing up, Mr. Paulsen?  More than two

1      hours?

2              MR. PAULSEN:  I've got five -- I've got four

3      witnesses left.

4              THE COURT:  Is it going to take more than two

5      hours?

6              MR. PAULSEN:  Well, most of them relate to

7      Mr. Birrell's client so.

8              MR. BIRRELL:  It could easily take two hours.

9              THE COURT:  All right.  Well, our choices are two

10     hours in the morning from 8:30 to 10:30 or we reconvene on

11     Friday at 10 o'clock and we have the rest of the day, so I

12     guess I'm just going to give up on trying to negotiate and

13     say we're going to schedule this for 10 o'clock on Friday.

14             MR. PAULSEN:  Oh, you want to do it 10 o'clock

15     Friday?

16             THE COURT:  That gives us the rest of the day.

17             MR. SHIAH:  I have a problem with that, something

18     that has been continued before, and I'm supposed to be up in

19     Mille Lacs on Friday, Judge.

20             I have a problem tomorrow too, but I missed the

21     conference call today with another judge but they said they

22     could hear me tomorrow at 9 o'clock.  That's probably only

23     going to take ten minutes.  So I'd just as soon start

24     tomorrow and if I have to be excused or have someone cover

25     me for ten minutes.

1          Mr. Catchings, I'll talk to you about that.  I may

2     have to step out tomorrow just to make a phone call to

3     another judge on another case, but we'll discuss it, okay?

4          DEFENDANT CATCHINGS:  All right.

5          MR. BRUDER:  Your Honor, I'm simply unavailable

6     tomorrow.  I have oral argument in front of the Court of

7     Appeals tomorrow morning.

8          MR. PLUNKETT:  I have court appearances at 8:30

9     also tomorrow morning.

10          THE COURT:  All right.  Well, here's what we're

11     going to do now.  We're going to recess now.  The defendants

12     that are in custody will be remanded to the custody of the

13     marshal.  You're still under oath.  I'm going to go talk to

14     my staff.  All of the lawyers come back to chambers except

15     for Mr. Paulsen and Mr. Richman who have to be upstairs

16     before Judge Tunheim.

17          What is your availability, Mr. Paulsen?  Do you

18     have any --

19          MR. PAULSEN:  Tomorrow is -- tomorrow is fine for

20     me all day long but --

21          THE COURT:  What about Friday?

22          MR. PAULSEN:  Friday is not as good.  I'll have to

23     rearrange several things.  I have a trial next week.

24          THE COURT:  And Mr. Richman, your availability for

25     tomorrow and Friday?

1          MR. RICHMAN:  I'm available both times, Your

2     Honor.

3          And in addition to the time for the witnesses,

4     I -- there are some other motions that I would like an

5     opportunity to be heard on.

6          THE COURT:  All right.  All the other lawyers meet

7     me in chambers.  And we're in recess.

8          (Proceedings concluded at 4:43 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2    GOVERNMENT WITNESSES:                                    PAGE

3         Officer George Peltz
             Direct Examination by Mr. Paulsen          12
4            Cross Examination by Ms. Zinsmaster        19
             Redirect Examination by Mr. Paulsen        25
5
          Detective Andrew Suerth
6            Direct Examination by Mr. Paulsen          28
             Cross-Examination by Mr. Couillard         36
7            Redirect Examination by Mr. Paulsen        44

8         Deputy Timothy Inglett
             Direct Examination by Mr. Paulsen          48
9            Cross-Examination by Mr. Zayed             50

10        Officer Matt Brost
             Direct Examination by Mr. Paulsen          58
11           Cross-Examination by Mr. Wold              65
             Redirect Examination by Mr. Paulsen        71
12
          Officer Jeffrey Hagen
13           Direct Examination by Mr. Paulsen          75
             Cross-Examination by Mr. Wold              79
14
          Officer Rian Jensen
15           Direct Examination by Mr. Paulsen          87
             Cross-Examination by Mr. Shiah             98
16           Cross-Examination by Mr. Birrell          109
             Redirect Examination by Mr. Paulsen       120
17           Recross-Examination by Mr. Shiah          123
             Examination by the Court                  129
18           Recross-Examination by Mr. Shiah          131
             Redirect Examination by Mr. Paulsen       132
19
          Detective Erik Fleck
20           Direct Examination by Mr. Paulsen         133
             Cross-Examination by Mr. Birrell          138
21
          Officer Justin Merten
22           Direct Examination by Mr. Paulsen         150
             Cross-Examination by Mr. Goetz            161
23           Cross-Examination by Mr. Wold             176

24

25

1                        **I N D E X**   (Cont.)

2       GOVERNMENT WITNESSES:                              PAGE

3           Sergeant Rich Straka
                Direct Examination by Mr. Paulsen        180
4               Cross-Examination by Mr. Goetz           184
                Redirect Examination by Mr. Paulsen      189

5
            Officer Daniel Ledman
6               Direct Examination by Mr. Paulsen        190
                Cross-Examination by Mr. Birrell         196
7               Redirect Examination by Mr. Paulsen      208

8           Sergeant John Biederman
                Direct Examination by Mr. Paulsen        209
9               Cross-Examination by Mr. Richman         215
                Redirect Examination by Mr. Paulsen      234

10
            Sergeant Chris House
11              Direct Examination by Mr. Paulsen        236
                Cross-Examination by Mr. Richman         239

12
            Officer Ricardo Muro
13              Direct Examination by Mr. Paulsen        245
                Cross-Examination by Mr. Richman         246

14
            Sergeant Michael Coleman
15              Direct Examination by Mr. Paulsen        249
                Cross-Examination by Mr. Engh            256

16

17

18

19

20

21

22

23

24

25

1              **I N D E X**   (Cont.)

2     GOVERNMENT EXHIBITS:                                    REC'D

3     1                                                       30
      2                                                       34
4     4                                                       45
      5                                                       47
5     6                                                       256
      8                                                       64
6     10                                                      93
      11                                                      95
7     17-1                                                    213
      17-2                                                    213
8     17-3                                                    213
      18                                                      138
9     22                                                      13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2              I, Staci A. Heichert, certify that the foregoing is

3      a correct transcript from the record of proceedings in the

4      above-entitled matter.

5

6                  Certified by:   *s/ Staci A. Heichert*

7                                   Staci A. Heichert,
                                     RDR, CRR, CBC, CCP
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25